**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**


**ROBERT F. KENNEDY, JR. ET AL.**　　　**CIVIL ACTION NO. 3:23-cv-00381**


**VERSUS**　　　**JUDGE:  TERRY A. DOUGHTY**


**JOSEPH R. BIDEN ET AL.**　　　**MAG. JUDGE: KAYLA D. MCCLUSKY**


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM IN SUPPORT OF MOTION**
**FOR PRELIMINARY INJUNCTION**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1

## **TABLE OF CONTENTS**

TABLE OF CONTENTS...............................................................................................i

TABLE OF AUTHORITIES .......................................................................................ii

INTRODUCTION ......................................................................................................1

I.  THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION.........................................2

   A.  Factual Statement............................................................................................ 2

   B.  Injunctive Relief Requested ........................................................................... 2

   C.  Legal Standard for Grant of Preliminary Injunction....................................... 5

   D.  Plaintiffs' Free Speech Claim is Extremely Likely to Succeed on the Merits ..................... 6

       1.  Under controlling Supreme Court authority, the government's censorship campaign is unconstitutional in its entirety, including communications that do not coerce or meet any other state action test. ......................................................................... 7

       2.  The state action tests such as coercion and joint action are also inapplicable here because the government's censorship campaign is overtly viewpoint-discriminatory...................... 10

       3.  To the extent that state action tests are relevant here, Supreme Court authority dictates that the statutory immunity granted by Section 230 weighs heavily in favor of a finding that the state action line has been crossed. ................................................................. 12

   E.  The Other, Equitable Criteria are Established as a Matter of Law ....................................... 13

   F.  Necessity of Preliminary Injunctive Relief ........................................................................ 14

   G.  Plaintiff CHD Has Rock-Solid Standing To Assert the First Amendment Right of Social Media Users To Receive Information and Ideas ..................................................................... 16

CONCLUSION.............................................................................................................17

CERTIFICATE OF SERVICE .....................................................................................19

# TABLE OF AUTHORITIES

**Cases**

*Am. C.L. Union of Ohio Found., Inc. v. Ashbrook,*
   375 F.3d 484 (6th Cir. 2004) ................................................................ 4

*Associated Press v. United States,*
   326 U.S. 1 (1945) ................................................................................ 17

*Biden v. Knight First Amend. Inst. at Columbia Univ.,*
   141 S. Ct. 1220 (2021) .......................................................................... 8

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,*
   531 U.S. 288 (2001) ............................................................................... 6

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.,*
   17 F.4th 604 (5th Cir. 2021) ............................................................... 14

*CBS, Inc. v. FCC,*
   453 U.S. 367 (1981) ............................................................................. 17

*Columbia Broad. Sys., Inc. v. Democratic Nat. Comm.,*
   412 U.S. 94 (1973) ................................................................................ 4

*Davis v. East Baton Rouge Parish School Bd.,*
   78 F.3d 920 (5th Cir. 1996) ................................................................ 16

*Garcetti v. Ceballos,*
   547 U.S. 410 (2006) ............................................................................... 3

*Harrison v. Young,*
   48 F.4th 331 (5th Cir. 2022) ................................................................. 6

*Iancu v. Brunetti,*
   139 S. Ct. 2294 (2019) ........................................................................ 11

*Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.,*
   88 F.3d 274 (5th Cir. 1996) ................................................................ 13

*Kass v. City of New York,*
   864 F.3d 200 (2d Cir. 2017) ............................................................... 16

*Legal Servs. Corp. v. Velazquez,*
   531 U.S. 533 (2001) ............................................................................. 11

*NAACP v. Hunt,*
   891 F.2d 1555 (11th Cir. 1990) ............................................................ 4

*Norwood v. Harrison,*
    413 U.S. 455 (1973) ........................................................................... 7, 9, 10

*O'Handley v. Weber,*
    __ F.4th ____, No. 22-15071, 2023 U.S. App. LEXIS 57291145 (9th. Cir. Mar. 10, 2023) ..... 9

*Opulent Life Church v. City of Holly Springs, Miss.,*
    697 F.3d 279 (5th Cir. 2012) ........................................................................ 14

*Pleasant Grove City, Utah v. Summum,*
    555 U.S. 460 (2009) ..................................................................................... 4

*Prantil v. Arkema, Inc.,*
    986 F.3d 570 (5th Cir. 2021) ......................................................................... 2

*Pruitt v. Pernell,*
    360 F. Supp. 2d 738 (E.D.N.C. 2005) .......................................................... 10

*Richard v. City of Harahan,*
    6 F. Supp. 2d 565 (E.D. La. 1998) ................................................................ 9

