**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**

ROBERT F. KENNEDY, JR., *et al.*,

    *Plaintiffs*,

    v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States of
America, *et al.,*

    *Defendants*.

Civil Action No. 3:23-cv-381

Judge Terry A. Doughty

Mag. Judge Kayla D. McClusky

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND........................................................................................2

LEGAL STANDARD ..................................................................................................2

ARGUMENT ...............................................................................................................2

I.      Plaintiffs Fail to Establish Irreparable Harm Absent a Preliminary Injunction...................2

II.     Plaintiffs Fail to Show Likelihood of Success on the Merits...............................................5

        A.      Plaintiffs Lack Article III Standing.......................................................5

                1.      Plaintiffs Fail to Make a Clear Showing of Injury in Fact.........................6

                2.      CHD Fails to Make a Clear Showing of Standing. ...............................10

                        a.      CHD Cannot Make a Clear Showing of Associational Standing. .10

                        b.      CHD Fails to Make a Clear Showing of Organizational Standing.
                                ................................................................................................11

        B.      Plaintiffs Are Not Likely to Prevail on Their First Amendment Claim...............12

                1.      Plaintiffs Do Not Show That the Private Conduct of Social Media
                        Companies "Must in Law Be Deemed to Be That of the State.".............12

                2.      Plaintiffs Cannot Avoid the State-Action Doctrine..................................17

III.    Plaintiffs Fail to Satisfy the Remaining Preliminary Injunction Requirements.................21

IV.     Plaintiffs' Proposed Injunction Is Improper. ...................................................22

CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*AARP v. U.S. EEOC*,
   226 F. Supp. 3d 7 (D.D.C. 2016) ..........................................................................7

*Abdullah v. Paxton*,
   65 F.4th 204 (5th Cir. 2023) .................................................................................7

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*,
   878 F.2d 806 (5th Cir. 1989) .................................................................................2

*Altman v. Bedford Cent. Sch. Dist.*,
   245 F.3d 49 (2d Cir. 2001) ..................................................................................23

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
   526 U.S. 40 (1999) ........................................................................................15, 16

*Anderson v. Jackson*,
   556 F.3d 351 (5th Cir. 2009) .................................................................................2

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
   627 F.3d 547 (5th Cir. 2010) ...............................................................................10

*Barber v. Bryant*,
   860 F.3d 345 (5th Cir. 2017) .................................................................................5

*Bass v. Parkwood Hosp.*,
   180 F.3d 234 (5th Cir. 1999) ...............................................................................16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .............................................................................................10

*Benisek v. Lamone*,
   138 S. Ct. 1942 (2018) ..........................................................................................4

*BHI Energy I Power Servs., LLC v. KVP Energy Servs., LLC*,
   No. 3:22-CV-1981-L, 2023 WL 223179 (N.D. Tex. Jan. 17, 2023)........................3

*Biden v. Knight First Amendment Inst.*,
   141 S. Ct. 1220 (2021) ....................................................................................19, 20

*Blum v. Yaretsky*,
   457 U.S. 991 (1982) .....................................................................................*passim*

*Burton v. Wilmington Parking Auth.*,
   365 U.S. 715 (1961) .............................................................................................18

*Cajun Servs. Unlimited, LLC v. Benton Energy Serv. Co.*,
No. 17-491, 2020 WL 3000361 (E.D. La. Jan. 23, 2020) ........................................................3

*Campaign Legal Ctr. v. Scott*,
49 F.4th 931 (5th Cir. 2022) ..................................................................................................8

*Carney v. Adams*,
141 S. Ct. 493 (2020) ...........................................................................................................8, 9

*CHEP USA v. Cobra Stone Inc.*,
1:22-cv-843, 2023 WL 3441556 (W.D. Tex. May 12, 2023)...................................................4

*Children's Health Defense v. Facebook Inc.*,
546 F. Supp. 3d 909 (N.D. Cal. 2021)...............................................................................14, 16

*Children's Health Defense v. Facebook Inc., et al.*,
No. 20-cv-05787 (N.D. Cal.) .............................................................................................4, 14

*Chiras v. Miller*,
432 F.3d 606 (5th Cir. 2005) ............................................................................................21, 22

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ..................................................................................................................7

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*,
48 F.3d 618 (1st Cir. 1995)......................................................................................................4

*Connick v. Myers*,
461 U.S. 138 (1983) ...............................................................................................................24

*Ctr. for Bio. Diversity v. Office of U.S. Trade Rep.*,
450 F. App'x 605 (9th Cir. 2011) ..........................................................................................22

*Ctr. for Bio. Diversity v. U.S. EPA*,
937 F.3d 533 (5th Cir. 2019) ...................................................................................................8

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .................................................................................................................8

*Divino Grp. LLC v. Google LLC*,
No. 19-cv-4749, 2021 WL 51715 (N.D. Cal. Jan. 6, 2021) ..................................................16

*El Paso Cnty. v. Trump*,
982 F.3d 332 (5th Cir. 2020) ........................................................................................5, 11, 12

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
762 F.2d 464 (5th Cir. 1985) ...................................................................................................2

*Evans v. Newton*,
   382 U.S. 296 (1966) ...................................................................................................18

*Fontenot v. McCraw*,
   777 F.3d 741 (5th Cir. 2015) ....................................................................................10

*Gilmore v. City of Montgomery*,
   417 U.S. 556 (1974) ...................................................................................................18

*Google, Inc. v. Hood*,
   822 F.3d 212 (5th Cir. 2016) ......................................................................................3

*H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs. LLC*,
   No. 3:09-cv-00393, 2009 WL 1766095 (N.D. Tex. June 23, 2009) ...........................4

*Hart v. Facebook Inc.*,
   No. 22-cv-737, 2023 WL 3362592 (N.D. Cal. May 9, 2023) ...........................14, 15

*Hart v. Facebook Inc.*,
   No. 3:22-cv-737 (N.D. Cal.) ................................................................................14-15

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ...................................................................................................11

*Hope v. Warden York Cnty. Prison*,
   972 F.3d 310 (3d Cir. 2020) .....................................................................................24

*Hotze v. Burwell*,
   784 F.3d 984 (5th Cir. 2015) ......................................................................................8

*John Doe #1 v. Veneman*,
   380 F.3d 807 (5th Cir. 2004) ....................................................................................25

*John H. Harland Co. v. Clarke Checks, Inc.*,
   711 F.2d 966 (11th Cir. 1983) ..................................................................................24

*Jones v. Bush*,
   122 F. Supp. 2d 713 (N.D. Tex. 2000), *aff'd,* 244 F.3d 134 (5th Cir. 2000) ...........8

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) ...................................................................................................11

*La. Div. Sons of Confederate Veterans v. City of Natchitoches*,
   821 F. App'x 317 (5th Cir. 2020) .......................................................................18, 19

*League of United Latin Am. Citizens v. Abbott*,
   604 F. Supp. 3d 463 (W.D. Tex. 2022) ....................................................................11

*Lee v. Macon Cnty. Bd. of Educ.*,
  267 F. Supp. 458 (M.D. Ala. 1967) ....................................................................18

*Legal Servs. Corp. v. Velazquez*,
  531 U.S. 533 (2001) .............................................................................................20, 21

*Lombard v. State of La.*,
  373 U.S. 267 (1963) .............................................................................................18

*Lugar v. Edmondson Oil Co.*,
  457 U.S. 922 (1982) .............................................................................................15, 18

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .............................................................................................5

*Maher v. Roe*,
  432 U.S. 464 (1977) .............................................................................................21

*Manhattan Cmty. Access Corp. v. Halleck*,
  139 S. Ct. 1921 (2019) ........................................................................................12

*Martinez v. Mathews*,
  544 F.2d 1233 (5th Cir. 1976) .............................................................................2

*Matal v. Tam*,
  582 U.S. 218 (2017) .............................................................................................21

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) .............................................................................................2, 7, 21

*Meyer v. Brown & Root Const. Co.*,
  661 F.2d 369 (5th Cir. 1981) ...............................................................................24

*Missouri v. Biden*,
  No. 3:22-cv-01213 (W.D. La) ..........................................................................*passim*

*Missouri v. Biden*,
  --- F. Supp. 3d ----, 2023 WL 2578260 (W.D. La. Mar. 20, 2023) .........................7, 12, 18-19

*Moody v. Farrell*,
  868 F.3d 348 (5th Cir. 2017) ...............................................................................13

