UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| **ROBERT F. KENNEDY, JR. ET AL.** | **CIVIL ACTION NO. 3:23-cv-00381** |
| **VERSUS** | **JUDGE: TERRY A. DOUGHTY** |
| **JOSEPH R. BIDEN ET AL.** | **MAG. JUDGE: KAYLA D. MCCLUSKY** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFFS' REPLY MEMORANDUM
IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pending before this Court is perhaps the most consequential First Amendment question of the present day. Social media is "the modern public square."[1] But today's public square has gatekeepers—"platform gatekeepers"[2]—a handful of private companies with unprecedented control over the content of public discourse.[3] For years, federal agents have been communicating secretly with these gatekeepers, seeking very effectively to induce them to censor constitutionally protected speech. This censorship-by-proxy campaign is flagrantly unconstitutional: it is "axiomatic that [the] state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Watts v. Northside Indep. Sch. Dist.*, 37 F.4th 1094, 1097 (5th Cir. 2022) (quoting *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (emphasis added)). If Defendants' conduct goes unchecked, the United States will be a country where government can and will contrive to keep hundreds of millions of Americans from hearing what governmental actors don't want them to hear—for example, that COVID-19 may have originated in a Chinese laboratory we clandestinely funded, or that compromising emails were found on a laptop belonging to the President's son.

The burden of standing up against such censorship, against ministries of truth, against governmental efforts at thought control—this burden falls today, as it has before, on the federal judiciary. It falls in particular, at this moment, on the United States District Court for the Western

---

[1] *See Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).
[2] UNITED STATES HOUSE OF REPRESENTATIVES, SUBCOMMITTEE ON ANTITRUST, INVESTIGATION OF COMPETITION IN DIGITAL MARKETS 57 (2020).
[3] *See Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220, 1221 (Thomas, J., concurring) ("Today's digital platforms provide avenues for historically unprecedented amounts of speech. . . Also unprecedented, however, is the concentrated control of so much speech in the hands of a few private parties.").

District of Louisiana.

Both the instant case, *Kennedy v. Biden*, and the closely related case, *Missouri v. Biden*, also pending before this Court, challenge the Federal Government's ongoing, multi-agency campaign to induce social media censorship. *Missouri v. Biden* was brought on behalf of *speakers* alleging that their speech had been censored online. This case, *Kennedy v. Biden*, is a class action brought to ensure that the rights of social media *viewers and listeners* are fully represented.

This Reply Memorandum is submitted in support of Plaintiffs' preliminary injunction motion. Defendants argue that Plaintiffs have not shown irreparable harm because no "plaintiff-specific" speech has been censored; that Plaintiffs lack standing; and that the government has not been proven to have so "coerced" or "dominated" any act of censoring "plaintiff-specific" speech as to turn that censorship into "state action."  But Defendants simply misunderstand this case. Plaintiffs here, unlike in *Missouri v. Biden*, do not rest their claims on censorship of their own speech. Rather, Plaintiffs have brought this case as (and on behalf of) social media *users*, whose right to an uncensored public square is being systematically violated. As a result, as will be shown below: (1) irreparable harm exists as a matter of law; (2) Plaintiffs undoubtedly have standing—indeed there could be no plaintiff with stronger standing than Plaintiff Children's Health Defense; and (3) Plaintiffs need not prove that Defendants coerced—or satisfied any other state action test with respect to—any particular act of social media censorship. Plaintiffs need only show—and the evidence before the Court clearly establishes—that Defendants are deliberately "induc[ing], encourage[ing], or promot[ing]" social media censorship of protected speech. *Norwood*, 413 U.S. at 465. For "[i]f there is any fixed star in our constitutional constellation," as the Supreme Court reaffirmed just days ago, "it is the principle that the government may not interfere with an uninhibited marketplace of ideas." *303 Creative, LLC v. Elenis*, 600 U.S. ___, slip op. at 7 (2023).

**FACTUAL STATEMENT**

To minimize additional burdens both for the Court and for Defendants themselves, Plaintiffs rely on the voluminous evidence submitted in *Missouri v. Biden*. Defendants seize on this, claiming that there is "no evidence" before the Court supporting Plaintiffs' claims. But in the Fifth Circuit, it has been established for seventy years that a District Court may take into account evidence already submitted in a pending, closely related case, rather than having plaintiff re-examine the very same witnesses, re-introduce the very same evidence, and ask the Court to re-determine the very same factual questions. *See Walker v. Loop Fish & Oyster Co.*, 211 F.2d 777, 780-81 (5th Cir. 1954) ("It would have been a work of supererogation, and a needless waste of time, for the trial judge to have again heard in the [new] cases the lengthy evidence on the question of negligence which he had just heard eleven days before, in the [previous] case.").

