## Citations

1. **Nathan Wade Paid More Than Other Fulton Special Prosecutors | 11alive.com** https://www.11alive.com/article/news/special-reports/ga-trump-investigation/nathan-wade-paid-substantially-more-than-fulton-special-prosecutors/85-c1fa7418-7608-4417-a685-2fbab1c450aa
2. **New Report: How Manhattan DA Alvin Bragg and Judge Merchan Violated the Constitutional and Legal Rights of President Donald J. Trump | House Judiciary Committee Republicans** https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/2024-07-09%20Lawfare%20-%20How%20the%20Manhattan%20District%20Attorneys%20Office%20and%20a%20New%20York%20State%20Judge%20Violated%20the%20Constitutional%20and%20Lega.pdf
3. **Department of Housing and Urban Development--Application of Section 713 of the Financial Services and General Government Appropriations Act, 2012 (Reconsideration) | U.S. GAO** https://www.gao.gov/assets/b-325124.2.pdf
4. **Report Fraud, Waste, and Abuse | Office of Inspector General** https://oig.treasury.gov/report-fraud-waste-and-abuse

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON(s)**

UNITED STATES OF AMERICA,

        Plaintiff,

v.

**DONALD J. TRUMP,**
**WALTINE NAUTA, and**
**CARLOS DE OLIVEIRA,**

        Defendants.

_____/

**NOTICE OF APPEAL**

The United States of America hereby gives notice that it appeals to the United States Court

of Appeals for the Eleventh Circuit from the order of the District Court entered on July 15, 2024,

Docket Entry 672.

? ?? ~$24,000,000~ By: ? ? ? Page 8

    Respectfully submitted,

    JACK SMITH
    Special Counsel
    N.Y. Bar No. 2678084

    /s/ *Jay I. Bratt*
    Jay I. Bratt
    Counselor to the Special Counsel
    Special Bar ID #A5502946
    950 Pennsylvania Avenue, N.W.
    Washington, D.C. 20530

    David V. Harbach, II
    Assistant Special Counsel
    Special Bar ID #A5503068

July 17, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which in turn serves counsel of record via transmission of Notices of Electronic Filing.

/s/ *Jay I. Bratt*
Jay I. Bratt

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON**

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

      Defendants.
_____/

**ORDER GRANTING MOTION TO DISMISS SUPERSEDING INDICTMENT**
**BASED ON APPOINTMENTS CLAUSE VIOLATION**

Former President Trump's Motion to Dismiss Indictment Based on the Unlawful Appointment and Funding of Special Counsel Jack Smith is **GRANTED** in accordance with this Order [ECF No. 326]. The Superseding Indictment is **DISMISSED** because Special Counsel Smith's appointment violates the Appointments Clause of the United States Constitution. U.S. Const., Art. II, § 2, cl. 2. Special Counsel Smith's use of a permanent indefinite appropriation also violates the Appropriations Clause, U.S. Const., Art. I, § 9, cl. 7, but the Court need not address the proper remedy for that funding violation given the dismissal on Appointments Clause grounds. The effect of this Order is confined to this proceeding.

**INTRODUCTION**

The Motion before the Court challenges the legality of Special Counsel Smith (hereinafter, "Special Counsel Smith" or "Special Counsel") in two consequential respects, both of which are matters of first impression in this Circuit, and both of which must be resolved before this

1

prosecution proceeds further [ECF No. 326]. The first is a challenge to his appointment under the Appointments Clause, which provides the exclusive means for appointing "Officers of the United States." Article II, § 2, cl. 2. The Appointments Clause sets as a default rule that all "Officers of the United States"—whether "inferior" or "principal"—must be appointed by the President and confirmed by the Senate. *Id.* It then goes on to direct that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in Heads of Departments." *Id.* For purposes of this Order, the Court accepts the Special Counsel's contested view that he qualifies as an "inferior Officer," not a "principal" one, although the Court expresses reservations about that proposition and addresses those arguments below. The Motion's second challenge is rooted in the Appropriations Clause, which prohibits any money from being "drawn from the Treasury" unless such funding has been appropriated by an act of Congress. Art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law. . . .").

Both the Appointments and Appropriations challenges as framed in the Motion raise the following threshold question: is there a statute in the United States Code that authorizes the appointment of Special Counsel Smith to conduct this prosecution? After careful study of this seminal issue, the answer is no. None of the statutes cited as legal authority for the appointment—28 U.S.C. §§ 509, 510, 515, 533—gives the Attorney General broad inferior-officer appointing power or bestows upon him the right to appoint a federal officer with the kind of prosecutorial power wielded by Special Counsel Smith. Nor do the Special Counsel's strained statutory arguments, appeals to inconsistent history, or reliance on out-of-circuit authority persuade otherwise.

The bottom line is this: The Appointments Clause is a critical constitutional restriction stemming from the separation of powers, and it gives to Congress a considered role in determining the propriety of vesting appointment power for inferior officers. The Special Counsel's position effectively usurps that important legislative authority, transferring it to a Head of Department, and in the process threatening the structural liberty inherent in the separation of powers. If the political branches wish to grant the Attorney General power to appoint Special Counsel Smith to investigate and prosecute this action with the full powers of a United States Attorney, there is a valid means by which to do so. He can be appointed and confirmed through the default method prescribed in the Appointments Clause, as Congress has directed for United States Attorneys throughout American history, *see* 28 U.S.C. § 541, or Congress can authorize his appointment through enactment of positive statutory law consistent with the Appointments Clause.