*Santa Fe Indep. Sch. Dist. v. Doe,*
    530 U.S. 290 (2000) ..................................................................................... 4

*Skinner v. Ry. Lab. Executives' Ass'n,*
    489 U.S. 602 (1989) ................................................................................... 12

*Specht v. Jensen,*
    832 F.2d 1516 (10th Cir. 1987) ..................................................................... 9

*Texas Div., Sons of Confederate Veterans, Inc. v. Vandergriff,*
    759 F.3d 388 (5th Cir. 2014) ......................................................................... 4

*United States v. Davis,*
    482 F.2d 893 (9th Cir. 1973) ......................................................................... 8

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976) ................................................................................... 16

*Vista-Graphics, Inc. v. Virginia Dep't of Transportation,*
    682 F. App'x 231 (4th Cir. 2017) ................................................................... 5

*Watts v. Northside Indep. Sch. Dist.,*
    37 F.4th 1094 (5th Cir. 2022) ........................................................................ 7

**Statutes and Bills**

47 U.S.C. § 230(c)(2)(A) ........................................................................................... 12, 13

**Other Authorities**

Jake Gibson & Adam Sabes, *FBI responds to Twitter Files disclosures, says it didn't request 'any action' on specific tweets*, FOX News (Dec. 21, 2022).................................................. 14

Kelly Hooper, *Mayorkas cites misinformation about Homeland Security's disinformation board*, Politico (Aug. 5, 2022) ........................................................................................... 14

Pls. Mot. Prelim. Inj., *Missouri v. Biden*, No. 3:22-cv-01213, 2023 U.S. Dist. LEXIS 46918 (W.D. La.), ECF No. 10.............................................................................................. 3

Pls. Proposed Findings of Fact, *Missouri v. Biden*, No. 3:22-cv-01213, 2023 U.S. Dist. LEXIS 46918 (W.D. La), ECF No. 214-1 ................................................................ 6, 12, 13

The White House, *Press Briefing by Press Secretary Jen Psaki*, April 25, 2022 ........................ 12

U.S. House of Representatives, Committee on the Judiciary, *The Weaponization of the Federal Trade Commission: An Agency's Overreach To Harass Elon Musk's Twitter*, Mar. 7, 2023 . 14

Zolan Kanno-Youngs & Cecilia Kang, *They're Killing People: Biden Denounces Social Media for Virus Disinformation*, N.Y. Times (July 16, 2021)............................................................ 12

## MEMORANDUM IN SUPPORT OF MOTION
## FOR PRELIMINARY INJUNCTION

### INTRODUCTION

This lawsuit challenges the Federal Government's massive, multi-agency, ongoing campaign to induce social-media companies to censor protected speech. The Court is well aware of the background facts and law, having recently issued a lengthy, detailed, closely-reasoned opinion rejecting almost entirely the Government's attempt to dismiss a related case. *See Missouri v. Biden*, No. 3:22-cv-01213, 2023 U.S. Dist. LEXIS 46918 (W.D. La. Mar. 20, 2023). Indeed, it is only because this Court permitted limited discovery in *Missouri* that the astonishing magnitude of the Government's censorship campaign has now been revealed.

Plaintiffs are mindful that the Court has deferred their consolidation motion, that a parallel preliminary injunction motion is pending in *Missouri*, and that judicial resources are limited. Accordingly, in this motion, Plaintiffs seek no new discovery and submit no new evidence, but *only*: (1) propose a ***narrower injunction*** than that asked for by the *Missouri* plaintiffs; and (2) seek to ***clarify the applicable legal tests***.

<u>Narrower injunction</u>. The *Missouri* plaintiffs have asked the Court to enjoin Defendants from taking "any steps" to urge or otherwise induce social-media companies to censor any "content." (*See* Point I(B) *infra*.) Defendants will undoubtedly object that such an order would (a) violate their own First Amendment rights to express their views; and (b) prevent them from taking action against genuinely criminal online content. To avoid these defense arguments, Plaintiffs here offer the Court an alternative: enjoining Defendants from engaging, ***pursuant to their official duties***, in ***private communications with social media companies*** with the purpose of inducing those companies censor ***constitutionally protected*** speech. This narrower injunction will completely answer both objections, insulating the Court's order from challenge. (*See id.*)

1

Applicable Legal Tests. Although evidence already before the Court in *Missouri* proves otherwise, Defendants are certain to argue that they never engaged in coercion of, or joint action with, social media companies sufficient to turn those companies into state actors.  But as Plaintiffs will show below, ***state action doctrine does not govern this case***.  On the contrary, under clear and controlling Supreme Court authority, Defendants act unconstitutionally every time they privately communicate with social-media companies with the purpose of inducing, encouraging, or promoting censorship of protected speech, ***even when those communications do not coerce or collude or satisfy any other state action test***. (*See* Point I(D)(1) *infra*.)