*Morice v. Hosp. Serv. Dist. #3*,
  No. 18-7945, 2019 WL 1517954 (E.D. La. Apr. 8, 2019) ...................................4, 7

*Motient Corp. v. Dondero*,
  529 F.3d 532 (5th Cir. 2008) ...............................................................................5

*N.A.A.C.P. v. City of Kyle*,
    626 F.3d 233 (5th Cir. 2010) ............................................................ 10, 11, 12

*Nat'l Endowment for Arts v. Finley*,
    524 U.S. 569 (1998) ....................................................................................22

*Nat'l Org. for Women v. Operation Rescue*,
    37 F.3d 646 (D.C. Cir. 1994) ......................................................................23

*Newman v. Google LLC*,
    No. 20-cv-4011, 2021 WL 2633423 (N.D. Cal. June 25, 2021) ...............16

*Norwood v. Harrison*,
    413 U.S. 455 (1973) .............................................................................17, 18

*O'Handley v. Weber*,
    62 F.4th 1145 (9th Cir. 2023) ................................................ 14, 18, 20, 22

*Payne v. Travenol Labs., Inc.*,
    565 F.2d 895 (5th Cir. 1978) ......................................................................24

*Plains Cotton Co-op. Ass'n v. Goodpasture Comp. Serv. Inc.*,
    807 F.2d 1256 (5th Cir. 1987) ......................................................................5

*Pub. Citizen, Inc. v. Bomer*,
    274 F.3d 212 (5th Cir. 2001) ........................................................................8

*Randolph v. E. Baton Rouge Par. Sch. Bd.*,
    No. 15-cv-654-SDD, 2016 WL 3579224 (M.D. La. June 28, 2016) ........24

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) .............................................................................20, 21

*Sanders v. Unum Life Ins. Co.*,
    553 F.3d 922 (5th Cir. 2008) ......................................................................21

*Schmidt v. Lessard*,
    414 U.S. 473 (1974) ....................................................................................23

*Scott v. Schedler*,
    826 F.3d 207 (5th Cir. 2016) ......................................................................24

*Seals v. McBee*,
    898 F.3d 587 (5th Cir. 2018) ........................................................................9

*Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*,
    968 F.3d 419 (5th Cir. 2020) ...................................................................7, 11

*Sierra Club v. U.S. Army Corps of Eng'rs.*,
  482 F. Supp. 3d 543 (W.D. Tex. 2020) ................................................................ 3

*Skinner v. Ry. Labor Execs.' Assoc.*,
  489 U.S. 602 (1989) ................................................................... 15, 16, 17

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ..................................................................... 5, 6

*Stringer v. Whitley*,
  942 F.3d 715 (5th Cir. 2019) .............................................................. 7

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ........................................................................ 11

*Tenth St. Residential Ass'n v. City of Dallas*,
  968 F.3d 492 (5th Cir. 2020) ............................................................. 6

*Tex. Democratic Party v. Benkiser*,
  459 F.3d 582 (5th Cir. 2006) ............................................................. 3

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) .................................................................... 9

*United States v. Cordova-Espinoza*,
  49 F.4th 964 (5th Cir. 2022) ......................................................... 18, 19

*United States v. Meals*,
  21 F.4th 903 (5th Cir. 2021) ........................................................... 17

*United States v. Miller*,
  982 F.3d 412 (6th Cir. 2020) ........................................................... 17

*United States v. Rosenow*,
  50 F.4th 715 (9th Cir. 2022) ........................................................... 17

*VanDerStok v. Garland*,
  --- F. Supp. 3d ----, No. 4:22-cv-00691, 2022 WL 4809376 (N.D. Tex. Oct. 1, 2022) .............. 3

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) ..................................................................... 8-9

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
  576 U.S. 200 (2015) ..................................................................... 21, 22

*Waters v. St. Francis Hosp., Inc.*,
  618 F.2d 1105 (5th Cir. 1980) ......................................................... 16

*Watts v. Northside Indep. Sch. Dist.*,
  37 F.4th 1094 (5th Cir. 2022) ..............................................................................18

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)..................................................................................................2

*Zuniga v. Univ. Health Sys.*,
  71 F. App'x 293 (5th Cir. 2003) ...........................................................................3

**STATUTES**

18 U.S.C. § 2703...........................................................................................................21

18 U.S.C. § 2706...........................................................................................................21

42 U.S.C. § 230.............................................................................................................16

**RULE**

Fed. R. Civ. P. 65(d)(1)................................................................................................23

**OTHER AUTHORITIES**

Christopher Brito, *Robert Kennedy Jr.'s Instagram account has been restored*, CBS NEWS
  (June 5, 2023),
    https://www.cbsnews.com/news/robert-kennedy-jr-instagram-restored-twitter-spaces/. ...........7

Oliver Darcy, *Facebook takes action against 'disinformation dozen' after White House pressure*,
  CNN (Aug. 18, 2021),
    https://www.cnn.com/2021/08/18/tech/facebook-disinformation-dozen/index.html. ..............13

## INTRODUCTION

Plaintiffs in this action are two individuals and an organization that piggyback off the filings in *Missouri v. Biden*, No. 3:22-cv-01213 (W.D. La.), in an effort to obtain their own preliminary injunctive relief against the federal government. Plaintiffs, however, have utterly neglected their burden of proof—submitting no evidence of their own—and fail to establish any, much less every, element required for the extraordinary remedy of preliminary injunctive relief.

*First*, Plaintiffs cannot establish that they will suffer irreparable harm in the absence of a preliminary injunction. Plaintiffs have adduced no evidence that *they* face ongoing or imminent First Amendment injury, and submissions in *Missouri* concerning entirely different plaintiffs do not satisfy these Plaintiffs' independent burden.

*Second*, Plaintiffs cannot establish a likelihood of success on the merits. As to jurisdiction, Plaintiffs fail to make the clear showing of standing necessary to obtain preliminary relief. Neither the individuals nor the organization present any evidence of a cognizable injury in fact. And their unsupported and vague allegations of lost access to information suffered by "the American people," ECF No. 6-1 ("PI Br.") at 17, amount to a generalized and abstract injury that the Supreme Court has repeatedly held cannot confer standing.

Plaintiffs' First Amendment theories also do not pass muster. Their first theory, which relies on the *Missouri* plaintiffs' assertion of state action, fails for the reasons discussed in that case and because these Plaintiffs have failed to show any state action as it pertains to *their own* social media content. And Plaintiffs' second theory, that they need not satisfy any state-action test at all, is unsupported by authority and incompatible with their claimed injury.

*Third*, Plaintiffs make virtually no effort to establish that their injunction would satisfy the balancing of the equities and serve the public interest. Those factors weigh heavily in Defendants' favor, as Plaintiffs' vague and overbroad injunction would impermissibly encroach on the Executive Branch's prerogative to carry out its functions and speak on matters of public concern.

*Finally*, and even if Plaintiffs were to satisfy the requirements for a preliminary injunction, Plaintiffs' proposed injunction cannot issue because its undefined terms do not provide reasonable

notice as to the enjoined conduct. And to the extent the proposed injunction has any meaning, it is no more than a forbidden command simply to follow the law and is impermissibly overbroad.

Accordingly, Plaintiffs' motion for a preliminary injunction should be denied.

## FACTUAL BACKGROUND

Plaintiffs decline to submit any evidence of their own, basing their motion entirely "on facts already before the Court in *Missouri v. Biden*." PI Br. at 2. Accordingly, Defendants respectfully refer the Court to the presentation of facts in Defendants' Opposition to Motion for Preliminary Injunction (ECF No. 266 at 5-101), Defendants' Response to Plaintiffs' Proposed Findings of Fact (ECF No. 266-8), and the exhibits and declarations thereto (ECF Nos. 266-1 through 266-7) in *Missouri*.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should only be granted when the movant has clearly carried the burden of persuasion," *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009). Plaintiffs must "by a clear showing" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Failure to satisfy any one of these requirements precludes injunctive relief, *see Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989), and Plaintiffs bear a heavy burden as to each requirement, *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985). Plaintiffs' burden is even higher because they seek a preliminary injunction that would alter the status quo. *See, e.g.*, *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (such injunctions are "particularly disfavored").

## ARGUMENT

**I.      Plaintiffs Fail to Establish Irreparable Harm Absent a Preliminary Injunction.**

Defendants incorporate by reference their arguments in *Missouri* regarding failure to establish irreparable harm. *Missouri*, ECF No. 266 at 104-28. For the reasons explained therein,

neither the *Missouri* plaintiffs nor Plaintiffs here can establish irreparable injury that is likely to occur during the pendency of the litigation merely by asserting past First Amendment harm.