**ARGUMENT**

I.   ***Irreparable Harm Exists Here as a Matter of Law***

Ignoring controlling Fifth Circuit case law, Defendants first contend that Plaintiffs "fail to establish irreparable harm." (Def. Mem., Doc. # 17, at 2.) But when "an alleged deprivation of a constitutional right is involved," "*no further showing of irreparable injury is necessary*." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (emphasis added) (quoting 11A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d ed. 1995)). The "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury." *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013).

Defendants never acknowledge this clear Fifth Circuit case law. Instead, they claim that Plaintiffs fail to show that any "plaintiff-specific" speech has been or will be censored. (Doc. # 17, at 4.) But Defendants misunderstand the nature of this action. Unlike the individual plaintiffs in

3

*Missouri v. Biden*, resting their claims on their rights as *speakers*, Plaintiffs here seek to vindicate the rights of *viewers* and *users* of social media. Each named Plaintiff is an active consumer of health and political news on social media (Doc. # 1, at 12-15),[4] with a right of access to "the widest possible dissemination of information from diverse and antagonistic sources." *Associated Press v. United States*, 326 U.S. 1, 20 (1945). For Plaintiffs as for countless other Americans, receiving accurate information and a full range of opinions about COVID-19—information specifically targeted for censorship by Defendants—is critical to their political activities and their ability to make health-related decisions. (Doc. # 1, at 12-15.)

Under controlling Fifth Circuit precedent, denial of such information is irreparable harm as a matter of law. *Louisiana Consumer's League, Inc. v. Louisiana State Bd. of Optometry Examiners*, 557 F.2d 473, 475 (5th Cir. 1977) (where plaintiffs allege suppression of "information bearing a significant relationship to their health," a "[d]enial of a preliminary injunction . . . *cannot be predicated on any purported lack of irreparable injury*") (emphasis added); *Little v. Llano Cnty.*, No. 1:22-CV-424-RP, 2023 U.S. Dist. LEXIS 54716, at *35 (W.D. Tex. Mar. 30, 2023) ("Because Plaintiffs have clearly shown Defendants actions likely violate their First Amendment right to access to information, they have clearly shown they are suffering irreparable harm.").

II.     ***Plaintiffs Plainly Have Standing***

Defendants' argument that Plaintiffs lack standing repeats the same error, insisting there is no "injury in fact" in this case because Plaintiffs have not proven any censorship of their own "plaintiff-specific" speech. Again, Defendants misunderstand the right at issue here. Plaintiffs

---

[4] A "verified allegation" is "competent . . . evidence." *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003); *Louisiana v. CDC*, 603 F. Supp. 3d 406, 420 n.72 (W.D. La. 2022) (on preliminary injunction, "relief can be based on pleadings alone . . . if the pleadings are verified") (citing 11A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2949 (3d ed. 2013)).

bring this case not as censored speakers, but as social media users—viewers and listeners—challenging a denial of their right to receive information and ideas. Under law settled almost a half redress that First Amendment injury. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) (consumers could challenge ban of drug price advertisements); *Louisiana Consumer's League,* 557 F.2d at 475 (vacating denial of preliminary injunction) (consumers could challenge denial of access to "information on a subject bearing a significant relationship to their health"). Moreover, Plaintiffs Kennedy and CHD are also news publishers (Doc. # 1, at 13-14), with a First Amendment right to gather news from any lawful source. *See Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017) ("The Supreme Court has . . . recognized a First Amendment right to 'receive information and ideas,' and there is 'an undoubted right to gather news from any source by means within the law.'") (citations omitted). Accordingly, "infringement on [the] right to access information is a 'continuing, present adverse effect[]' that qualifies as an injury for Article III purposes.'" *Little*, 2023 U.S. Dist. LEXIS 54716, at *16 (citation omitted).

Indeed, an organization like CHD has the strongest possible standing to seek a nationwide injunction of the Government's censorship campaign. CHD has over 70,000 members around the country, all of them consumers (and most of them avid consumers) of online health-related information. (Doc. # 1, at 14.) In the Supreme Court's seminal *Virginia State Board of Pharmacy* (establishing the right to "receive information and ideas"), plaintiff was a nonprofit consumers' organization, and the Court expressly upheld its standing. *See* 425 U.S. at 757. In the Fifth Circuit's *Louisiana Consumer's League* (following and building on *Virginia Board of Pharmacy*), suit was again brought by a consumers' organization. *See* 557 F.2d at 473. Defendants' attack on CHD's

5

standing flies in the face of established case law.[5]

### III. *The Evidence Establishes a High Likelihood of Success on Plaintiffs' First Amendment Claim Whether or Not Defendants Can Be Proven To Have Coerced—or Satisfied Any Other State Action Test with Respect to—Any Specific Act of Social Media Censorship.*

Quoting *Hart v. Facebook Inc.*, No. 22-cv-737, 2023 WL 3362592 (N.D. Cal. May 9, 2023), Defendants argue that Plaintiffs cannot succeed on the merits because they have not shown that Defendants so "coerced" or "dominated" any "specific" act of censorship as to turn that censorship into state action. (Doc. # 17, at 15.) In fact, evidence before the Court shows frequent governmental coercion and collusion sufficient for state action doctrine. But more fundamentally, Plaintiffs here *do not have to satisfy the state action tests*. The reason why is simple.