This Order proceeds as follows. After laying forth pertinent factual and procedural background leading to the present Motion, the Court summarizes the legal principles underlying the Appointments Clause and the separation-of-powers doctrine on which it rests. The Court then surveys the statutory structure of the Department of Justice, focusing on the provisions which grant the Attorney General appointment authority. Following that contextual summary, the Court engages with the text, context, and structure of each of the statutes cited in the Appointment Order. Finding no officer-appointing authority in the cited statutes—and seeing no reason in the mixed historical record to deviate from the absence of such authority—the Court addresses the Supreme Court's dictum with respect to those statutes in *United States v. Nixon*, 418 U.S. 683, 694 (1974). As the *Nixon* decision and record bear out, the Attorney General's statutory appointment authority, or the matter of the Appointments Clause more generally, was not raised, argued, disputed, or analyzed; at most, the Supreme Court assumed without deciding that the Attorney General

possessed statutory appointment authority over the special prosecutor involved in that action. Following the discussion of *Nixon* and related out-of-circuit precedent, the Court turns to the question whether Special Counsel Smith is a principal officer requiring Presidential nomination and Senatorial consent. On that issue, although there are compelling arguments in favor of a principal-officer designation given the regulatory framework under which he operates, the Court rejects the position based on the available Supreme Court guidance. The Court then examines the question of remedy, concluding that dismissal of this action is the only appropriate solution for the Appointments Clause violation. Finally, the Court considers the Appropriations Clause challenge to the funding of Special Counsel Smith, concluding for many of the same reasons that Congress has not authorized the appropriation of money to be drawn for the expenses of his office. The Order concludes there, finding it unnecessary under the current posture to reach the remedy question for the Appropriations Clause violation.

## PROCEDURAL HISTORY AND OVERVIEW OF MOTION

On June 8, 2023, a grand jury in the Southern District of Florida returned an indictment, signed by the Special Counsel, charging former President Trump with thirty-one counts of willful retention of national defense information in his Mar-a-Lago residence, in violation of 18 U.S.C. § 793(e) [ECF No. 3]. The indictment also brought seven conspiracy and concealment charges against Trump and Waltine Nauta, collectively and/or individually [ECF No. 3 (charging 18 U.S.C. §§ 1512(k), 1512(b)(2)(A), 1512(c)(2), 1519, 1001(a)(2), 2)]. On July 27, 2023, the grand jury returned a Superseding Indictment, also signed by the Special Counsel, increasing the number of total charges to forty-two, and adding a third defendant, Carlos De Oliveira [ECF No. 85].

On February 22, 2024, Trump filed the instant Motion [ECF No. 326].[1]   The Special Counsel filed an Opposition on March 7, 2024 [ECF No. 374], and Trump filed a Reply on March 24, 2024 [ECF No. 414].[2]   Three sets of *amicus* parties filed briefs on the Appointments Clause question [ECF Nos. 364-1, 586–587, 618 ("Meese *amici*"); ECF No. 410-2 ("Landmark Legal *amici*"); ECF No. 429 ("Constitutional Lawyers *amici*")].   And the Court later ordered and received supplemental briefing addressing the need for factual development on the Motion [ECF No. 588; *see* ECF No. 617, 619–620].   Finally, on June 21 and 24, 2024, the Court heard lengthy oral argument on the Motion from the parties and the authorized *amici*.[3]

The Motion seeks dismissal of the Superseding Indictment "based on the unlawful appointment and funding of Special Counsel Jack Smith" [ECF No. 326].   The Motion argues that his appointment violates the Appointments Clause for two basic reasons: (1) Special Counsel Smith was not nominated by the President or confirmed by the Senate, as would be required for the appointment of a principal officer or for the appointment of an inferior officer as to which Congress has not authorized such appointment, and (2) even accepting the position that he qualifies as an inferior officer, none of the statutes cited in the Appointment Order, *see* 28 U.S.C. §§ 509, 510, 515, 533, vests the Attorney General with authority to appoint a special counsel "with the full power and authority to exercise all investigative and prosecutorial functions of any United States Attorney," as is the case with Special Counsel Smith, *see* 28 C.F.R. § 600.6.   The Motion

---

[1] Defendants De Oliveira and Nauta join the Motion [ECF Nos. 331, 611].

[2] Defendant Trump stood trial in New York state criminal court from April 15, 2024, through late May 2024 [ECF No. 421].

[3] The Appointments Clause challenge was argued on June 21, 2024; the Appropriations Clause challenge was argued on June 24, 2024.   Transcripts for these hearings can be located at ECF Nos. 647 and 648.

separately raises an Appropriations Clause challenge because (1) he is drawing on a permanent indefinite appropriation reserved for an "independent counsel" under a statutory appropriation that does not apply to him, *see* Department of Justice Appropriations Act of 1988, Pub. L. No. 100-202, 101 Stat. 1329 (Dec. 22, 1987) (hereinafter, "Indefinite Appropriation"); and (2) there is no "other Law" authorizing the appropriation as to him [ECF No. 326].

The Special Counsel opposes both challenges. As to the Appointments Clause issue, he urges that the Attorney General exercised statutory authority in 28 U.S.C. §§ 515 and 533 to appoint him, citing the Supreme Court's decision in *United States v. Nixon*, 418 U.S. 683 (1974), D.C. Circuit authority, and historical practice [ECF No. 374 pp. 1–16]. As to the Appropriations Clause issue, Special Counsel Smith argues that he lawfully draws from the Indefinite Appropriation for independent counsels, because he retains substantial independence from the Attorney General and was appointed pursuant to "other law" in the form of the same statutes cited above—28 U.S.C. §§ 515 and 533. In any case, Special Counsel Smith continues, any appropriations defect should not result in dismissal of the Superseding Indictment because the Department could lawfully have drawn funds from another source to investigate and prosecute this action [ECF No. 374 p. 25].

## FACTUAL BACKGROUND

**I.     Smith Appointment Order**

On November 18, 2022, by Order Number 5559-2022, Attorney General Garland appointed John L. Smith, an attorney from outside the United States Government, to serve as

Special Counsel for the United States Department of Justice.[4]  Special Counsel Smith was not nominated by the President or confirmed by the Senate.