Plaintiffs hope that these small but critical additional points will assist the Court in its deliberations while imposing virtually no new burdens on any party.

## I.  THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION

### A.      Factual Statement

In the interest of judicial economy and of avoiding any delay, Plaintiffs here neither seek new discovery nor submit new evidence of the Government's censorship campaign. Instead, this Motion is based on facts already before the Court in *Missouri v. Biden*, and those facts will not be repeated here.  They are powerfully summarized and evidenced in the *Missouri* plaintiffs' preliminary injunction briefs and proposed findings of fact, together with the copious exhibits thereto, all of which are incorporated herein by reference.

### B.      Injunctive Relief Requested

Critically, however, Plaintiffs here propose **a different, more narrowly-framed preliminary injunction** than the one sought by the *Missouri* plaintiffs.  The Fifth Circuit is well-known to put a premium on the specificity of proposed injunctive relief in cases like this.  *Cf.,  e.g.*, *Prantil v. Arkema, Inc*., 986 F.3d 570, 580-81 (5th Cir. 2021) (reversing class certification

where proposed injunction insufficiently "specific").   The narrower injunction proposed by Plaintiffs will strengthen the authority and legality of any preliminary relief the Court may order, both: (1) by satisfying the Fifth Circuit's specificity requirement and, equally important, (2) by obviating certain important arguments Defendants are virtually certain to make.

The *Missouri* Plaintiffs have asked this Court to preliminarily enjoin Defendants from "taking any steps to demand, urge, pressure, or otherwise induce any social-media company . . . to censor . . . content."  Pls. Mot. Prelim. Inj., *Missouri v. Biden*, No. 3:22-cv-01213 (W.D. La.), ECF No. 10, at 2. That request is logical, but Defendants will without doubt argue that such an order would: (a) violate their own First Amendment rights to express their views and opinions; and (b) prevent the Government from alerting social media companies to the existence of genuinely criminal online content and asking those companies to remove such content.

Whatever the ultimate merits of such defense arguments, the Court can at this stage of the proceedings issue a narrower injunction avoiding them entirely. Specifically, Plaintiffs ask the Court to preliminarily enjoin Defendants from ***engaging, <u>pursuant to their official duties</u>, in <u>private communications</u> with any social media company with the purpose of inducing, encouraging, or promoting the censorship of <u>constitutionally protected</u> speech.***

This narrower preliminary injunction will, first of all, obviate any claim that the Court is entrenching on Defendants' free speech rights.  When governmental agents, pursuant to their official duties, in private communications with social media companies, they are ***not*** engaging in protected First Amendment speech.  "[W]hen public employees ***make statements pursuant to their official duties***, the employees are ***not speaking as citizens for First Amendment purposes***."  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) (emphasis added). Rather, they are engaging in ***government speech***, and although government actors and their counsel often forget

3

this fact, it is well established that "*government speech itself is not protected*" by the First Amendment.  *NAACP v. Hunt*, 891 F.2d 1555, 1565 (11th Cir. 1990) (emphasis added) (citation omitted) ("The First Amendment protects citizens' speech only from government regulation; government speech itself is not protected by the First Amendment.").  As the Supreme Court has stated, there is a "crucial difference between *government speech*" and "*private speech . . ., which the Free Speech and Free Exercise Clauses protect*." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302 (2000) (emphasis added); *see also, e.g.*, *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) ("[T]he Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."); *Columbia Broad. Sys., Inc. v. Democratic Nat. Comm.*, 412 U.S. 94, 139 & n.7 (1973) (Stewart, J., concurring) ("The First Amendment protects the press from governmental interference; *it confers no analogous protection on the Government*.") (emphasis added).

So long as this Court's preliminary injunction is limited to government speech, there can be no claim that it violates Defendants' First Amendment rights.  "[I]f we conclude that the speech in this case is government speech, the analysis ends because there has been no First Amendment violation—in fact, *the First Amendment would not even apply*." *Texas Div., Sons of Confederate Veterans, Inc. v. Vandergriff*, 759 F.3d 388, 393 (5th Cir. 2014) (emphasis added) (citation omitted), *rev'd on other grounds*, 576 U.S. 200 (2015). *See also, e.g.*, *Am. C.L. Union of Ohio Found., Inc. v. Ashbrook*, 375 F.3d 484, 490 n.4 (6th Cir. 2004) (rejecting judge's First Amendment claims because posters placed by judge on courtroom wall were not "*private* religious expression protected by the Free Speech Clause," but rather unprotected "*government speech*") (emphasis added); *Vista-Graphics, Inc. v. Virginia Dep't of Transportation*, 682 F.