But even if this Court were to determine that the *Missouri* plaintiffs carried their burden to show irreparable harm, such a holding would not compel the same conclusion as to these Plaintiffs. Plaintiff-specific declarations were the sole evidentiary basis on which the private plaintiffs in *Missouri* asserted irreparable harm. *See Missouri*, ECF No. 276 at 70-71.[1] But unlike the *Missouri* plaintiffs, Plaintiffs here provide no declarations or other evidence of actual and impending injury.

Plaintiffs' failure to adduce competent evidence precludes injunctive relief. "Because 'the court must decide whether the harm will in fact occur,' a party seeking injunctive relief must '*substantiate* the claim of irreparable injury.'" *Sierra Club v. U.S. Army Corps of Eng'rs.*, 482 F. Supp. 3d 543, 559 (W.D. Tex. 2020) (emphasis added; internal alterations omitted); *see also VanDerStok v. Garland*, --- F. Supp. 3d ----, No. 4:22-CV-00691, 2022 WL 4809376, at *6 (N.D. Tex. Oct. 1, 2022) ("Because FPC has failed to substantiate its alleged irreparable injury with concreteness and specificity, it is not entitled to expanded relief."). Plaintiffs' mere allegations and attorney argument are no substitute. *See Zuniga v. Univ. Health Sys.*, 71 F. App'x 293, 294 (5th Cir. 2003); *Cajun Servs. Unlimited, LLC v. Benton Energy Serv. Co.*, No. 17-491, 2020 WL 3000361, at *6 (E.D. La. Jan. 23, 2020). And, having failed to adduce such evidence with their opening brief, Plaintiffs may not do so on reply. *See BHI Energy I Power Servs., LLC v. KVP Energy Servs., LLC*, No. 3:22-cv-1981, 2023 WL 223179, at *4 (N.D. Tex. Jan. 17, 2023) ("[I]n ruling on the Motion for Preliminary Injunction, the court will not consider the new evidence submitted by BHI for the first time in conjunction with its reply brief."); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 594 (5th Cir. 2006) (party "waived" irreparable harm argument by "failing to raise it in its opening brief").

---

[1] The *Missouri* plaintiffs initially asserted that all First Amendment injury constituted irreparable harm. *See Missouri*, ECF No. 214 at 56-57. But mere "invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury," *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016), and the individual plaintiffs submitted supplemental declarations on reply to assert irreparable injury, *Missouri*, ECF No. 276 at 70-71.

Nor does the plaintiff-specific evidence adduced in *Missouri* establish imminent and irreparable injury to these different Plaintiffs. To justify issuance of a preliminary injunction, the irreparable harm asserted must be irreparable harm *to the movant*. *Morice v. Hosp. Serv. Dist. #3*, No. 18-7945, 2019 WL 1517954, at *7 (E.D. La. Apr. 8, 2019) (assertion of irreparable injury to third-party patients does not satisfy requirement to establish irreparable harm as to plaintiff); *CHEP USA v. Cobra Stone Inc.*, 1:22-cv-843, 2023 WL 3441556, at *2 (W.D. Tex. May 12, 2023) (similar); *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 622 (1st Cir. 1995) ("[A] preliminary injunction requires a showing of irreparable harm *to the movant* rather than to one or more third parties."). The evidence provided by the *Missouri* plaintiffs attests only to the claimed irreparable harm threatening those plaintiffs, none of whom is a party to this action. Accordingly, even a finding that the *Missouri* plaintiffs showed irreparable harm through plaintiff-specific declarations would not establish that these distinct Plaintiffs have done the same.

Plaintiffs' failure to adduce any evidence of irreparable harm is particularly fatal here in the context of their years-long delay in seeking relief. Since at least 2020, Plaintiffs have been allegedly aggrieved by social-media content-moderation decisions made in response to alleged federal government pressure, as demonstrated by plaintiff Children's Health Defense's ("CHD") prior action against Facebook and others. *See Children's Health Defense v. Facebook Inc., et al.*, No. 20-cv-05787 (N.D. Cal.). Despite similarly alleging federal coercion, joint action, and the threat of Section 230 repeal or revision, CHD never sought a preliminary injunction in that case— plainly indicating it did not believe such emergency relief was necessary—and then waited over three years until this Court denied Defendants' motion to dismiss in *Missouri* to file its follow-on action here. This delay is more than "sufficient to rebut a[ny] presumption of irreparable harm." *H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs. LLC*, No. 3:09-CV-00393, 2009 WL 1766095, at *4 (N.D. Tex. June 23, 2009) (denying preliminary injunction where plaintiff delayed for "five months"). *See also Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) ("[P]laintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request.").

No further analysis is necessary: Plaintiffs' failure to provide *any* evidence sufficient to

establish imminent irreparable harm precludes issuance of a preliminary injunction. *Motient Corp. v. Dondero*, 529 F.3d 532, 538 (5th Cir. 2008) ("[A] showing of irreparable harm is required for injunctive relief."); *Plains Cotton Co-op. Ass'n v. Goodpasture Comp. Serv. Inc.*, 807 F.2d 1256, 1261 (5th Cir. 1987) ("[P]reliminary injunctions will be denied based on a failure to prove separately each of the four elements.").[2]

## II.     Plaintiffs Fail to Show Likelihood of Success on the Merits.

### A.     Plaintiffs Lack Article III Standing.

To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Since these elements are "an indispensable part of the plaintiff's case, each element must be supported [] with the manner and degree of evidence required at the successive stages of the litigation." *El Paso Cnty. v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020). Accordingly, on a preliminary injunction motion, "the plaintiffs must make a 'clear showing' that they have standing." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017). At this stage, then, Plaintiffs may not rest on "general allegations," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), but must adduce specific facts clearly showing that they likely meet each Article III standing element to sustain their claims on the merits, *Barber*, 860 F.3d at 352. Plaintiffs fail to make such a clear showing.

---

[2] Ignoring their obligation to establish imminent and actual irreparable harm, Plaintiffs instead argue that preliminary injunctive relief is necessary because government officials have "defended" their communications with social media companies (citing two articles about the FBI and DHS) and because the Federal Trade Commission allegedly "demand[ed]" that Twitter identify the journalists whom Twitter had granted access to its internal communications and systems in connection with the "Twitter Files." PI Br. at 15. Setting aside that Plaintiffs' own citations establish that the FBI "didn't ask Twitter employees to 'take action,'" that the DHS is addressing "the disinformation threat from foreign state adversaries and cartels" (*i.e.*, non-constitutionally-protected speech), and that the FTC "has the authority" under a consent decree with Twitter "to monitor how Twitter is protecting users' private information," Plaintiffs' argument is also irrelevant. None of those three complaints has anything to do with these Plaintiffs, none presents any basis to speculate about future irreparable injury to these Plaintiffs, and the FTC is not even a defendant in this action against which Plaintiffs could pursue relief.

### 1.   Plaintiffs Fail to Make a Clear Showing of Injury in Fact.

Even if this Court's traceability and redressability analysis at the motion to dismiss stage in *Missouri* were applicable at the preliminary injunction stage (it is not, for the reasons Defendants explained in *Missouri*, ECF No. 266 at 128-36) and in this case (it is not, because these Plaintiffs do not connect any alleged moderation of their content to the actions of any Defendant, *infra* 12-15), Plaintiffs here cannot make a clear showing of an injury in fact, and thus lack standing.