---

[5] Defendants' convoluted attack on CHD's standing borders on frivolous. Organizations (like CHD and every other nonprofit and every corporation in the country) always have standing to enforce their own First Amendment rights. *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310 (2010).

Defendants miss this obvious point of law because they commit the "classic logical fallacy" of "mistaking a sufficient factor for a necessary one." *Kisor v. McDonough*, 995 F.3d 1347, 1371 n.5 (Fed. Cir. 2021). Defendants cite a well-known standing test—the diversion-of-resources test—and assert that CHD has failed to meet it. (Doc. # 17, at 11.) But that test is not *necessary*; it is merely one way an organization "*may*" establish standing. *See NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (emphasis added). Organizations can have standing under any "test that applies to individuals." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). Thus just as individuals can always sue to enforce their own constitutional rights, so too can CHD.

Defendants further argue that CHD lacks standing because it has failed to "identify any specific member" threatened with injury. (Doc. # 17, at 11.) But that is required only for "representative" standing (sometimes called "organizational" or "associational" standing)—an additional form of standing available where an organization's *own* rights have *not* been violated. *See Students for Fair Admissions v. Harvard Coll.*, 600 U.S. ___, slip op. at 7 (2023); *Kyle*, 626 F.3d at 237; *OCA-Greater Houston*, 867 F.3d at 610. Here, CHD's own rights *are* being violated, so it does not need representative standing. All the same, CHD does have representative standing. In the Fifth Circuit, the name-a-member requirement does not apply at this stage of the proceedings. *See Hancock County Bd. of Supervisors v. Ruhr*, 487 Fed. Appx. 189, 198 (5th Cir. 2012) ("no authority for the proposition that an [organization] must identify a particular . . . member *at the pleading stage*") (original emphasis). For representative standing, CHD's verified pleadings need only show a likelihood that CHD will later, at trial, be able to prove that one or more members are threatened with injury. *Louisiana v. Ctrs. for Disease Control & Prevention*, 603 F. Supp. 3d 406, 424 (W.D. La. 2022) (plaintiffs "must show a substantial likelihood that they will be able to prove standing by a preponderance of the evidence at a trial on the merits"). CHD easily meets that test.

Unlike *Hart*, this case is brought not by a social media speaker against a private company, but by social media users against federal agents and agencies. Defendants' conduct here is governmental action because they *are* the government. Thus the question in this case is not whether Defendants are state actors (of course they are); the only question is whether their campaign to induce social media censorship is permissible under the First Amendment.

And plainly it is not. As the Supreme Court held in 1973, and as the Fifth Circuit reaffirmed just last year, it is "axiomatic" that the "state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973), *quoted in Watts v. Northside Indep. Sch. Dist.*, 37 F.4th 1094, 1097 (5th Cir. 2022). Under *Norwood*, the Federal Government's censorship campaign is unlawful in its entirety, because that campaign is one gigantic, deliberate effort to "induce, encourage [and] promote private [social media platforms] to accomplish what [the government] is constitutionally forbidden to accomplish"—i.e., the suppression of constitutionally protected speech.

By its own terms, a *Norwood* violation does not turn on "coercion" or "collusion" or any other state action test. The words "state action" do not appear in *Norwood*, and the Court did not hold that giving a few textbooks to private schools (the conduct at issue in *Norwood*) turned those schools into state actors. It was not the schools that were violating the Constitution in *Norwood*, but rather the government officials, because officials violate the Constitution whenever they deliberately "induce, encourage, or promote" private parties to achieve an objective the government "is constitutionally forbidden to accomplish." On their face, the words "induce," "encourage" and "promote" extend beyond the familiar state action tests, and they include governmental *efforts* or *attempts* to bring about unconstitutional ends through private parties. Such efforts can therefore be enjoined even when they have not (yet) succeeded.