The Appointment Order states that Attorney General Garland is "vested" with appointment authority to issue the Appointment Order pursuant to 28 U.S.C. §§ 509, 510, 515, 533—statutes discussed further below.  The Appointment Order then authorizes the Special Counsel to conduct two specified "ongoing investigation[s]" and to "prosecute federal crimes arising from" those investigations.  Appointment Order at 1–2.  The first investigation relates to "efforts to interfere with the lawful transfer of power following the 2020 presidential election."  *Id.* at 1.  The second investigation is "referenced and described in the United States' Response to Motion for Judicial Oversight and Additional Relief, *Donald J. Trump v. United States*, No. 9:22-CV-81294-AMC (S.D. Fla. Aug. 30, 2022) (ECF No. 49 at 5–13), as well as any matters that arose or may arise directly from this investigation or that are within the scope of 28 C.F.R. § 600.4(a)."  *Id.* at 2.  The instant Superseding Indictment—and the only indictment at issue in this Order—arises from the latter investigation.

With respect to funding, all parties agree that Special Counsel Smith's office has been funded since its inception using "a permanent indefinite appropriation . . . established within the Department of Justice to pay all necessary expenses of investigations and prosecutions by independent counsel appointed pursuant to the provisions of 28 U.S.C. § 591 et seq. [now expired] or other law."  101 Stat. 1329.  This is a limitless appropriation.  As of September 2023, Special

---

[4] The Appointment Order is made part of the record on this Motion and is referred to herein as the "Appointment Order."  *See* https://www.justice.gov/d9/press-releases/attachments/2022/11/18/2022.11.18_order_5559-2022.pdf.  The Department of Justice's main webpage contains an "Oversight" category with links to webpages for various Special Counsel's Offices, including that of Jack Smith.  https://www.justice.gov/agencies/chart/grid; https://www.justice.gov/sco-smith.

Counsel Smith's Statement of Expenditures reflects $12,807,668 in direct expenses drawn from the Indefinite Appropriation, plus an additional $11,096,601 in "component" expenses "attributable to this investigation," also drawn from the Indefinite Appropriation.[5]

## II.    Special Counsel Regulations

At the end of the Appointment Order, there is the following reference to Department of Justice regulations: "Sections 600.4 to 600.10 of title 28 of the Code of Federal Regulations are applicable to the Special Counsel." Appointment Order at 2. Those regulations, hereinafter referred to as the "Special Counsel Regulations" or "Regulations," are in force today, and they stem from a Final Rule promulgated by the Office of the Attorney General in July 1999 and later codified at 28 C.F.R. §§ 600.1 through 600.10. *See* Office of Special Counsel, 64 Fed. Reg. 37038 (July 9, 1999).[6] The Notice of Final Rule states that the regulations "replace the procedures for appointment of independent counsel pursuant to the Independent Counsel Reauthorization Act of 1994," and it cites as statutory authority the following seven statutes in Title 28, Chapter 31 of the United States Code: 28 U.S.C. §§ 509, 510, 515–519.[7]

The Special Counsel Regulations consist of ten sections spanning various topics, ranging from jurisdiction, power, staffing, conduct, and accountability, among others. 28 C.F.R. §§ 600.1– 600.10. As most relevant here, and as explored more fully below, the Special Counsel Regulations

---

[5] Special Counsel's Office – Smith Statement of Expenditures, November 18, 2022 through March 31, 2023; Special Counsel's Office – Smith Statement of Expenditures, April 1, 2023 through September 30, 2023. See https://www.justice.gov/sco-smith (last visited July 13, 2024). No additional financial statements have been published yet.

[6] This rule was deemed exempted from the notice and comment requirements of the Administrative Procedure Act on the view that it "relate[d] to matters of agency management or personnel." 64 Fed Reg. at 37041.

[7] 28 U.S.C. § 533, cited in the Appointment Order, is not among the authorizing statutes listed in the Final Rule.



**LAWFARE: HOW THE MANHATTAN DISTRICT ATTORNEY'S OFFICE AND A NEW YORK STATE JUDGE VIOLATED THE CONSTITUTIONAL AND LEGAL RIGHTS OF PRESIDENT DONALD J. TRUMP**

Interim Staff Report of the

Committee on the Judiciary
and the
Select Subcommittee on the Weaponization of the Federal Government

U.S. House of Representatives



July 9, 2024

# Prayer to St. Michael the Archangel

 SHARE

St. Michael the Archangel,

defend us in battle.

Be our defense against the wickedness and snares of the Devil.

May God rebuke him, we humbly pray,

and do thou,

O Prince of the heavenly hosts,

by the power of God,

thrust into hell Satan,

and all the evil spirits,

who prowl about the world

seeking the ruin of souls. Amen. .

*O glorious prince St. Michael,*

*chief and commander of the heavenly hosts,*

*guardian of souls, vanquisher of rebel spirits,*

*servant in the house of the Divine King*

*and our admirable conductor,*

*you who shine with excellence*

*and superhuman virtue deliver us from all evil,*

*who turn to you with confidence*

*and enable us by your gracious protection*

*to serve God more and more faithfully every day.*

Case 3:23-cv-00381-TAD-KDM Document 43-1 Filed 07/18/24 Page 14 of 38 PageID #: 518



**CRIMINAL RESOURCE MANUAL**

## CRM 500-999

# 716. Use Immunity, Transactional Immunity, Informal Immunity, Derivative Use

Congress enacted the use immunity provisions in 1970, replacing a myriad of specialized immunity statutes enacted over the years for specialized purposes, such as the Atomic Energy Act, the Cotton Research and Promotion Act, the Connally Hot Oil Act, and the Merchant Marine Act. The new statutory scheme (located at 18 U.S.C. § 6001-6005) provides a mechanism by which the government may apply to the court for an order granting a witness limited immunity in all judicial, administrative, and congressional proceedings. Section 6003 covers court and grand jury proceedings, § 6004 covers administrative hearings, and § 6005 covers congressional proceedings.

See Chapter 8 of the Federal Grand Jury Practice Manual for a more in depth discussion of immunity.

[cited in JM 9-23.100]

715. USA Form 186 — Pretrial Diversion Agreement

717. Transactional Immunity Distinguished

2/18/24, 3:40 PM    Case 3:23-cv-00381-TAD-KDM    Document 43-1    Filed 02/18/24    Page 15 of 38 PageID #: 519

Justice Manual | 716. Use Immunity, Transactional Immunity, Informal Immunity, Derivative Use... | United States Department of Ju...