App'x 231, 237 (4th Cir. 2017) ("[G]overnment speech [is] not subject to protection under the Free Speech Clause").

Accordingly, an injunction limited to non-public, pursuant-to-official-duty communications between government agents and social media companies will not impinge in any way on Defendants' free speech rights.  It will not, for example, restrict the ability of the President to publicly state his opinion that the American people should not be permitted to say or see certain information or viewpoints online.  Instead, such an injunction will apply only to government speech, which is unprotected by the First Amendment.

Moreover, an injunction directed solely at censorship of ***constitutionally protected*** speech will defang any claim Defendants may make that the government has a right and duty to ask social media companies to remove genuinely criminal (or otherwise illegal) content.  The Court can avoid that argument completely by limiting its preliminary injunction solely to government efforts to censor constitutionally protected speech.

Finally, an injunction directed solely at ***private communications with social media companies*** undertaken with the purpose of inducing censorship is more specific than enjoining Defendants from "***taking any steps***" to induce social media companies to block content. Defendants might well contend, for example, that the *Missouri*-proposed injunction would interfere with their ability to seek or enact new regulations, or to work with Congress to enact new statutes, restricting illegal online content.  The narrower injunction proposed here would have no such effect and will, if accepted, insulate the Court's order from challenge under the Fifth Circuit's requirement of injunctive specificity.

### C.     Legal Standard for Grant of Preliminary Injunction

"For a preliminary injunction to issue, a plaintiff must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm absent the injunction, (3) that

the harm [plaintiff] will suffer without the injunction outweighs the cost to comply with the injunction, and (4) that the injunction is in the public interest."  *Harrison v. Young*, 48 F.4th 331, 339 (5th Cir. 2022).  Provided that the injunction is narrowed in the ways proposed above, all four of these criteria are easily satisfied.

### D.  Plaintiffs' Free Speech Claim is Extremely Likely to Succeed on the Merits Regardless of Whether Defendants Coerced or Colluded with Social-Media Companies

The facts before the Court in *Missouri v. Biden* prove in copious detail that Defendants have repeatedly applied coercive pressure on, and colluded with, social media companies so as to turn those companies' censorship decisions into unconstitutional state action.[1]  Because the *Missouri* plaintiffs have convincingly made these arguments already, Plaintiffs here will not repeat them.

Against these arguments, however, Defendants are certain to contend that their communications with social media companies have *not* crossed any state action lines—i.e., that many (or perhaps most, or perhaps even all) of their communications with social media companies were mere "requests," which did not amount to coercion or joint action or meet the criteria of any other state action test.  Indeed, Defendants are likely to attempt to make that argument the central issue in this matter.

---

[1] As this Court is well aware, private party conduct can become state action when (among other tests) it is "coerced" by the government or the product of collusive "joint activity" with the government.  *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 297 (2001); *Missouri v. Biden*, 2023 U.S. Dist. LEXIS 46918, at *80-81.  And as the evidence before the Court in *Missouri* proves, Defendants have repeatedly crossed these lines.  *See, e.g.*, Pls. Proposed Findings of Fact, *Missouri v. Biden*, ECF No. 214-1, at ¶¶ 1-30 (coercive threats), ¶¶ 34-122 (close joint censorship activity between White House and social-media companies). On this ground alone, there is a substantial likelihood that that Plaintiffs will succeed on their claim that Defendants' censorship campaign has been unconstitutional.

Therefore, to assist the Court in its deliberations, Plaintiffs here clarify the applicable law and show that under controlling Supreme Court authority, the Government's censorship campaign is unconstitutional ***regardless*** of whether the Government's communications to social media companies amount to coercion or joint action or meet any other state action test.

### 1. Under controlling Supreme Court authority, the government's censorship campaign is unconstitutional in its entirety, including communications that do not coerce or meet any other state action test.

A half century ago, in *Norwood v. Harrison*, 413 U.S. 455, 465 (1973), the Supreme Court reaffirmed what the Justices called an "axiomatic" principle of constitutional law.  The Court set forth this principle categorically, without qualification or dissent.  The "axiomatic" principle was this: government "***may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish***."  *Norwood*, 413 U.S. at 465 (emphasis added) (citation omitted); *see Watts v. Northside Indep. Sch. Dist.*, 37 F.4th 1094, 1097 (5th Cir. 2022) ("[I]t is also axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish.") (quoting *Norwood*).