"To establish an injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339. Plaintiffs fail to make a clear showing that they have experienced an injury in fact under this standard from either moderation of their own speech or their inability to receive information and ideas.

a.   *First*, Plaintiffs do not adduce *any* evidence of an actual or imminent injury resulting from alleged moderation of their speech—whether in response to federal pressure or otherwise. Plaintiffs Sampognaro and CHD do not even *allege* any moderation of their speech at any point in time (and allegations would be insufficient at the preliminary injunction phase in any case). *See* ECF No. 1. While Plaintiff Kennedy alleges in conclusory fashion a single instance in 2023 in which a speech he gave "was blocked by YouTube," *id.* ¶ 435, and that Facebook "censored" him (without identifying a single expression of his that was moderated) as one of "12 specific disfavored speakers," *id.* ¶ 305, he presents no evidence to conclude that any future moderation of his speech is imminent.[3] This failure to adduce evidence of specific, imminent injury precludes

---

[3] Significantly, these allegations also fail because Kennedy presents no evidence (or even allegation) that Defendants caused YouTube's decision, *infra* 13-15, and the record shows that Defendants did not request action be taken against the "Disinformation Dozen" and Facebook declined to take any action against those accounts in any event, *Missouri*, ECF No. 174-1 at 42. This lack of "direct relation between the injury asserted and the injurious conduct alleged" also defeats standing. *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 502 (5th Cir. 2020).

the prospective relief Plaintiffs seek.[4] *Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 423 (5th Cir. 2020) ("[A] petitioner's claim of standing cannot rest on 'mere allegations,' but must instead be supported by citations to specific facts in the record"); *Mazurek*, 520 U.S. at 972; *see also AARP v. U.S. EEOC*, 226 F. Supp. 3d 7, 15 (D.D.C. 2016) ("Where, as here, a plaintiff seeks a preliminary injunction, the plaintiff's burden to demonstrate standing will normally *be no less than* that required on a motion for summary judgment.") (emphasis added). And even if these Plaintiffs could connect prior moderation decisions to Defendants, "past wrongs do not in themselves amount to that real and immediate threat of injury necessary" to establish standing for prospective relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983).

Nor may Plaintiffs establish standing based on this Court's holding at the pleading stage in *Missouri*, 2023 WL 2578260 (W.D. La. Mar. 20, 2023). In that case, the Court relied on plaintiff declarations of purported ongoing and expected future content moderation and on allegations of ongoing moderation "specifically targeting" one plaintiff's website to find a sufficiently pleaded injury in fact. *Id.* at *18-19. While Defendants respectfully disagree with that ruling, it cannot confer standing on the different Plaintiffs here in any event because a litigant "cannot rest his claim to relief on the legal rights or interests of third parties." *Abdullah v. Paxton*, 65 F.4th 204, 210 (5th Cir. 2023); *Morice*, 2019 WL 1517954, at *7 ("[Plaintiff] lacks standing to seek injunctive relief for harm that will occur to others."). "Plaintiff-specific evidence is needed before Plaintiffs' claims can be properly characterized as an attempt to remedy an imminent injury to Plaintiffs instead of a generalized grievance." *Stringer v. Whitley*, 942 F.3d 715, 722-23 (5th Cir. 2019) (finding no "injury in fact sufficient to confer standing" given "absence of any Plaintiff-specific evidence").

---

[4] Even if Plaintiffs (improperly) attempt to submit evidence on reply that Kennedy's Instagram account was previously suspended in 2021, that would not provide him standing to seek prospective relief. He has not shown that Instagram's action was effectively that of the federal government, and the same defect would doom any other content-moderation decision he newly relies on. In any event, Instagram has reinstated Kennedy's account such that there is no prospective relief to order (much less against these Defendants). *See* Christopher Brito, *Robert Kennedy Jr.'s Instagram account has been restored*, CBS NEWS (June 5, 2023), https://www.cbsnews.com/news/robert-kennedy-jr-instagram-restored-twitter-spaces/.

And Plaintiffs cannot submit such evidence or argument with their reply, as such tactics would deprive Defendants the ability to respond to material that should have accompanied the opening brief. *Ctr. for Bio. Diversity v. U.S. EPA*, 937 F.3d 533, 542 (5th Cir. 2019).

b.      Plaintiffs also cannot establish an injury in fact from any infringement on their right to receive information because that alleged injury is generalized and abstract. Plaintiffs affirmatively argue as much, asserting: "The true victims of the Government's censorship campaign are *the American people*, whose 'right to receive information and ideas' the Government is flagrantly violating." PI Br. at 16 (emphasis added). Thus, "the undifferentiated and general nature of the claimed harm is illustrated by" Plaintiffs' own argument that "Plaintiff[s] *and all other American citizens* will suffer . . . injury[.]" *Jones v. Bush*, 122 F. Supp. 2d 713, 717 (N.D. Tex.), *aff'd*, 244 F.3d 134 (5th Cir. 2000). Such an abstract injury suffered by "the American people" is precisely the type of generalized grievance that the Supreme Court and Fifth Circuit repeatedly hold insufficient to confer standing. *Carney v. Adams*, 141 S. Ct. 493, 499 (2020) ("[A] plaintiff cannot establish standing by asserting an abstract 'general interest common to all members of the public.'"); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006) (similar); *Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 219 (5th Cir. 2001) (no standing as plaintiffs "have done little more than present a generalized grievance, common to all citizens"); *Hotze v. Burwell*, 784 F.3d 984, 995 (5th Cir. 2015) (similar). If anything, Plaintiffs' argument in their brief that the "true victims" are "the American people" refutes their conclusory allegation in the Complaint of injury to their own supposedly distinct interest in obtaining information "about COVID-19 and U.S. politics." ECF No. 1 ¶¶ 34, 37, 45. All, or at least a "large class," of citizens share those interests, precluding standing given Plaintiffs' failure to establish a distinct and concrete injury caused by content moderation of those topics. *Hotze*, 784 F.3d at 995; *cf. Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 935, 938 (5th Cir. 2022) (when a plaintiff claims "informational injury," he must also adduce evidence of "'downstream consequences' from failing to receive the required information," meaning "concrete harm from [the] failures").

The generalized and abstract nature of the injury asserted here distinguishes this case from

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) (cited in PI Br. at 16-17). Plaintiffs in that case challenged a statute prohibiting advertisement of, *inter alia*, prescription drug pricing, and the plaintiffs included prescription drug takers who purchased more expensive drugs than they would have had they received the prohibited pricing information. *Id.* at 753. Accordingly, the Supreme Court found that the injury suffered was both concrete (because the challenged statute resulted in plaintiffs paying more for drugs) and particularized (because the victims were not all citizens, but "prescription drug consumers" in a single state and organizations who represented those consumers). *Id.* at 753-54 & n.10. Here, however, Plaintiffs fail to identify any costs they have incurred or actions they have been forced to take as a result of the alleged inability to receive information about COVID or U.S. politics. *Cf. TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2214 (2021) ("An 'asserted informational injury that causes no adverse effects cannot satisfy Article III.'"); *Scott*, 49 F.4th 937 ("doctrine[] of informational . . . standing do[es] not derogate from the elemental requirement that an alleged injury be 'concrete and particularized'"). In any event, *Virginia Board* does not stand for the proposition that the injury-in-fact requirement for Article III standing is satisfied simply because a plaintiff asserts claims under the First Amendment—the injury still must be concrete and particularized. *Carney*, 141 S. Ct. at 499 (no standing to assert First Amendment claim where plaintiff did not show "concrete, particularized 'injury in fact'" over and above the abstract generalized grievance suffered by all citizens of Delaware"); *Seals v. McBee*, 898 F.3d 587, 591 (5th Cir. 2018) ("the core Article III requirements" apply in First Amendment cases no less than in others).

   c.    Moreover, even if Plaintiffs could show an injury in fact arising from content moderation or the inability to receive information pertaining to COVID, they could not do so with respect either to all the Defendants they have sued or as to all "constitutionally protected" speech, PI Br. at 1. Plaintiffs' allegations (which, again, are insufficient for a preliminary injunction anyway) reveal their exclusive focus on COVID information. *See, e.g.*, ECF No. 1 ¶¶ 434, 437, 438-440. Plaintiff CHD is a "children's health" organization. *Id.* ¶ 35. Plaintiff Sampognaro is a

"heath care policy advocate." *Id.* ¶ 44. Plaintiff Kennedy advocates against policies "he believes to be inimical to the health and well-being of individuals and this country." *Id.* ¶ 32.[5] Yet Plaintiffs sue numerous Defendants who have nothing to do with COVID for actions that have nothing to do with COVID misinformation, including the Departments of Homeland Security, State, Treasury, and Justice; the Cybersecurity and Infrastructure Security Agency ("CISA"); the Federal Bureau of Investigation ("FBI"); the Election Assistance Commission; various officials within those entities; and a White House Climate Advisor—as just a few examples. But "standing is not dispensed in gross." *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015). Plaintiffs thus lack standing to pursue their claims both against Defendants whom they have not even alleged (much less shown) caused them any injury and as to a broader universe of "constitutionally protected" speech in which Plaintiffs do not identify a distinct interest.

### 2. CHD Fails to Make a Clear Showing of Standing.

CHD's standing fails for additional reasons. For an organization to possess standing, it must establish either "associational standing" or "organizational standing." *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 237-38 (5th Cir. 2010). CHD fails to make a clear showing of either.