7

Defendants struggle mightily to deny all this, arguing that providing textbooks to private schools did satisfy the state action test, turning those schools into government actors. (Doc. # 17, at 16-17.) That argument is risible, and Defendants surely know it. *See, e.g.*, *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) (fact that private school received over 90% of its funding from government did not make private school a state actor). *Norwood* is not a state action case. Its principle is simple: *Norwood* prevents government from deliberately circumventing constitutional rights by getting private actors to do what the government constitutionally can't. That's an exact description of the Federal Government's censorship campaign.[6]

Defendants try to stave off this conclusion by returning to the same error discussed above: they insist that Plaintiffs cannot show that Defendants coerced or aided in or caused any particular "plaintiff-specific" speech to be censored. Factually, this is false: as the evidence before the Court shows, Defendants have specifically targeted both Plaintiff Kennedy and Plaintiff CHD for censorship. (E.g., Doc. # 174-1, at 2, 25.) But this issue is again legally irrelevant. Plaintiffs have brought this case as *viewers* and *users* of social media. While a *speaker*'s preliminary injunction motion might have to show that Defendants censored his specific posts or videos, Plaintiffs do not bear that burden. At most, Plaintiffs need only show a substantial likelihood—which cannot seriously be disputed on the evidence before the Court—that the Federal Government's censorship campaign will curtail the accessibility of *some* significant amount of constitutionally protected

---

[6] And if instead Defendants' argument were accepted—if under *Norwood* providing textbooks is such significant assistance that it turns private schools into state actors—then Defendants would be hoist on their own petard, because the Government has clearly provided far *greater* assistance to social media companies, both overall and specifically to their censorship practices (e.g., immunity under Section 230, funding for complying with government information requests, repeatedly identifying specific posts for censorship, assisting with enforcement of the companies' terms of service, and assisting in deciding what speech counts as true). If state action doctrine was satisfied in *Norwood*, it is more than satisfied here.

speech, thereby violating the rights of Plaintiffs and millions of other social media consumers. *See Virginia State Bd. of Pharmacy*, 425 U.S. at 757 n.15 (fact that information had not been totally blocked, and consumers could still access it elsewhere, did not cure First Amendment violation).

Moreover, the fact that the Government's censorship campaign is *viewpoint-based* provides an independent reason for enjoining it without regard to whether it turns social media companies into state actors. *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (ban on viewpoint discrimination is "core postulate of free speech law"). If the Federal Government offered social media companies *one dollar* every time they censored pro-Republican (and only pro-Republican) political ads, that viewpoint-based inducement would be plainly unconstitutional even though it did not coerce, collude or satisfy any other state action tripwire. Here, the evidence demonstrates a high likelihood that the Federal Government was and is offering numerous inducements, both subtle and explicit, to social media companies that acquiesce in its viewpoint-based censorship requests/demands. Hence for this reason too, a high likelihood of success on the merits has been established, even if the government cannot be proven to have coerced (or even caused) any particular act of social media censorship.

    IV.    ***Plaintiffs' Proposed Injunction Serves the Public Interest***

Plaintiffs ask this Court to preliminarily enjoin Defendants from "engaging, pursuant to their official duties, in private communications with any social media company with the purpose of inducing, encouraging, or promoting the censorship of constitutionally protected speech." This injunction is not a mere "obey the law" command, as Defendants try to paint it. On the contrary, it is on its face narrowly tailored and specific. It applies only to private communications with social media companies, clearly indicates what is impermissible, and targets exactly the unconstitutional conduct Defendants have already repeatedly engaged in, while infringing not at all on any

government official's own First Amendment rights, nor curbing any actor's ability to block genuinely unlawful online content. Defendants' notion that the term "constitutionally protected speech" is unconstitutionally vague (Doc. # 17, at 24) cannot be taken seriously.

Nor can Defendants' argument that such an injunction would be contrary to the public interest: "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *Associated Press*, 326 U.S. at 20. No doubt the current Administration believes it is protecting Americans when it keeps them from seeing information and idea it deems dangerous. The Constitution says otherwise. As the great Judge Learned Hand put it, the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." *Id*. at 28 (Frankfurter, J., concurring) (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (Hand, J.)).

It seems that many in the Federal Government are today in the camp of those who see the First Amendment's foundational presupposition as "folly." Plaintiffs hope this Court will come to a different conclusion.

## CONCLUSION

For the foregoing reasons, Plaintiffs ask the Court to grant the requested injunction.

Dated: July 4, 2023

    /s/ G. Shelly Maturin, II
G. SHELLY MATURIN, II (#26994)
WELBORN & HARGETT, LLC
1540 W. Pinhook Road
Lafayette, LA 70503
Telephone: (337) 234-5533
Facsimile: (337) 769-3173
shelly@wandhlawfirm.com
Attorney for Plaintiffs

JED RUBENFELD
NY Bar # 2214104
(Pro Hac Vice)
1031 Forest Rd.
New Haven CT 06515
Tel.: 203-432-7631
E-mail: jed.rubenfeld@yale.edu