## U.S. Department of Justice

950 Pennsylvania Avenue NW

Washington DC 20530

### Contact the Department

Phone: 202-514-2000

TTY/ASCII/TDD: 800-877-8339

LII > U.S. Code > Title 18 > PART I > CHAPTER 13 > **§241**

Quick search by citation:

**Title** enter title     **Section** section     | Go! |

# 18 U.S. Code § 241 - Conspiracy against rights

U.S. Code     Notes

If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt

to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

(June 25, 1948, ch. 645, 62 Stat. 696; Pub. L. 90–284, title I, § 103(a), Apr. 11, 1968, 82 Stat. 75; Pub. L. 100–690, title VII, § 7018(a), (b)(1), Nov. 18, 1988, 102 Stat. 4396; Pub. L. 103–322, title VI, § 60006(a), title XXXII, §§ 320103(a), 320201(a), title XXXIII, § 330016(1)(L), Sept. 13, 1994, 108 Stat. 1970, 2109, 2113, 2147; Pub. L. 104–294, title VI, §§ 604(b)(14)(A), 607(a), Oct. 11, 1996, 110 Stat. 3507, 3511.)

U.S. Code Toolbox

Law about...
Articles from Wex
Table of Popular Names
Parallel Table of Authorities
How current is this?

LII > U.S. Code > Title 18  > PART I  > CHAPTER 13  > **§ 242**

Quick search by citation:

**Title** enter title        **Section** section

Go!

# 18 U.S. Code § 242 - Deprivation of rights under color of law

U.S. Code        Notes

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an

attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

(June 25, 1948, ch. 645, 62 Stat. 696; Pub. L. 90–284, title I, § 103(b), Apr. 11, 1968, 82 Stat. 75; Pub. L. 100–690, title VII, § 7019, Nov. 18, 1988, 102 Stat. 4396; Pub. L. 103–322, title VI, § 60006(b), title XXXII, §§ 320103(b), 320201(b), title XXXIII, § 330016(1)(H), Sept. 13, 1994, 108 Stat. 1970, 2109, 2113, 2147; Pub. L. 104–294, title VI, §§ 604(b)(14)(B), 607(a), Oct. 11, 1996, 110 Stat. 3507, 3511.)

U.S. Code Toolbox

Law about...
Articles from Wex
Table of Popular Names
Parallel Table of Authorities
How current is this?

March 4, 2024

Office of Professional Responsibility
U.S. Department of Justice
950 Pennsylvania Avenue NW
Suite 3266
Washington DC 20530-0001


Dear Honorable Jeffrey Ragsdale,
Thank you so much for your prompt response to my request for review on this matter.
I apologize if public defenders, judges, and judge candidates aren't in your jurisdiction.

Unfortunately, the issue at hand involves a failure of due process so severe, the entire
court in question denied their jurisdiction when approached for resolution of the matter.

Yet, it now claims jurisdiction, despite declaratory decrees to the contrary from federal
court, including holding in-camera inspection in their own court over my federal clearance.

In my opinion, this appears to be contrary to procedure and violation of 14th amendment,
as well as a direct violation of the court's own rules and the federal preemption clause.

In my opinion it's an unfortunate circumstance and may be an honest mistake playing out.
Due to these circumstances, I've reached out to you in an appeal to resolve the situation.

While you've mentioned not responding to 1:07-cv-1205, this was provided merely as a
precedential example of preemption in action showing that the court in question not only
has no jurisdiction, but also gave up jurisdiction before their fraudulent actions were filed.

In my opinion, this is a situation where the office of professional responsibility has
jurisdiction to step in and dictate judicial officers may be in violation of oaths of office.

Thus, I've reached out to you to inform you of the issue of a fraudulent protective order,
which was allowed not only by the Public Defender Ronald J. Moore, but also, the clerk,
Debra R. Berry, and the Honorable April R. Drake, of the Wayne County Superior Court.


Sincerely,
Jon F. "D." Turpin

*The "McKinney Doctrine":*
*"...They can't have it both ways..."*

**Judicial Profile**

## IN MEMORIAM

# Hon. Larry J. McKinney

### District Judge, U.S. District Court for the Southern District of Indiana

by Tim A. Baker



*Tim A. Baker is a U.S. magistrate judge for the Southern District of Indiana. He clerked for Judge Larry J. McKinney from 1989 to 1991. This article is reprinted with the permission of the* Circuit Rider. © *2018. Timothy Baker. All Rights Reserved.*



Friend. Mentor. Judge. Family man. Role model. Humorist. No single word adequately describes Judge Larry J. McKinney, who died on Sept. 20, 2017. His unexpected passing at age 73 leaves a void that will never truly be filled.

McKinney was born on the Fourth of July in 1944, in South Bend, Ind. "I was 12 years old before I finally realized that my dad wasn't telling me the truth when he told me all that celebration was just for me," McKinney said in an interview a few weeks before his death.[1] A stellar Indiana trial court judge who served as U.S. district judge for the Southern District of Indiana for 30 years, McKinney remained a humble man known as much for his quick wit and sense of humor as his intellect and work ethic.

McKinney graduated from South Bend John Adams High School in 1962. It was during this time that McKinney got his first taste of power, when he was assigned to introduce a speaker to the student body. After the speaker was done, it dawned on McKinney that none of the 1,500 students in attendance, or the teachers or the principal, could leave until he dismissed them. McKinney recounted that he walked "slowly" over to the microphone. "I took five minutes to summarize his points and then dismissed everyone. And you should have seen them. I had kids sitting on the edge of their seats in the front row just waiting to race to their classes. And the longer and the more they bent over and the more inertia taking them toward the door, the longer my summation took. I really enjoyed that," McKinney said with a familiar twinkle in his eye.