The *Norwood* principle is axiomatic because, without it, government actors could evade nearly every prohibition in the Bill of Rights through the simple expedient of asking and encouraging private parties to do what the Constitution bars the government from doing directly.  Police could ask a bystander to search the trunk of a car they cannot constitutionally search themselves.  The FBI could offer rewards to private hackers who break into a suspect's computer and send the government all the suspect's emails.  "Constitutional limitations on governmental action would be severely undercut if the government were allowed to actively encourage conduct by 'private' persons or entities that is prohibited to the government itself."  *United States v.*

*Davis*, 482 F.2d 893, 904 (9th Cir. 1973).  The *Norwood* principle fully applies to the First Amendment.  As Justice Thomas recently put it, the government acts unconstitutionally when it "induces [a private entity] to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint."  *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring).

Critically, the *Norwood* principle is **not tethered to state action doctrine**; it can be violated by government conduct that **would not turn a private party's conduct into state action**. In *Norwood* itself, for example, the Court enjoined Mississippi's policy of providing free textbooks to whites-only private schools.  *See Norwood*, 413 U.S. at 466.   **No claim was made or could have been made that by providing such textbooks, Mississippi turned the private schools into state actors.**  No claim was made or could have been made that Mississippi was **coercing** private schools to discriminate or that, under state action doctrine, its textbook-provision program turned the private schools into "**joint actors**" with the government. Nevertheless, the Court ruled Mississippi's policy unconstitutional—and did so without any reference to state action doctrine—because it is "axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish."  *Id*. at 465.

Thus the *Norwood* test is not limited by the well-known state action tests.  *Norwood* uses language markedly different from the language of state action doctrine ("induce, encourage, or promote" as opposed to "coerce," "conspire," "nexus," and so on), because *Norwood* is addressed to different circumstances and to a different category of cases.

Where plaintiffs allege that a private party's conduct amounted to state action, a court must decide if it is dealing with "one of the exceptional cases" in which the state action doctrine

is satisfied—i.e., in which the government involved itself so closely in private conduct that the latter can be attributed to the government. *See, e.g.*, *O'Handley v. Weber*, __ F.4th ___, No. 22-15071, 2023 U.S. App. LEXIS 57291145, at *12 (9th. Cir. Mar. 10, 2023)  ("Determining whether this is one of the exceptional cases in which a private entity will be treated as a state actor for constitutional purposes requires us to grapple with the state action doctrine.").  Such a determination typically turns on whether the government's conduct crossed the line into coercion, conspiracy, or one of the other state action categories.  *See id*.

By contrast, *Norwood* addresses cases where, as here, suit is brought **against governmental actors** to enjoin those actors from attempting to assist or facilitate private parties **to accomplish something the Constitution forbids**.  *Norwood* is especially applicable to cases where, again as here, government agents are deliberately evading constitutional rights by asking private parties to do a job that the Constitution prohibits the government from doing directly. In such cases, the state action tests like coercion and conspiracy do not set the limits of what the government is barred from doing or of what the Court may enjoin.  Rather, under the express language of *Norwood*, plaintiffs need only show that the government is engaging in a deliberate effort to "***encourage***" private parties "to accomplish what it is constitutionally forbidden to accomplish."

This rule is well established and routinely applied in cases—for example, search and seizure cases—of deliberate government efforts to circumvent constitutional rights by having private parties do the job.  "'When a government official affirmatively facilitates ***or encourages*** an unreasonable search performed by a private person, a constitutional violation occurs.'"  *Richard v. City of Harahan*, 6 F. Supp. 2d 565, 573 (E.D. La. 1998) (emphasis added) (quoting *Specht v. Jensen*, 832 F.2d 1516, 1523 (10th Cir. 1987), *judgment but not opinion vacated on*

*other grounds*, 853 F.2d 805 (10th Cir. 1988)); *Pruitt v. Pernell*, 360 F. Supp. 2d 738, 746 (E.D.N.C. 2005) ("[I]t is also well settled that state actors must not affirmatively facilitate *or encourage* an unreasonable search by a private person.") (emphasis added) (citations omitted).

Under *Norwood*, the entirety of the Federal Government's censorship campaign is unconstitutional, because that campaign was and is one gigantic effort to "induce, encourage, and promote" social media companies to do what the government itself cannot constitutionally do—censor protected speech. *Norwood* makes irrelevant any argument that some (or many, or even all) of Defendants' censorship-requesting communications were not coercive and/or do not prove joint action. Every such communication nonetheless "encourage[d]," "promote[d]," and sought to "induce" social media censorship and was thus unconstitutional.