#### a. CHD Cannot Make a Clear Showing of Associational Standing.

To assert associational standing, CHD must make a clear showing that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). CHD fails to do so.

*First*, for the reasons explained *supra* 6-9, Plaintiffs adduce no evidence showing that CHD members have suffered a cognizable injury. Because an organization may derive associational

---

[5] Kennedy alone makes a bare reference to interest in "U.S. elections" and asserts a single "political speech" he gave that was "blocked by YouTube." ECF No. 1 ¶¶ 32, 435. These conclusory allegations would be insufficient under mere pleading standards to plead plausible injury, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), flowing from the conduct of any Defendant, *infra* 13-15, and it is all the more so on a preliminary injunction motion that requires specificity and proof.

standing only from the standing of its members, the failure to show any underlying injury in fact also precludes associational standing. *Shrimpers*, 968 F.3d at 425; *N.A.A.C.P.*, 626 F.3d at 237.

*Second*, "[a]n organization must identify 'a specific member' to assert standing on his behalf." *League of United Latin Am. Citizens v. Abbott*, 604 F. Supp. 3d 463, 483 (W.D. Tex. 2022); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("plaintiffs claiming an organizational standing" must "identify members who have suffered the requisite harm"). Neither the Complaint nor Plaintiffs' brief identifies specifically any members who have suffered an injury, instead referring only to CHD's "many members," ECF No. 1 at ¶ 437, and "70,000 members across the country," PI Br. at 16. The failure to adduce proof that any specifically identified members have suffered an injury in fact forecloses associational standing: "After all, to assess our power to decide a case, this Court must know who was injured and how." *League*, 604 F. Supp. 3d at 483; *N.A.A.C.P.*, 626 F.3d at 237 (affirming dismissal for lack of associational standing absent evidence "a specific member" suffered injury).[6]

> b.  *CHD Fails to Make a Clear Showing of Organizational Standing.*

In addition to its failure to establish an informational injury in fact, *supra* 8-9, CHD cannot establish organizational standing pursuant to *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). "An organization suffers an injury in fact if a defendant's actions 'perceptibly impair[]' the organization's activities and consequently drain the organization's resources." *El Paso Cnty.*, 982 F.3d at 343. CHD has not offered evidence showing that it has expended any resources, let alone significant resources, as a result of the challenged conduct. Rather, CHD conclusorily alleges that it is more "difficult or impossible" for it to find the information it gathers. *See, e.g.*, ECF No. 1 ¶ 39. But CHD routinely obtains information from other sources: CHD alleges that it already "draws on information, analysis, and ideas it gathers from, *among other sources*, Facebook,

---

[6] Even if CHD possesses associational standing to sue on behalf of its members, it lacks third-party standing to sue on behalf of "the American people" because it has not shown: (1) an injury-in-fact in its own right, *supra* 6-10; (2) a "close relationship" with all non-member Americans; and (3) that other Americans are hindered in their ability to bring suit to protect their interests. *See, e.g.*, *Kowalski v. Tesmer*, 543 U.S. 125, 130-31 (2004).

Twitter, and YouTube." *Id.* (emphasis added). And to establish organizational standing, "the organization's reaction to the allegedly unlawful conduct must differ from its routine activities." *El Paso Cnty.*, 982 F.3d at 344. Thus, CHD's non-litigation reaction[7] to the challenged conduct amounts to no more than its routine activities, and CHD has not established that searching outside of Facebook, Twitter, and YouTube has shifted resources from CHD's other projects.

**B.      Plaintiffs Are Not Likely to Prevail on Their First Amendment Claim.**

Independent of their failure to establish standing, Plaintiffs also are not likely to prevail on the merits of their First Amendment claim. Plaintiffs advance two unsuccessful theories, one asserting "coercive pressure" by Defendants "so as to turn [social media] companies' censorship decisions into unconstitutional state action," and the other arguing that Plaintiffs need not "meet any [] state action test" at all. PI Br. at 6-13. The former fails because the allegations here— particularly those few about *these* Plaintiffs—fall far short of the demanding standard that must be met before Defendants may be held responsible for the private actions of social media companies. The latter fails because it is unsupported by authority and divorced from the conduct from which Plaintiffs claim injury.

**1.      Plaintiffs Do Not Show That the Private Conduct of Social Media Companies "Must in Law Be Deemed to Be That of the State."**

As the Court has recognized, "the First Amendment imposes limitations only on 'state action, not action by private parties.'" *Missouri*, 2023 WL 2578260, at *28. Thus, when (as here) a plaintiff claims injury resulting from private conduct, they must show that the conduct "can fairly be seen as state action." *Id.*; *see also, e.g.*, *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (the private conduct "must in law be deemed to be that of the State"); *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (noting "limited circumstances" where "a private entity can qualify as a state actor"). On this issue, Plaintiffs rely almost exclusively on the arguments made by the *Missouri* plaintiffs. PI Br. at 6. Defendants therefore refer the Court to their response in that action, which details how those plaintiffs failed to convert private social media companies'

---

[7] "[L]itigation efforts cannot establish injury in fact." *N.A.A.C.P.*, 626 F.3d at 238.

conduct into state action. *Missouri*, ECF No. 266 at 136-250; ECF No. 266-8.

That failure is even more acute here because Plaintiffs in this action have made no effort to attribute any social media company's *specific* decision to moderate Plaintiffs' content to any *specific* Defendant(s), as required by controlling authority. *See, e.g.*, *Blum*, 457 U.S. at 1004 ("The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is responsible for the *specific conduct* of which the plaintiff complains." (emphasis added)); *Moody v. Farrell*, 868 F.3d 348, 352 (5th Cir. 2017) (state action inquiry "begins by identifying the specific conduct" from which a plaintiff claims injury).[8] Even the Complaint—which contains only allegations, not evidence—is silent as to any content-moderation decision pertaining to Plaintiffs Sampognaro or CHD. *See* ECF No. 1. This shortcoming is fatal to their claim on the merits. And as to Plaintiff Kennedy, the sparse allegations in the pleading (which cannot be assumed as true on a preliminary injunction motion) are insufficient to establish state action. Vaguely alleging that "in March 2023, an important public political speech given by Kennedy in New Hampshire was blocked by YouTube," *id.* ¶ 435, provides no basis to conclude that any particular Defendant was somehow "*responsible* for th[is] specific conduct" of YouTube's, *Blum*, 457 U.S. at 1004. Likewise, identifying Kennedy as one of the "disinformation dozen" referenced by former Press Secretary Psaki, ECF No. 1 ¶¶ 288-292, 305, fails to establish any content-moderation decision attributable to Defendants, particularly because the article cited in paragraph 305 of the Complaint itself notes that "[o]ne of those pages not taken down [by Facebook] belonged to Robert F. Kennedy Jr." Oliver Darcy, *Facebook takes action against 'disinformation dozen' after White House pressure*, CNN (Aug. 18, 2021),

---

[8] For example, at the preliminary injunction hearing in *Missouri*, the Court expressed concern about the Election Integrity Partnership ("EIP"). As an initial matter, the EIP is a private partnership, which CISA did not found or fund and in which CISA did not have any role in the management or operations. *Missouri* ECF No. 266-5, Ex. 97 ¶ 52. Moreover, Plaintiffs do not allege (much less substantiate) any connection between EIP activity and any decision by a social media company causing injury to Plaintiffs here. *See* ECF Nos. 1, 6-1. And even if Plaintiffs had alleged injury from "targeting" of speech by the EIP against particular viewpoints, the factual record establishes that the EIP examined content across the political spectrum. *See Missouri*, ECF No. 266-8 ¶ 1206.

https://www.cnn.com/2021/08/18/tech/facebook-disinformation-dozen/index.html; *see also Missouri*, ECF No. 266 at 156; ECF 266-8 ¶ 170 (showing that Facebook exercised its independent judgment to determine whether the twelve accounts violated its policies, and if not, took no action).