Following high school, McKinney attended MacMurray College in Illinois, where he met his wife Carole. He asked her to marry him on their graduation day in 1966, and they enjoyed 51 years of marriage until his death. Following graduation from MacMurray, McKinney attended Indiana University (IU) Mauer School of Law in Bloomington, and Carole pursued a graduate degree at IU in psychology. Though there were no lawyers in his family, McKinney said he was drawn to the law because of the esteem in which lawyers were held in their communities and because

being a lawyer gave him the opportunity to help others.

Upon his graduation in 1969, McKinney accepted a position with the Indiana Attorney General's Office for $7,200 per year. The McKinneys' lean earnings left little room for frolic. "I kept a journal of our expenses one year," McKinney said. "Our entire entertainment expenses for one month was 35 cents. It was for a 25-cent Dairy Queen for me and a dime Dairy Queen for Carole."

The McKinneys' financial outlook improved over time, if slowly. McKinney opened a private law practice, Rogers & McKinney, with Charlie Rogers in Edinburg, south of Indianapolis. The law firm began inauspiciously. McKinney and Rogers made a sign for their law firm they were very proud of—if only briefly. "Then a puff of wind came along and just blew that thing down in 30 seconds," McKinney said. "I never did put it back up. I've still got that sign at home. I was just quite proud of the sign that lasted 30 seconds." After painting and wallpapering his new law office, McKinney landed his first client. Except it wasn't legal work the man wanted; he asked McKinney to remodel his kitchen. "I thought to myself, this

is another one of life's crossroads," McKinney joked.

In 1974, McKinney joined forces with Jim Sargent in Greenwood, Ind., at Sargent and McKinney. Around this time, McKinney had mentioned an interest in becoming a judge to the heir-apparent to the Johnson County Circuit Court judge. Serendipity resulted in that person opting to remain in private practice. McKinney jumped in, won the Republican primary, defeated his World War II hero Democrat opponent, and was sworn in as the Johnson County Circuit Court judge in 1979. The McKinneys had started a family by this time, with their first son, Josh, being born in 1976. "I was just so proud," McKinney said. "I just was thrilled." A second son, Andrew, followed in 1980.

Back in those days, state court rules permitted an automatic change of venue. McKinney was developing a reputation as a skilled trial judge, and many big firm lawyers in Indianapolis were eager to have him hear their cases, even though they risked a longer wait given McKinney's increasingly heavy caseload. McKinney estimated he had more than 100 jury trials in his first six years on the bench, in addition to handling countless guilty pleas, sentencing, divorces, child support modifications, and other court-related responsibilities. He did all his own research and writing; he had no law clerks or legal interns. "It was a very busy place to do business," McKinney remarked.

**For the next 30 years, McKinney handled high-stakes, complex cases. He once had a 10-defendant criminal court case involving gang activity that lasted three months. There were so many defendants and lawyers in his courtroom for that trial that he had risers erected to ensure adequate seating.**

In 1987, President Ronald Regan nominated McKinney to be a U.S. district court judge. In typical humble McKinney fashion, when he went to Washington, D.C., for his confirmation hearing, the trial court judge from Edinburg, Ind., didn't stay in a fancy hotel. Instead, he drove out in a trailer with his dad, wife, two kids, and his blind and diabetic dog and stayed at a KOA campground. "We had to give her shots every morning and every night, had to follow her around with a little pan to get her urine," McKinney said of his dog. "And then you'd dip the tester strip in the urine." When McKinney informed a member of one of the Indiana senator's staff that he was staying at the KOA campground she was "flabbergasted." McKinney remembered, "She said, 'I've never heard of anyone staying there.'

Soon after his Senate confirmation, McKinney realized the power available to him at the federal court was significantly greater than what he had as a state court judge. One Friday afternoon a lawyer filed a request for a temporary restraining order involving a horse from Chile that was in Indiana for the Pan American Games. Remembering the moment, McKinney stated, "It dawned on me that instead of the power to throw somebody in jail

for failure to pay child support, or sort out a family crisis by putting the children here or there, or to sort out other domestic relations issues, in one stroke of my pen, I could have brought the whole darn Pan American Games to a halt." Ultimately, McKinney did not grant the restraining order and interfere in the games. "Fortunately, I was able to rely on my judicial philosophy, which comes from the Dolly Parton school of jurisprudence, which is, 'Don't take my man just 'cause you can,'" McKinney joked.

For the next 30 years, McKinney handled high-stakes, complex cases. He once had a 10-defendant criminal court case involving gang activity that lasted three months. There were so many defendants and lawyers in his courtroom for that trial that he had risers erected to ensure adequate seating. "That was a very interesting case," McKinney noted, adding that there were excellent lawyers on both sides.

Excellent lawyers and case complexities also dominated his civil docket. Patent disputes were among the cases McKinney particularly enjoyed. Over the years, he handled cases involving the design of tennis shoes, oxygen tanks, and much more. McKinney's expertise in patent law earned him opportunities to travel to Argentina, Chile, China, and other countries to explain America's patent and legal system to foreign lawyers and judges. Though he found patent cases interesting, McKinney's affinity for such cases had a deeper origin. As McKinney explained it: "My dad has always been my mentor; and he told me once that in order to be successful in life, you had to learn to like what everybody else didn't like, which explains my affinity for patent law."

Through his many trials, McKinney earned a reputation among the bar as a "lawyer's judge" who had high expectations for lawyers but never took the law or himself too seriously. "I think it's part of the judge's role to set a tone of civility and set a tone of relaxation in that courtroom so lawyers can concentrate on the matters of representation instead of oppressive protocol," he stated. "The dispute resolution system constitutionally created as the third branch of government needs to be respected and protected by lawyers and judges alike. This is best done, in my view, in a relaxed courtroom."

McKinney did take seriously and respected his obligation to help others. In 2007, McKinney helped launch the first re-entry court in Indiana's federal system. The court was dubbed "REACH," which stands for Re-Entry and Community Help. The program is designed to assist high-risk offenders return to society following incarceration and reduce recidivism. "We need to be increasing our efforts to ensure that these people have every chance available to do what we've asked them to do, which is be a law-abiding citizen," McKinney said. Through the work of McKinney and others, the program doubled in size and added a second REACH court in 2017. One of the REACH court graduates is an individual that McKinney once sentenced to life in prison. After his sentence was reduced, he embraced the REACH court, served as a mentor to other REACH court participants,

holds a steady job, and was moved to tears upon hearing of McKinney's passing.