Thus even when merely "requesting" social media companies to block protected speech, the Federal Government's censorship campaign violates the *Norwood* test. It was and is a systematic, deliberate effort to "induce, encourage, and promote" censorship of protected speech by private parties. Accordingly, the Court can and should enjoin that censorship campaign, regardless of whether Defendants are coercing, colluding, or satisfying any other state action test.

### 2. The state action tests such as coercion and joint action are also inapplicable here because the government's censorship campaign is overtly viewpoint-discriminatory.

There is another reason why the existence of coercion, joint activity, or any other state-action trigger is irrelevant here: because the government's censorship campaign is overtly viewpoint-discriminatory. Clearly the White House could not launch a government-wide, multi-agency campaign asking—simply asking, not coercing or colluding with—social media companies to censor all speech supporting Republican political candidates. Such a blatantly viewpoint-discriminatory campaign would be per se unconstitutional, regardless of its non-

10

coerciveness and indeed regardless of whether it succeeded or failed.   But the current

Administration is doing just that: conducting a government-wide, multi-agency campaign that

asks social media companies to suppress speech based on its viewpoint.

As the Supreme Court has held, it is:

> a core postulate of free speech law [that] government may not discriminate against
> speech based on the ideas or opinions it conveys.  *See Rosenberger v. Rector and Visitors
> of Univ. of Va.*, 515 U.S. 819, 829–830 (1995) (explaining that viewpoint discrimination
> is an "egregious form of content discrimination" and is "presumptively
> unconstitutional").

*Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019).  Because viewpoint discrimination is the most

egregious violation of the First Amendment, it is barred not only when government coerces or

conspires with private actors, but also when government merely ***offers benefits*** to them.  *See,*

*e.g.*, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 549 (2001) (striking down denial of benefits

to private parties where such denial was "aimed at the suppression of ideas").

Here, the Government's massive, multi-agency censorship campaign plainly offers

significant benefits to social-media companies—for example, avoiding adverse regulatory action,

remaining in the Administration's good graces, and receiving millions of dollars in payments in

connection with reporting certain users and certain content to the FBI.[2]  Accordingly, because

the Government's censorship campaign is blatantly viewpoint-discriminatory, and offers benefits

to social-media companies that comply, it is unconstitutional and enjoinable in its entirety,

regardless of whether it amounted to coercion or otherwise meets the criteria of the traditional

state action tests.

---

[2] *See, e.g.*, https://twitter.com/ShellenbergerMD/status/1604908670063906817 (internal Twitter email admitting that Twitter received $3,415,323 from the FBI from October 2019 through February 2021 for handling FBI disclosure requests).

### 3.    To the extent that state action tests are relevant here, Supreme Court authority dictates that the statutory immunity granted by Section 230 weighs heavily in favor of a finding that the state action line has been crossed.

To the extent state action tests are deemed relevant in this case, the famous Section 230, which immunizes social-media companies from liability if they censor "objectionable" speech even if that speech is "constitutionally protected,"47 U.S.C. § 230(c)(2)(A), weighs heavily in favor of a finding of state action here.

In *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602 (1989), the Supreme Court held that a federal regulation granting immunity to railroads if they performed specified employee drug and alcohol tests, turned those tests into state action where that immunity was coupled with other indicia of government "encouragement," including the government's communicating its "strong preference" for the tests to be performed and its interest in "shar[ing] the fruits" of those tests. *Id.* at 615-16.  Even though the tests were "permissive," not mandatory, and hence remained a voluntary choice by the railroad companies, the combination of immunity plus encouragement turned those tests into state action.  *Id*.

The instant case is analogous to *Skinner* but presents an even stronger case.  Here too, but much more so than in *Skinner*, the Government has communicated to social media companies the government's "strong preference" for those companies to censor speech disfavored by the government.[3]  Indeed, the Government has excoriated social-media companies that do not censor more aggressively and has repeatedly threatened to hold them and their chief executive officers

---

[3] To take just one of countless examples, on July 16, 2021, President Biden accused social-media companies of "killing people" by failing to censor certain COVID-related speech.  Pls. Proposed Findings of Fact, *supra*, ¶ 27; Zolan Kanno-Youngs & Cecilia Kang, *They're Killing People: Biden Denounces Social Media for Virus Disinformation*, N.Y. Times (July 16, 2021), https://www.nytimes.com/2021/07/16/us/politics/biden-facebook-social-media-covid.html.