Tellingly, when plaintiffs (including Plaintiff CHD) have sued social media companies directly on the same First Amendment claim, numerous courts dismissed the claims for lack of state action. For instance, before bringing the present claim against federal officials, Plaintiff CHD sued Facebook, alleging that Facebook's content-moderation decisions regarding vaccine misinformation was attributable to government actors, including "federal officials at the CDC" who provided information about vaccines and a congressman who "threatened to introduce legislation to remove Facebook's immunity under Section 230." *Children's Health Defense v. Facebook Inc.*, No. 3:20-cv-5787, ECF No. 1 ¶¶ 1, 174-184 (N.D. Cal. Aug. 17, 2020); *see also Children's Health Defense v. Facebook Inc.*, 546 F. Supp. 3d 909, 927, 931 (N.D. Cal. 2021) (summarizing plaintiff's allegations of joint action and coercion). The court rejected those arguments, however, explaining that, among other problems, CHD had not alleged government involvement with any of the specific conduct from which the organization claimed injury. 546 F. Supp. 3d at 930-31, 933; *see also Missouri*, ECF Nos. 128-1 at 35-38 (collecting cases), 266 at 144-45 (discussing *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023)).

*Hart v. Facebook Inc.*, No. 22-cv-737, 2023 WL 3362592 (N.D. Cal. May 9, 2023), further demonstrates the infirmity of Plaintiffs' claim. After being dismissed a first time, the amended complaint in *Hart* drew on "the discovery in *Missouri*" and asserted substantively similar allegations to those made here, including: the CDC's (two) "be on the lookout" meetings with social media companies, the CDC sending Facebook examples of COVID misinformation, communications with the Surgeon General, the Surgeon General's July 2021 Advisory offering misinformation recommendations, emails involving Assistant to the President Rob Flaherty and former White House Senior Advisor Andrew Slavitt, comments by former Press Secretary Psaki about "flagging" misinformation for Facebook and being "in regular touch with these social media platforms," and President Biden's "they're killing people" statement and calls for social media

companies to create "a robust enforcement strategy." *Id.* at *2; *see also Hart v. Facebook Inc.*, No. 3:22-cv-737, ECF No. 112-1 (N.D. Cal. Feb. 15, 2023). But what those additional allegations critically failed to do, the court explained, was "show that the government exercised dominant control over the social media companies' action in temporarily restricting [plaintiff's] accounts"— *i.e.*, the specific conduct from which the plaintiff claimed injury. *Hart*, 2023 WL 3362592 at *3. The same is even more true here given Plaintiffs' failure to submit any evidence of their own in support of their motion.

Plaintiffs' argument that Section 230 "weighs heavily in favor of a finding of state action," PI Br. at 12-13, is based solely on an inapt analogy to *Skinner v. Ry. Labor Execs.' Assoc.*, 489 U.S. 602 (1989).[9] In *Skinner*, the Supreme Court addressed whether blood and urine tests administered by private railroads to their employees, under regulations promulgated by the Federal Railroad Administration ("FRA"), amounted to state action in the Fourth Amendment context (immediately diminishing any relevance to the instant First Amendment context, *see Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982) (for state action, "the Court has articulated a number of different factors or tests in different contexts")). The Court's concern was not that the regulations gave railroads permission to test. *Skinner*, 489 U.S. at 611-12, 615; *see also, e.g., Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 53-54 (1999) (rejecting state action theory based on statutory "authorization" or "encouragement" of the conduct). Rather, the Court found that the tests became state action because the regulations had removed any "private initiative" around testing by prohibiting the railroads from contracting away or engaging in collective bargaining over their testing authority, establishing particular procedures for the collection of test samples, requiring the railroads to report certain samples and test results to the FRA, imposing punishments for noncompliance, and preempting state laws on the same subject matter. *Skinner*, 489 U.S. at 611-12, 615. Indeed, the FRA had issued the regulations specifically because existing efforts by the railroads "were not adequate to curb alcohol and drug abuse by railroad employees." *Id.* at 607.

---

[9] Defendants further refer the Court to their discussion of *Skinner* and Section 230 in *Missouri*. *See Missouri*, ECF No. 199 at 57-59; ECF No. 266 at 141-42, 185-93.

That regulatory context is a far cry from Section 230, which refers to "action[s] voluntarily taken" by online platforms and an online space "unfettered by Federal or State regulation." 42 U.S.C. § 230(b)(2), (c)(2)(A). Section 230 does not call on any social media company to moderate (or not to moderate) content, nor does it impose any punishment or provide any reward for moderating (or not moderating) content. *Compare id.* § 230, *with Skinner*, 489 U.S. at 615 (FRA "made plain [] its strong preference for testing"). It does not establish any procedures or methods by which social media companies are to moderate (or not moderate) content. *Compare* § 230, *with Skinner*, 489 U.S. at 611-12 (FRA "set forth procedures for the collection of samples"). It does not require any company to report its content-moderation efforts (or lack thereof) to any government entity. *Compare* § 230, *with Skinner*, 489 U.S. at 615 (FRA "desire[d] to share the fruits" of testing by receiving test results and samples). It does not prevent any company from bargaining away the right to moderate (or not to moderate) content. *Compare* § 230, *with Skinner*, 489 U.S. at 615 (FRA "removed all legal barriers to testing," including by "mandat[ing] that the railroads not bargain away the authority to perform tests"). And unlike the regulations in *Skinner* that were promulgated specifically to bring about the challenged testing, Section 230 was neither enacted more than two decades ago nor remains law today to enable the government to moderate content through private actors. *See Children's Health Defense*, 546 F. Supp. 3d at 931-32 (rejecting reliance on *Skinner* and Section 230 in similar First Amendment action against Facebook); *Divino Grp. LLC v. Google LLC*, No. 19-cv-4749, 2021 WL 51715, at *6 (N.D. Cal. Jan. 6, 2021) ("Section 230 reflects a deliberate absence of government involvement in regulating online speech.'"); *Newman v. Google LLC*, No. 20-cv-4011, 2021 WL 2633423, at *9-10 (N.D. Cal. June 25, 2021) (similar). The very most Section 230 says is that companies do not face civil liability for "voluntarily" and "in good faith" making content-moderation choices they have always had the authority and ability to make. 42 U.S.C. § 230(c)(2)(A). That does not transform those private choices into state action. *See Am. Mfrs.*, 526 U.S. at 53-54; *Waters v. St. Francis Hosp., Inc.*, 618 F.2d 1105, 1107 (5th Cir. 1980); *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242-43 (5th Cir. 1999).

Notably, Plaintiffs do not engage with the substance of Section 230, instead shifting their

16

focus to alleged content moderation demands made by "the Government" as a monolith. *See* PI Br. at 12-13.[10] But the *Skinner* Court performed a different analysis, considering whether the nature of the cited regulations (here, Section 230) made the challenged conduct (here, content moderation by social media companies) attributable to the government rather than the result of private initiative. *Skinner*, 489 U.S. at 614-15. And under that analysis, set forth above, Section 230 does not support Plaintiffs' argument. Indeed, multiple Circuits have concluded that the types of features present in Section 230—the freedom of social media companies to take or not take the challenged action, and even to bargain away their authority—are inconsistent with a finding of state action and easily distinguishable from the regulations in *Skinner*. *See, e.g.*, *United States v. Rosenow*, 50 F.4th 715, 730 (9th Cir. 2022) (federal statutes did not transform social media companies' searches into state action where the companies were free to search or not search their users' data and to contract away those rights); *United States v. Meals*, 21 F.4th 903, 907 (5th Cir. 2021) (similar); *United States v. Miller*, 982 F.3d 412, 424 (6th Cir. 2020) (similar).

### 2.   Plaintiffs Cannot Avoid the State-Action Doctrine.

Plaintiffs also suggest that they can prevail in this case without satisfying the standards set out in the state-action cases, based on language in *Norwood v. Harrison*, 413 U.S. 455, 465 (1973), that a government "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish," and accusations of viewpoint discrimination. PI Br. at 7-11. Neither of these arguments finds any support.

To start, *Norwood* is simply a variation on the other state-action cases, and it accordingly does not absolve Plaintiffs of their obligation to show that the government played a sufficiently significant role in the private-party conduct that caused the complained-of injury. The question in *Norwood* was whether the state could be held liable for a harm—discrimination—caused by private schools. *See* 413 U.S. at 463-64 (discussing "whether and on what terms a State may . . . provide tangible assistance" to racially segregated schools, given the state's affirmative

---

[10] Plaintiffs cite portions of the *Missouri* plaintiffs' proposed findings of fact, which misstate and distort the factual record. *See Missouri*, ECF 266-8 ¶¶ 6, 8, 9, 14, 16, 18, 27, 94, 119.

constitutional obligation not to support racial discrimination). In answering that question in the equal protection context, the Court held that "the constitutional infirmity of the Mississippi textbook program is that it significantly aids the organization and continuation of a separate system of private schools which . . . may discriminate if they so desire. A State's constitutional obligation requires it to steer clear . . . of giving significant aid to institutions that practice racial or other invidious discrimination." *Id.* at 467. In other words, the state's conduct amounted to "significant encouragement." *See Blum*, 457 U.S. at 1004 ("[A] State normally can be held responsible for a private decision only when it . . . has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.").