McKinney's efforts to help others were not limited to the REACH program. McKinney's dedication to public service and civil education was exemplified by his commitment to the "We the People" program, an Indiana Bar Foundation program that educates middle school and high school students about the Constitution. McKinney spent countless hours judging and volunteering his time for this program. On a separate front, McKinney also worked tirelessly with others to ensure that a new federal courthouse was constructed in Terre Haute, Ind., when the lease agreement for the former courthouse location expired. Having a federal court presence in Terre Haute was important to McKinney, particularly given that there is a federal prison and a robust bankruptcy docket there. "Seemingly impossible obstacles were overcome" in getting a new Terre Haute courthouse built, McKinney observed.

In many ways, it seems impossible that McKinney is gone. But on Sept. 20, 2017, he suddenly was. Thankfully, his caring spirit, friendship, humor, and humility will live on in the countless people he touched. ⊙

**Endnote**

[1] The primary source for the information in this article, including quotes by Judge McKinney, is taken from the Oral History of Judge Larry J. McKinney, taken on May 4 and 9, 2009, in Indianapolis by the author.



# Judicial Profile Writers Wanted

*The Federal Lawyer* is looking to recruit current law clerks, former law clerks, and other attorneys who would be interested in writing a judicial profile of a federal judicial officer in your jurisdiction. A judicial profile is approximately 1,500–2,000 words and is usually accompanied by a formal portrait and, when possible, personal photographs of the judge. Judicial profiles do not follow a standard formula, but each profile usually addresses personal topics such as the judge's reasons for becoming a lawyer, his/her commitment to justice, how he/she has mentored lawyers and law clerks, etc. If you are interested in writing a judicial profile, we would like to hear from you. Please send an email to Zebley Foster, Editorial and Production Specialist, at tfl@fedbar.org.

4:50 ▶▶▶ M ! X •  📷 🔇 LTE+ 82%

← **Post**  📖

---

**Department of Housing and Urban Development--Application of Section 713 of the Financial Services and General Government Appropriations Act, 2012 (Reconsideration)**

B-325124.2
Apr 05, 2016

🔵 🔵 🔵 🔵

Jump To

| VIEW DECISION | DOWNLOADS | RELATED PAGES | GAO CONTACTS |
|---|---|---|---|
| ⓘ | ⓘ | ⓘ | ⓘ |

**Highlights**

The Department of Housing and Urban Development (HUD) appropriation was not available to pay the salaries of HUD officials, in circumstances where the communications between the officials and committee staff and communications with a HUD employee resulted in prohibiting or preventing, or attempting or threatening to prohibit or prevent, a HUD employee from communicating with Congress. Section 713 of the Financial Services and General Government Appropriation Act, 2012, as carried forward into fiscal year 2013 by the Consolidated and Further Continuing Appropriations Act, 2013, provides a governmentwide prohibition on the use of appropriated funds to pay the salary of an officer or employee who prohibits or prevents, or attempts or threatens to prohibit or prevent, another federal officer or employee from communicating with Congress.

---

4:46 PM · 16 Jul 24 · **41** Views

**1** Like

💬  🔁  ♡  🔖  ⤴

✦ **Related posts**

**Tristan Leavitt** ✓ @tristanleavitt · 44s
Replying to @JsnFostr
Indeed there is. And we have been successful in getting pay withheld from federal officials who interfered with witnesses speaking with Congress.

💬  🔁  ♡  ᐧ�randᐧ 1  🔖  ⤴

Post your reply  📷

‹  ◯  |||

**GAO**

U.S. Government Accountability Office

Home ▓ Reports & Testimonies ▓ Department of Housing and Urban Development--Application of Section 713 of The Financial Services and General Gover...

# Department of Housing and Urban Development-- Application of Section 713 of the Financial Services and General Government Appropriations Act, 2012 (Reconsideration)

B-325124.2

Apr 05, 2016

   

## Highlights

The Department of Housing and Urban Development (HUD) appropriation was not available to pay the salaries of HUD officials, in circumstances where the communications between the officials and committee staff and communications with a HUD employee resulted in prohibiting or preventing, or attempting or threatening to prohibit or prevent, a HUD employee from communicating with Congress. Section 713 of the Financial Services and General Government Appropriation Act, 2012, as carried forward into fiscal year 2013 by the Consolidated and Further Continuing Appropriations Act, 2013, provides a governmentwide prohibition on the use of appropriated funds to pay the salary of an officer or employee who prohibits or prevents, or attempts or threatens to prohibit or prevent, another federal officer or employee from communicating with Congress.

## View Decision

B-325124.2

April 5, 2016

The Honorable Charles E. Grassley
Chairman
Committee on the Judiciary
United States Senate

The Honorable Jason Chaffetz
Chairman
Committee on Oversight and Government Reform

Read more

## Downloads



Full Report
(15 pages)

## GAO Contacts

**Shirley A. Jones**
Managing Associate General Counsel

 jonessa@gao.gov

(202) 512-5400

## Office of Public Affairs

**Sarah Kaczmarek**
Acting Managing Director

 kaczmareks@gao.gov

(202) 512-4800

## Related Pages

| Related |
Appropriations Law

| Related |
Bid Protests

| Related |
Decisions & FAQs

| Related |
The Red Book

| Related |
Contract Appeals Board

| Related |
Federal Vacancies Reform Act

**Related**

Congressional Review Act - archived



Receive GAO Updates

Stay informed as we add new reports & testimonies.