"accountable" if they do not.[4]   And just as the Federal Government in *Skinner* told the railroads exactly what tests it wanted them to perform, so here the Federal Government tells social-media companies exactly what speech, viewpoints and speakers it wants them to censor.[5]   Moreover, as in *Skinner*, the Government seeks to "share[s] the fruits" of social media content-moderation operations by asking (and paying for) social-media companies to report to the FBI information gathered about users who post disfavored content.[6]   Finally, like the immunizing regulation in *Skinner*, Section 230 protects social-media companies from state law liability if they comply with the government's requests.  47 U.S.C. § 230(c)(2)(A).

Thus under *Skinner*, the combination of these factors militates decisively in favor of a finding that the Government's censorship campaign has crossed the state action line.

### E.      The Other, Equitable Criteria are Established as a Matter of Law

Once this Court finds, as it should, a substantial likelihood of success on Plaintiffs' First Amendment claim, the three other, equitable preliminary injunction criteria—irreparable harm, balance of hardships, and public interest—are established as a matter of law.  "Loss of First Amendment freedoms, even for minimal periods of time, constitutes irreparable injury." *Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996). Moreover, as shown above, if the Court issues the narrowly framed injunction proposed here, it will not impinge on Defendants' First Amendment rights, and it will not prevent the government

---

[4] *See, e.g.*, The White House, *Press Briefing by Press Secretary Jen Psaki*, April 25, 2022, https://www.whitehouse.gov/briefing-room/press-briefings/2022/04/25/press-briefing-by-press-secretary-jen-psaki-april-25-2022/; Proposed Findings of Fact, *supra*, ¶¶ 6, 8, 9, 14, 16, 18 (threatening to hold "accountable").

[5] *See, e.g.*, Proposed Findings of Fact, *supra*, ¶¶ 94 (White House demanding censorship of Tucker Carlson), 119 (White House commanding Facebook: "Do not distribute or amplify vaccine hesitancy, and Facebook should end group recommendations for groups with a history of COVID-19 or vaccine misinformation.").

[6] *See supra* note 2.

from taking action against genuinely criminal (or otherwise illegal) content, thus impinging on legitimate governmental interests. *Cf. BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604, 618 (5th Cir. 2021) ("[a]ny interest" the government may "claim in enforcing an unlawful (and likely unconstitutional)" policy "is illegitimate"). Finally, "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 298 (5th Cir. 2012) (quotation marks and citation omitted).

### F.    Necessity of Preliminary Injunctive Relief

Defendants have not acknowledged any fault or wrongdoing concerning their efforts to induce social-media censorship of constitutionally protected speech.   On the contrary, Defendants have repeatedly defended that campaign and denied that it implicates any First Amendment concerns.

For example, in a public statement provided to Fox News in December 2022, the FBI defended its actions in communicating with social-media companies, saying, "The correspondence between the FBI and Twitter show nothing more than examples of our traditional, longstanding and ongoing federal government and private sector engagements, which involve numerous companies over multiple sectors and industries.   As evidenced in the correspondence, the FBI provides critical information to the private sector in an effort to allow them to protect themselves and their customers."  Jake Gibson & Adam Sabes, *FBI responds to Twitter Files disclosures, says it didn't request 'any action' on specific tweets*, FOX News (Dec. 21, 2022), https://www.foxnews.com/politics/fbi-responds-twitter-files-disclosures-says-didnt-request-any-action-specific-tweets.

Similarly, Defendant Mayorkas has expressly defended the DHS's censorship efforts, including an endorsement of the Department's plan to institute a Disinformation Governance Board.  *See* Kelly Hooper, *Mayorkas cites misinformation about Homeland Security's disinformation board*, Politico (Aug. 5, 2022), https://www.politico.com/news/2022/05/01/ mayorkas-defends-dhs-disinformation-board-00029182. He said, "The fact is that disinformation that creates a threat to the security of the homeland is our responsibility to address.  And this department has been addressing it for years." *Id.*

Moreover, after publication began of the so-called "Twitter Files" (which reported about emails between Twitter and government agents concerning censorship of protected speech), instead of investigating possible violations of the First Amendment, the Administration apparently commenced *an investigation of Twitter and the Twitter Files journalists*.  According to the House Judiciary Committee, on December 13, 2022, the Federal Trade Commission sent Twitter a demand that Twitter disclose its interactions with Twitter Files journalists "Bari Weiss, Matt Taibbi, [and] Michael Shellenberger" and "[i]dentify all journalists and other members of the media" with whom Twitter had shared internal documents. U.S. House of Representatives, Committee on the Judiciary, *The Weaponization of the Federal Trade Commission: An Agency's Overreach To Harass Elon Musk's Twitter*, at pp. 5, 7, Mar. 7, 2023, https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/Weaponization_Select_Subcommittee_Report_on_FTC_Harrassment_of_Twitter_3. 7.2023.pdf.