Reinforcing that understanding, the Supreme Court's subsequent cases—including in the directly applicable First Amendment context—have continued to ask whether the government was sufficiently involved to make it responsible for the complained-of private conduct.[11] *E.g.*, *Gilmore v. City of Montgomery*, 417 U.S. 556, 573 (1974) (asking "whether there is significant state involvement in the private discrimination alleged" such that "that involvement makes the city a 'joint participant'"); *Blum*, 457 U.S. at 1004; *see also, e.g.*, *La. Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 320 (5th Cir. 2020) (considering whether there was "sufficiently strong 'encouragement'" by the state in First Amendment case); *O'Handley*, 62 F.4th at 1158 (similar). The few other cases Plaintiffs cite without further discussion, including *Watts v. Northside Indep. Sch. Dist.*, 37 F.4th 1094, 1097 (5th Cir. 2022), do the same in assessing whether private conduct is actually attributable to the state. PI Br. at 7, 9-10.[12] And this Court applied the

---

[11] The very case cited in *Norwood* for the "axiomatic" proposition quoted, *Lee v. Macon Cnty. Bd. of Educ.*, applied the state-action tests, as did the precedents the *Lee* court cited in turn. 267 F. Supp. 458, 478 (M.D. Ala. 1967); *id.* at 476 n.22 (citing, *e.g.*, *Lombard v. State of La.*, 373 U.S. 267, 273 (1963) (looking to the "coercive effect" of the state's conduct); *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961) (looking to whether the state's involvement was so significant "that it must be recognized as a joint participant"); *Evans v. Newton*, 382 U.S. 296, 299 (1966) (looking to the extent of "entwine[ment]")).

[12] The cases cited at pages 9-10 of Plaintiffs' brief are also all Fourth Amendment search and seizure cases, which involve different substantive law and thus different state-action tests. *Lugar*, 457 U.S. at 939; *United States v. Cordova-Espinoza*, 49 F.4th 964, 967 (5th Cir. 2022).

same standard in *Missouri* on the same allegations at the motion to dismiss stage. *Missouri*, 2023
WL 2578260, at *28.

Plaintiffs' selective quotation of Justice Thomas' concurrence in *Biden v. Knight First
Amendment Inst.*, 141 S. Ct. 1220 (2021), *see* PI Br. at 8, confirms the point. There, Justice Thomas
reiterated the very test Plaintiffs resist: "if the government coerces or induces [a private entity] to
take action the government itself would not be permitted to do," then "a private entity is . . .
constrained by the First Amendment." *Knight*, 141 S. Ct. at 1226 (citing, *inter alia*, *Blum*, 457 U.S.
at 1004-05). Thus, the question is whether the government effectively controls the space for
expression:

> For example, a government agency that leases a conference room in a hotel to hold
> a public hearing about a proposed regulation cannot kick participants out of the
> hotel simply because they express concerns about the new regulation. But
> government officials who informally gather with constituents in a hotel bar can ask
> the hotel to remove a pesky patron who elbows into the gathering to loudly voice
> his views. The difference is that the government controls the space in the first
> scenario, the hotel, in the latter.

*Id.* at 1222 (citations omitted); *see also, e.g.*, *Sons of Confederate Veterans*, 821 F. App'x at 320
(municipal not liable for business association's denial of an application to display the Confederate
flag even though the mayor requested denial, because the mayor did not control the association
and the association was not "all but forced by the coercive power of a governmental official").

These established standards plainly apply here. Plaintiffs do not (and cannot) assert any
injury from governmental actors making requests to social media companies without
accompanying content moderation by those companies—just as a request to the hotel in Justice
Thomas's example in *Knight*, or to the association in *Sons of Confederate Veterans*, or even to the
bystander or private hackers in Plaintiffs' (inapt) hypotheticals (PI Br. at 7) would not on its own
present an injury to the pesky patron, the Confederate organization, or the driver or computer user,
respectively. *See Knight*, 141 S. Ct. at 1222; *Sons of Confederate Veterans*, 821 F. App'x at 320.[13]

---

[13] Plaintiffs' hypotheticals also concern Fourth Amendment searches and seizures, which are
governed by dramatically different substantive law on the question of state action. *See, e.g.*,
*Cordova-Espinoza*, 49 F.4th at 967.

Rather, Plaintiffs necessarily claim injury (and thus standing) from content-moderation decisions, and social media companies are undisputedly the only entities that control their platforms and moderate content. But because a "private entity is not ordinarily constrained by the First Amendment," *Knight*, 141 S. Ct. at 1222, Plaintiffs' only option is to show that the private entity's "choice must in law be deemed to be that of the State," *Blum*, 457 U.S. at 1004.

Plaintiffs cannot lower the required showing simply by suing the governmental actors interacting with the social media companies instead of the social media companies themselves. *See* PI Br. at 9. Governmental actors also were the defendants in *Gilmore*, *Blum*, *Sons of Confederate Veterans*, *O'Handley*, and *Missouri*—and all of those courts applied the state-action tests because, as here, the injury arose from private conduct (allegedly at the behest of state actors). As *Blum* explained, even when government officials are defendants, state-action principles "shed light upon the analysis necessary" where plaintiffs "seek[] to hold state officials liable for the actions of private parties." 457 U.S. at 1003.

Finally, Plaintiffs contend that the state-action tests do not apply because the government's conduct is not viewpoint neutral, PI Br. at 10-11, but they cite no applicable authority for that proposition. Their citation to cases where, for instance, the state "expend[ed] funds to encourage a diversity of views from private speakers," as in *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995), or funded a program "designed to facilitate private speech," as in *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001), has no relevance here. In those cases, the government created a forum for speech but then imposed viewpoint-based restrictions on that speech. Here, however, there is no colorable argument that social media platforms are a forum created by Defendants or that Defendants have the ability to impose any restrictions on speech occurring on those platforms. As already discussed, social media companies control their platforms, which is why the state-action doctrine necessarily applies.[14]

---

[14] Plaintiffs also vaguely assert that Twitter "receiv[ed] millions of dollars in payments in connection with reporting certain users and certain content to the FBI." PI Br. at 11. Apart from providing no competent, authenticated evidence to support that allegation, Plaintiffs' vagueness

Absent state action, Plaintiffs' argument is no more than a challenge to the content of the government's speech. But as Plaintiffs' own authorities establish, "when the State is the speaker, it may make content-based choices." *Rosenberger*, 515 U.S. at 833 (cited at PI Br. at 11); *see also Velazquez*, 531 U.S. at 541 (recognizing the "latitude" given "where the government's own message is being delivered" (cited at PI Br. at 11)); *Chiras v. Miller*, 432 F.3d 606, 613 (5th Cir. 2005) ("[T]he government . . . has the discretion to promote policies and values of its own choosing free from forum analysis or the viewpoint-neutrality requirement."). "[I]t is entitled to promote a program, to espouse a policy, or to take a position." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). It is entitled to "urg[e]" a particular action without balancing its message. *Matal v. Tam*, 582 U.S. 218, 235 (2017). It is entitled "to encourage actions deemed to be in the public interest." *Maher v. Roe*, 432 U.S. 464, 476 (1977). That is just what Defendants did here, in response to health misinformation during a global pandemic, and Plaintiffs' complaint about Defendants communicating a particular message misses the mark.

In short, the Court should reject Plaintiffs' unsupported attempt to evade or reformulate the state-action doctrine. And under those well-established tests, Plaintiffs have failed to make a clear showing of likely success on the merits.

### III.   Plaintiffs Fail to Satisfy the Remaining Preliminary Injunction Requirements.

The Court also should deny the requested emergency relief for the independent reason that Plaintiffs have offered nothing more than two conclusory statements—both presupposing "unlawful" and "unconstitutional" conduct—regarding the remaining preliminary injunctive requirements, balance of the equities and the public interest. PI Br. at 13-14. Such bare, circular conclusions do not satisfy Plaintiffs' burden to make a "clear showing" on those factors, *Mazurek*, 520 U.S. at 972, and Plaintiffs cannot belatedly remedy their failure on reply, *Sanders v. Unum*

---

makes a meaningful response very difficult. Nevertheless, the government is required to provide reimbursement for reasonable expenses directly related to searching for, assembling, reproducing, or otherwise providing information responsive to legal process, such as court orders. This requirement is set by federal law. *See, e.g.*, 18 U.S.C. §§ 2703, 2706. It is not payment for content moderation.