SUBSCRIBE

**GAO**

U.S. Government Accountability Office

Press Center
Contact Us
Inspector General
Restricted Reports

Copyright & Terms of Use
Privacy Policy
Accessibility
Sitemap

FOIA Requests
Scam Alerts
No FEAR Act Data
Health Care Advisory Committees

2/18/24, 3:39 PM

Access to Justice 2010-2018 | The Legacy of Gideon v. Wainwright



# The Legacy of Gideon v. Wainwright

The Legacy of Gideon v. Wainwright

"If an obscure Florida convict named Clarence Earl Gideon had not sat down in his prison cell with a pencil and paper to write a letter to the Supreme Court, and if the Court had not taken the trouble to look for merit in that one crude petition ... the vast machinery of American law would have gone on functioning undisturbed. But Gideon did write that letter, the Court did look into his case ... and the whole course of American legal history has been changed."

Attorney General Robert F. Kennedy
Speech Before the New England Conference on the
Defense of Indigent Persons Accused of Crime
November 1, 1963

On March 18, 1963, the U.S. Supreme Court issued its decision in *Gideon v. Wainwright*, unanimously holding that defendants facing serious criminal charges have a right to counsel at state expense if they cannot afford one.  The time that has passed since *Gideon* have demonstrated that effective legal assistance for all persons charged with crimes is critical to safeguarding justice and fairness in the criminal process.  On the 50th anniversary of *Gideon*, the Justice Department reaffirmed its commitment to supporting the highest standards in criminal defense.

# History

Clarence Gideon was accused of a felony in Panama City, Florida and convicted after the trial judge denied Gideon's request to have counsel appointed to represent him. The Supreme Court agreed to hear Gideon's case and granted him a new trial, ruling that legal assistance is "fundamental and essential to a fair trial" and that due process requires states to provide a lawyer for any indigent person being prosecuted for a serious crime.  After being retried with the help of a local attorney, who had the time and skill to investigate his case and conduct a competent defense, Gideon was acquitted of all charges.

The right to appointed counsel has been extended to misdemeanor and juvenile proceedings.  Today, states and localities make use of a variety of systems to provide indigent defense, from state-and county-based public defenders, to appointment systems that reimburse private attorneys who represent indigent defendants.

Despite the significant progress that has been made over 50 years after the decision, the promise of *Gideon* remains unfulfilled.  The quality of criminal defense services varies widely across states and localities.  Many defenders struggle under excessive caseloads and lack adequate funding and independence, making it impossible for them to meet their legal and ethical obligations to represent their clients effectively.  The problems of mental illness and juveniles in our criminal justice system pose special difficulties for achieving fairness and justice.

As Attorney General Eric Holder has stated, "our criminal justice system, and our faith in it, depends on effective representation on both sides." The Justice Department is providing a number of tools and resources to help establish effective indigent defense systems across the nation.  In 2010 the Department also launched the Office for Access to Justice — establishing a new, permanent office focused on enhancing access to criminal and civil legal services for those who cannot afford them.

The Supreme's Court recognition in *Gideon* that "lawyers in criminal courts are necessities, not luxuries," and its guarantee of the right to counsel in the state criminal process, has had a profound impact on the operation and aspirations of the American criminal justice system.  The Justice Department is committed to working to ensure that the goals and vision of *Gideon* are fully, and finally, realized.

*Updated October 24, 2018*

**Contact the Department**

Phone: 202-514-2000

TTY/ASCII/TDD: 800-877-8339

**U.S. Department of Justice**

950 Pennsylvania Avenue NW

Washington DC 20530

 Gmail

Jon F Turpin <jt4590@gmail.com>

---

## Letter for Bishop Doherty
1 message

**Erin Golden** <erin465336@gmail.com>
To: bishop@dol-in.org
Bcc: jt4590@gmail.com

Mon, Feb 19, 2024 at 2:57 PM

Erin Golden
2421 South Plum Street
Yorktown, IN 47396

February 19, 2024

Dear Most Reverend Timothy Doherty,

My name is Erin Golden (Turpin), wife of Jon Frederick Turpin. I am writing to you in regard to an alarming matter and I feel morally compelled to inform you of the situation on behalf of my husband.

My husband, Jon, is currently being targeted by attorney Ronald J. Moore, who poses as a Catholic among the Catholic pastorate when he is a practicing freemason. This goes against our Catholic Faith and the decree proclaimed from our Holy Father at the Vatican, His Excellency Pope Francis.

This attorney has allowed false allegations to be filed against Jon as a fraudulent protective order, using false civil suits as a weapon to cause us harms against our civil rights, constitutional rights, and religious freedoms.

Not only has this attorney targeted us, but also is colluding with other parties, including the petitioner, and my in laws by marriage, who despise our Catholic sacramental marriage and Faith.

They tried to prevent us from receiving the Sacrament of Matrimony in our Catholic Faith and contacted our priest in attempts to control, prevent, and harm our marriage and Catholic Faith.

Our priest who guided us during our sacramental marriage preparations and served as celebrant for our Sacrament of Matrimony was the recipient of contact from the aforementioned colluding parties and discerned their allegations to be false and dismissed their attempts of control.

Unfortunately, they have continued to persecute and falsely prosecute us.

My in-laws even tried to bribe us, financially, out of our Catholic Faith, to marry at an Indiana courthouse instead of in the Catholic Church. We said no, but this didn't deter their discrimination. My husband's father also threatened to physically harm my husband with an actual weapon.

The colluding parties persisted in pursuing  any means to damage us, also making false claims without just cause nor reason even to law enforcement, impugning my husband's legal character and covering up their intolerable bad behavior against us.

They have destroyed Jon's career to remove his ability to provide for us, used these false proceedings in an attempt to remove his right to protect us in our home, and attempted to threaten us into silence, further harming his ability to profess our Faith and our religious freedoms.

This is a hate crime against practicing Catholics, and I do not wish for attorney Ronald J. Moore to attack any more devout Catholics in the future.

Ronald J. Moore attends Mass in St. Elizabeth Seton Catholic Parish in Richmond, Indiana.

I have attached the information confirming Ronald J. Moore has stated he is a practicing member of freemasonry. https://themoorelawfirm.com/about-us

Ronald J. Moore's behavior of hatred, or at the very least the enablement of this discrimination towards devout Catholics by using his law license to allow filings of false allegations via potential blackmail is disappointing, concerning, and

appalling.

Please keep my husband and me in your prayers as we continue to practice our Catholic Faith.