Because the government has not only refused to acknowledge any wrongdoing in its social media censorship efforts, but has defended those efforts, painted them as mere continuations of longstanding policies, and even taken action to investigate journalists who have

exposed those efforts, it is virtually certain that the government's censorship campaign will continue unless and until enjoined by this Court.

### G.     Plaintiff CHD Has Rock-Solid Standing To Assert the First Amendment Right of Social Media Users To Receive Information and Ideas

Should Defendants contest standing and therefore this Court's jurisdiction, Plaintiffs respectfully emphasize that the instant case differs from *Missouri* in that it includes among its named Plaintiffs a nonprofit organization—Children's Health Defense ("CHD")—representing over 70,000 members across the country, all (or virtually all) of whom are avid consumers of online health news and in particular avid consumers of COVID-related information (one of the main targets of governmental censorship).[7]  CHD is the ideal plaintiff, with rock-solid standing, to seek a nationwide injunction against the Government's nationwide censorship campaign.

The case for such a nationwide injunction turns ultimately on the fact that the First Amendment protects not only the right to speak, but also the "***right to receive information and ideas***." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 757 (1976) (emphasis added) (citation omitted); *Davis v. East Baton Rouge Parish School Bd*., 78 F.3d 920, 926 (5th Cir. 1996) ("[T]he First Amendment protects the . . . right to receive protected speech."); *Kass v. City of New York*, 864 F.3d 200, 207 (2d Cir. 2017) (citations omitted) (First Amendment "extends not only to the right to speak, but also to the right to listen and receive information").  The true victims of the Government's censorship campaign are the American people, whose "right to receive information and ideas" the Government is flagrantly violating.

And the one kind of plaintiff that has the most rock-solid standing to assert the "right to receive information and ideas" on behalf of social-media consumers nationwide is an association

---

[7] *See* ECF No. 1, at 13.

representing such consumers—because that is exactly the kind of plaintiff whose standing the Court upheld in the seminal case of *Virginia State Bd.* itself.  *See* 425 U.S. at 757 (upholding standing of Virginia Citizens Consumer Council to assert public's First Amendment right to "receive information and ideas" against a Virginia restriction on drug price advertising).  CHD is therefore the ideal plaintiff, with rock-solid standing, to seek a nationwide injunction here.

This case involves more than the rights of individuals whose speech has been blocked online.  Indeed, in a case like this one, "it is the right of the viewers and listeners . . . which is paramount," since it "is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *CBS, Inc. v. FCC*, 453 U.S. 367, 395 (1981) (emphasis added) (citation omitted).  As the Supreme Court said eighty years ago, "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *Associated Press v. United States*, 326 U.S. 1, 20 (1945). CHD is the ideal plaintiff to represent and vindicate this vital public interest, and Plaintiffs therefore respectfully request that this Motion for Preliminary Injunction be set for the same date, May 26, currently scheduled as the hearing date for the parallel motion in *Missouri*.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully ask the Court to hear this motion on May 26 and to issue a preliminary injunction barring Defendants (and anyone acting in concert with them) from engaging, in their official capacities, in any private communications with social-media companies with the purpose of inducing, encouraging, or promoting the censorship of constitutionally protected speech.

Respectfully submitted,

/s/ G. Shelly Maturin, II

_____
G. SHELLY MATURIN, II
(La. Bar # 26994)
Maturin Law
322 Heymann Blvd., Suite 1
Lafayette, LA 70503
Telephone: (337) 362-3514
E-mail: shelly@maturinlaw.com

Attorney for
ROBERT F. KENNEDY, JR.
CHILDREN'S HEALTH DEFENSE
CONNIE SOMPAGNARO
Plaintiffs in *Kennedy v. Biden*,
No. 3:23-cv-00381

JED RUBENFELD
(NY Bar # 2214104)
(pro hac vice forthcoming)
1031 Forest Rd.
New Haven CT 06515
Tel.:203-432-7631
E-mail: jed.rubenfeld@yale.edu

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the above and foregoing has been served on all known counsel of record via electronic transmission, facsimile, e-mail and/or by U.S. mail on this 12th day of April, 2023.


/s/ G. Shelly Maturin, II
_____
G. SHELLY MATURIN, II