*Life Ins. Co.*, 553 F.3d 922, 927 (5th Cir. 2008).

In any event, the balance of the equities and the public interest weigh decisively in Defendants' favor. "The government undoubtedly has the authority to control its own message when it speaks or advocates a position it believes is in the public interest," *Chiras*, 432 F.3d at 612, because without that ability, "government could not work." *Walker*, 576 U.S. at 207. That messaging routinely occurs not just in public settings, but also in communications with private third parties. *See O'Handley*, 62 F.4th at 1163-64 (communicating "directly with Twitter rather than by speaking out in public does not dilute [state government's] speech rights or transform permissible government speech into problematic adverse action"); *cf. Ctr. for Bio. Diversity v. Office of U.S. Trade Rep.*, 450 F. App'x 605, 608 (9th Cir. 2011) (in FOIA context, noting that there are frequently "communications between government officials and private third parties").

Plaintiffs' observation that the First Amendment does not protect Defendants' government speech, PI Br. at 3-5, attacks a strawman and does not shift the balance of equities. Defendants invoke the government speech doctrine not to argue that Plaintiffs' proposed injunction would violate Defendants' First Amendment rights, but because the Supreme Court has repeatedly recognized that government speech "to promote a program, to espouse a policy, or to take a position" is a critical government function: the government must have the "'freedom' to select the messages it wishes to convey." *Walker*, 576 U.S. at 207-08. Plaintiffs' requested injunction would encroach on this "very business of government" by purporting to restrict the entities with whom the Executive Branch may communicate and the channels available for such communications. *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring). Such interference with the Executive Branch's core prerogative to "advocate[] a position it believes is in the public interest," *Chiras*, 432 F.3d at 612, would weigh significantly against an injunction under any circumstance, but especially so here, where Plaintiffs have failed to even attempt to show a non-speculative harm to them from the government's speech.

## IV.    Plaintiffs' Proposed Injunction Is Improper.

In implicit recognition that the injunction sought in *Missouri* is improper, Plaintiffs seek a

"more narrowly-framed injunction" that would enjoin Defendants, "and anyone acting in concert with them," from "engaging, pursuant to their official duties, in any private communications with any social media company with the purpose of inducing, encouraging, or promoting the censorship of constitutionally protected speech." PI Br. at 2-3, 17. Plaintiffs' injunction, however, neither remedies the deficiencies identified in *Missouri*, *see Missouri*, ECF No. 266 at 262-75, nor presents a proper injunction its own right.

*First*, Plaintiffs' proposed injunction is impermissibly vague because it does not "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained." Fed. R. Civ. P. 65(d)(1); *see also Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Plaintiffs pull the verbs in their proposed injunction ("induce, encourage, or promote") from *Norwood*, but those words in the context of an injunction are so vague as to create an impermissible potential for over-inclusiveness. *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 657 (D.C. Cir. 1994) (portion of an injunction prohibiting groups from "inducing" and "encouraging" others to blockade clinics was impermissibly vague and "introduce[d] an easily avoidable measure of unclarity as to what speech and conduct is prohibited"). Indeed, those verbs in *Norwood* characterized the specific scheme at issue in that case—a textbook program through which the state provided significant financial assistance to schools that were unquestionably racially discriminatory—which is an entirely different context from the challenged conduct and constitutional claim here, thus providing no clarity as to what conduct the proposed injunction is meant to prohibit. And even if the inapposite factual context of *Norwood* could be imported into Plaintiffs' proposal, an injunction that orders no more than compliance with Supreme Court precedent fails to "describe in reasonable detail" the restrained actions. *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 80-81 (2d Cir. 2001) (vacating as impermissibly vague injunction requiring compliance with "the Supreme Court's standards set forth in the cases quoted").

"Censorship" is another imprecise term that purportedly encompasses an enormous swath of activity, including but not limited to "de-platform[ing]," "shadow-ban[ning]," "de-boost[ing]," "restrict[ing] access to," and "tak[ing] any other adverse action." *See* ECF No. 1, Prayer for Relief

23

¶ B. At best, then, Plaintiffs can define censorship only by reference to other undefined terms of art within the social media industry—and the limitless undefined term of "any other adverse action"—rendering their proposal impermissibly vague. *Scott v. Schedler*, 826 F.3d 207, 213-14 (5th Cir. 2016) ("[T]he injunction lacks the requisite specificity and detail because it does not clearly define the policies, procedures, and directives that it orders Schedler to maintain.").

Likewise, the injunction's reference to "constitutionally protected speech" requires Defendants to conduct a legal assessment of the expression in question to determine whether it is constitutionally protected each time any Defendant communicates privately with a social media company regarding content. *See Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983) ("The inquiry into the protected status of speech is one of law."). This, too, renders Plaintiffs' proposal impermissibly vague because "an injunction 'should be phrased in terms of objective actions, not legal conclusions.'" *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 322 (3d Cir. 2020); *see also John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 985 (11th Cir. 1983) (same). Accordingly, these numerous deficiencies fail to put the Defendants on reasonable notice of what conduct is proscribed, raising due process concerns.

*Second*, even if Plaintiffs' proposed injunction could derive a sufficiently specific meaning from the legal conclusions it incorporates, the proposal amounts to an impermissible follow-the-law injunction directing Defendants to obey Plaintiffs' reading of *Norwood*. But "[a] general injunction which in essence orders a defendant to obey the law is not permitted." *Meyer v. Brown & Root Const. Co.*, 661 F.2d 369, 373 (5th Cir. 1981); *Payne v. Travenol Labs., Inc.*, 565 F.2d 895, 898 (5th Cir. 1978) ("'[O]bey the law' injunctions cannot be sustained."); *Randolph v. E. Baton Rouge Par. Sch. Bd.*, No. 15-cv-654-SDD, 2016 WL 3579224, at *3 (M.D. La. June 28, 2016) (rejecting "request to enjoin Defendants from bullying, harassing, intimidating, or depriving administrators of due process" as an improper "'obey the law' injunction").

*Third*, Plaintiffs' proposed injunction is vastly overbroad because it is not 'narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order." *Scott*, 826 F.3d at 211. Plaintiffs here seek to enjoin *all* Defendants' involvement in social media companies' moderation

of *all* "constitutionally protected speech," PI Br. at 17, but do not even allege, much less prove, standing to challenge actions by all Defendants, or any content-moderation decision pertaining to non-COVID speech, *supra* 9-10. Accordingly, an injunction that applies to all Defendants and all protected speech would be "overbroad" because it would extend to claims "not properly before the district court." *John Doe #1 v. Veneman*, 380 F.3d 807, 818-19 (5th Cir. 2004).[15]

Nor does Plaintiffs' reference to "constitutionally protected speech" resolve the law-enforcement and cyber-security concerns that render overbroad the injunction sought in *Missouri*. *See Missouri*, ECF No. 266 at 265-67. For example, the FBI has asked platforms to remove personal information about FBI personnel and federal judges where that information may have been posted in order to encourage violence against those individuals, *Missouri*, ECF No. 266-6, Ex. 157 ¶ 46, even if that information does not rise to the level of a true threat or otherwise violate criminal law. Yet the proposed injunction would not allow this conduct. It is therefore overbroad because it would threaten to prevent Executive Branch agencies from performing functions essential to public safety and national security.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied. If nevertheless the Court were to enter an injunction, Defendants respectfully request that the injunction be administratively stayed for seven days, to allow Defendants time to consider moving for a stay pending appeal.

---

[15] Plaintiffs' proposal is also overbroad because it would apply to both current and former federal officials named as Defendants. Plaintiffs offer no justification for including former employees (including, as of June 30, 2023, Assistant to the President Rob Flaherty), or even for including current employees named in their official capacity when Plaintiffs also seek to enjoin the agencies employing those individuals. *Missouri*, ECF No. 266 at 273-75.

Dated: June 20, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel, Federal Programs Branch

JOSHUA E. GARDNER
Special Counsel, Federal Programs Branch

*/s/ Catherine M. Yang*
ALEXANDER W. RESAR (N.Y. Bar No. 5636337)
CATHERINE M. YANG (N.Y. Bar No. 5319736)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
Tel: (202) 514-4336
Catherine.m.yang@usdoj.gov

*Attorneys for Defendants*