Thank you for your consideration in this matter.

God bless you,

Erin Golden (Turpin)



**image.png**
128K

    

[EN - HR - IT]

## DICASTERIUM PRO DOCTRINA FIDEI

NOTE FOR THE AUDIENCE WITH THE HOLY FATHER
13 November 2023

**The Request of His Excellency, the Most Rev. Julito Cortes,
Bishop of Dumaguete (Philippines)
Regarding the Best Pastoral Approach to
Membership in Freemasonry by the Catholic Faithful**

Recently, His Excellency, the Most Rev. Julito Cortes, Bishop of Dumaguete, after explaining with concern the situation caused in his Diocese by the continuous rise in the number of the faithful enrolled in Freemasonry, asked for suggestions regarding how to respond to this reality suitably from a pastoral point of view, taking into account also the doctrinal implications related to this phenomenon.

Membership in Freemasonry is very significant in the Philippines; it involves not only those who are formally enrolled in Masonic Lodges but, more generally, a large number of sympathizers and associates who are personally convinced that there is no opposition between membership in the Catholic Church and in Masonic Lodges.

To address this issue appropriately, it was decided that the Dicastery would respond by involving the Catholic Bishops' Conference of the Philippines itself, notifying the Conference that it would be necessary to put in place a coordinated strategy among the individual Bishops that envisions two approaches:

(a) On the doctrinal level, it should be remembered that active membership in Freemasonry by a member of the faithful is forbidden because of the irreconcilability between Catholic doctrine and Freemasonry (cf. Congregation for the Doctrine of the Faith, "Declaration on Masonic Associations" [1983], and the guidelines published by the Catholic Bishops' Conference of the Philippines in 2003). Therefore, those who are formally and knowingly enrolled in Masonic Lodges and have embraced Masonic principles fall under the provisions in the above-mentioned *Declaration*. These measures also apply to any clerics enrolled in Freemasonry.

(b) On the pastoral level, the Dicastery proposes that the Philippine Bishops conduct catechesis accessible to the people and in all parishes regarding the reasons for the irreconcilability between the Catholic Faith and Freemasonry.

Finally, the Philippine Bishops are invited to consider whether they should make a public pronouncement on the matter.

*Ex Audientia die 13.11.2023*

*Franciscus*

**Víctor Manuel Card. Fernández**
*Prefect*

SACRED CONGREGATION
FOR THE DOCTRINE OF THE FAITH

# DECLARATION ON MASONIC ASSOCIATIONS

It has been asked whether there has been any change in the Church's decision in regard to Masonic associations since the new Code of Canon Law does not mention them expressly, unlike the previous Code.

This Sacred Congregation is in a position to reply that this circumstance is due to an editorial criterion which was followed also in the case of other associations likewise unmentioned inasmuch as they are contained in wider categories.

Therefore the Church's negative judgment in regard to Masonic associations remains unchanged since their principles have always been considered irreconcilable with the doctrine of the Church and therefore membership in them remains forbidden. The faithful who enroll in Masonic associations are in a state of grave sin and may not receive Holy Communion.

It is not within the competence of local ecclesiastical authorities to give a judgment on the nature of Masonic associations which would imply a derogation from what has been decided above, and this in line with the Declaration of this Sacred Congregation issued on 17 February 1981 (cf. AAS 73 [1981] pp. 240-241) (Published in English language edition of L'Osservatore Romano, 9 March 1981. Editor's note).

In an audience granted to the undersigned Cardinal Prefect, the Supreme Pontiff John Paul II approved and ordered the publication of this Declaration which had been decided in an ordinary meeting of this Sacred Congregation.

Rome, from the Office of the Sacred Congregation for the Doctrine of the Faith, 26 November 1983.

JOSEPH Card. RATZINGER
Prefect
Fr. JEROME HAMER, O.P.
Titular Archbishop of Lorium
Secretary

137

## DICASTERIUM PRO DOCTRINA FIDEI

### NOTE FOR THE AUDIENCE WITH THE HOLY FATHER
13 November 2023

**The Request of His Excellency, the Most Rev. Julito Cortes,
Bishop of Dumaguete (Philippines)
Regarding the Best Pastoral Approach to
Membership in Freemasonry by the Catholic Faithful**

Recently, His Excellency, the Most Rev. Julito Cortes, Bishop of Dumaguete, after explaining with concern the situation caused in his Diocese by the continuous rise in the number of the faithful enrolled in Freemasonry, asked for suggestions regarding how to respond to this reality suitably from a pastoral point of view, taking into account also the doctrinal implications related to this phenomenon.

Membership in Freemasonry is very significant in the Philippines: it involves not only those who are formally enrolled in Masonic Lodges but, more generally, a large number of sympathizers and associates who are personally convinced that there is no opposition between membership in the Catholic Church and in Masonic Lodges.

To address this issue appropriately, it was decided that the Dicastery would respond by involving the Catholic Bishops' Conference of the Philippines itself, notifying the Conference that it would be necessary to put in place a coordinated strategy among the individual Bishops that envisions two approaches:

(a) On the doctrinal level, it should be remembered that active membership in Freemasonry by a member of the faithful is forbidden because of the irreconcilability between Catholic doctrine and Freemasonry (cf. Congregation for the Doctrine of the Faith, "Declaration on Masonic Associations" [1983], and the guidelines published by the Catholic Bishops' Conference of the Philippines in 2003). Therefore, those who are formally and knowingly enrolled in Masonic Lodges and have embraced Masonic principles fall under the provisions in the above-mentioned *Declaration*. These measures also apply to any clerics enrolled in Freemasonry.

(b) On the pastoral level, the Dicastery proposes that the Philippine Bishops conduct catechesis accessible to the people and in all parishes regarding the reasons for the irreconcilability between the Catholic Faith and Freemasonry.

Finally, the Philippine Bishops are invited to consider whether they should make a public pronouncement on the matter.

*Ex Audientia die 13.11.2023*

*Franciscus*

**Víctor Manuel Card. Fernández**
*Prefect*