No. 23-cv-0381

=============================================

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

_____

ROBERT F. KENNEDY, JR.; CHILDREN'S HEALTH DEFENSE; CONNIE
SAMPOGNARO,
*Plaintiffs*,
v.
JOSEPH R. BIDEN, JR.; KARINE JEAN-PIERRE; VIVEK H. MURTHY;
XAVIER BECERRA; UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES, et al.,
*Defendants*.

_____

*having been consolidated with No. 22-cv-01213*
STATE OF MISSOURI, et al.,
*Plaintiffs*,
v.
JOSEPH R. BIDEN, JR., et al.,
*Defendants*.

_____

### *KENNEDY* PLAINTIFFS' SUPPLEMENTAL BRIEF ON STANDING

_____

**G. SHELLY MATURIN, II**          **JED RUBENFELD**
**La. Bar # 26994**                **NY Bar # 2214104**
**Welborn & Hargett, LLC**         **(pro hac vice forthcoming)**
**1540 W. Pinhook Road**           **1031 Forest Rd.**
**Lafayette, LA 70503**            **New Haven, CT 06515**
**Telephone: 337-234-5533**        **Tel.: 203-432-8715**
**shelly@wandhlawfirm.com**        **jed.rubenfeld@yale.edu**

**Attorneys for Plaintiffs**

## TABLE OF CONTENTS

Introduction …………………………………………………..                1

Procedural and Factual Statement ……………………………                4

Argument ………………………………………………….                5

    I.     Standard of Review ……………………………………                5

    II.    Under *Murthy*, All Three *Kennedy* Plaintiffs Have
           Standing …………………………………………..                5

    III.   The *Kennedy* Plaintiffs' Standing is Further Strengthened
           by Their Additional State Action Theories…………….                20

Conclusion …………………………………………………                22

# TABLE OF AUTHORITIES

## Cases

*Biden v. Nebraska*, 600 U.S. 477 (2023) ...................................................................5

*Chavez v. Plan Benefit Servs., Inc.*, No. 22-50368, 2024 U.S. App. LEXIS 17267 (5th Cir. July 15, 2024 .............................................................................................5

*Consumer Data Indus. Ass'n v. Texas*, No. 21-51038, 2023 U.S. App. LEXIS 19007 (5th Cir. July 25, 2023 ................................................................. 13, 14, 17

*DOC v. New York*, 588 U.S. 752 (2019)...............................................................14

*Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167 (2000)..................................15

*Gonzalez v. Blue Cross Blue Shield Ass'n*, 62 F.4th 891 (5th Cir. 2023) ..............14

*Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17 (2017) .......................18

*Kennedy v. Biden*, No. 3:23-CV-00381, 2024 U.S. Dist. LEXIS 26751 (W.D. La. Feb. 14, 2024) .........................................................................................................3

*Larson v. Valente*, 456 U.S. 228 (1982) ................................................................13

*MidCap Media Fin., L.L.C. v. Pathway Data, Inc.*, 929 F.3d 310 (5th Cir. 2019)...4

*Missouri v. Biden*, 680 F. Supp. 3d 630 (W.D. La. 2023)........................................7

*Murthy v. Missouri*, 144 S. Ct. 1972 (2024).................................................. passim

*Murthy v. Missouri*, 144 S. Ct. 32 (2023) ...............................................................3

*O'Shea v. Littleton*, 414 U. S. 488 (1974) .............................................................14

*Sanchez v. R.G.L.*, 761 F.3d 495 (5th Cir. 2014) ..................................................13

*Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020)...............................5, 14

*Steel Co.* v. *Citizens for Better Environment,* 523 U.S. 83 (1998)........................14

*U.S. WeChat Users Alliance v. Trump*, 488 F. Supp. 3d 912 (N.D. Cal. 2020)......16

*Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976)............................................................................................................19

### *KENNEDY* PLAINTIFFS'
### <u>SUPPLEMENTAL BRIEF ON STANDING</u>

### INTRODUCTION

By order of this Court and the Fifth Circuit, the *Kennedy* Plaintiffs respectfully submit this supplemental brief to address a single issue: standing, in light of the Supreme Court's ruling in *Murthy*. As will be shown below, Defendants cannot win on this issue. Far from undercutting the *Kennedy* Plaintiffs' standing, *Murthy* confirms it. Precisely what doomed standing in *Murthy* establishes it here:

- The *Murthy* Court emphasized that no Government defendant had specifically targeted any of the *Murthy* plaintiffs for censorship. Here, by contrast—as this Court, the Fifth Circuit, and even the *Murthy* Court itself all found—several Defendants specifically and repeatedly pressured the platforms to censor the *Kennedy* Plaintiffs. *See* Point II(A) *infra*.

- The *Murthy* Court emphasized that no Government defendant was shown to have been "behind" any particular social-media restriction imposed on any of the plaintiffs in that case. Here, several Defendants provably, coercively caused the censorship of two of the *Kennedy* Plaintiffs—and the complete deplatforming of one of them. *See* Point II(A) *infra*.

- The *Murthy* majority repeatedly emphasized that the plaintiffs in that case had shown only ***past*** censorship of their speech, rendering too speculative the risk of redressable censorship in future. By contrast, the censorship of the *Kennedy* Plaintiffs is ***present, ongoing, and continuing***, which renders their standing unassailable.  *See* Point II(B) *infra*.

1

• The *Murthy* majority further emphasized that the Defendants were no longer engaged in the challenged conduct, again undercutting redressability. With respect to the Government's election-related social-media operations, the Court stated that "the Government has represented that it will not resume operations for the 2024 election." *See* Point II(B) *infra*. But two weeks after *Murthy* was handed down, on July 12, 2024, the Department of Justice announced the "Resumption of FBI's Regular Meetings with Social Media Companies" and stated that the FBI's dealings with those companies would be conducted in the same "manner" as the "FBI did before pausing the meetings in summer 2023 due to the now-vacated *Missouri* injunction."[1] Not to put too fine a point on it, but the Government may have hoodwinked the Supreme Court, "pausing" its social-media operations during the *Murthy* proceedings, representing to the Court that it would not resume those operations, but then resuming them after the Court ruled. Surely the Government cannot be permitted to avoid a constitutional challenge to its conduct through such machinations.

And there's more.  One of the *Kennedy* Plaintiffs, Mr. Robert F. Kennedy Jr., is a presidential candidate in a volatile race that will be decided in the next few months. Thus the irreparable harm threatened by censorship of Mr. Kennedy is of a magnitude far greater than the harm claimed by the *Murthy* plaintiffs. Last December, Justice Alito foresaw exactly the scenario that has now unfolded:

---

[1]  DOJ, Memorandum from the Office of the Deputy Attorney General, July 12, 2024, at 3-4, *reprinted in* DOJ, EVALUATION OF THE U.S. DEPARTMENT OF JUSTICE'S EFFORTS TO COORDINATE INFORMATION SHARING ABOUT FOREIGN MALIGN INFLUENCE THREATS TO U.S. ELECTIONS appendix 7 (July 23, 2024), available at https://oig.justice.gov/reports/evaluation-us-department-justices-efforts-coordinate-information-sharing-about-foreign (hereafter DOJ Memorandum).

> "[T]he Government contend[s] strenuously that [the *Murthy* plaintiffs] lack
> standing. If the Court ultimately agrees with that argument and orders that this
> case be dismissed, our decision will provide little guidance for deciding Mr.
> Kennedy's case. [This] is likely to prevent Mr. Kennedy from vindicating the
> rights he claims until the spring of 2024 and perhaps as late as June of that
> year. And by that time, several months of the Presidential campaign will have
> passed.

*Murthy v. Missouri*, 144 S. Ct. 32, 32 (2023) (Alito, J., dissenting from denial of

leave to intervene).  "In fact, [it] may prevent Mr. Kennedy from obtaining redress

for an even longer period." *Id*. As Justice Alito concluded:

> [B]ecause Mr. Kennedy has been mentioned explicitly in communications
> between the Government and social media platforms, he has a strong claim to
> standing, and the Government has not argued otherwise. Our democratic form
> of government is undermined if Government officials prevent a candidate for
> high office from communicating with voters, and such efforts are especially
> dangerous when the officials engaging in such conduct are answerable to a
> rival candidate.

*Id*. at 32-33 (emphasis added).  Similarly, in February 2024, this Court warned that

if left unenjoined, "Defendants could use their power over millions of people to

suppress alternative views or moderate content they do not agree with in the

upcoming 2024 national election." *Kennedy v. Biden*, No. 3:23-CV-00381, 2024

U.S. Dist. LEXIS 26751, at *27-28 (W.D. La. Feb. 14, 2024).

Confirming these warnings, social-media censorship of Mr. Kennedy's

presidential campaign is now skyrocketing; Facebook and Instagram are blocking

links to Mr. Kennedy's campaign events and expressions of support for his

candidacy. *See* Point II(B) *infra*. If there is one person in the United States with

urgent standing to challenge the federal Government's use of social media platforms to achieve censorship-by-proxy—which this Court correctly called "arguably the most massive attack on free speech in United States history," *Missouri v. Biden*, 680 F. Supp. 3d 630, 641 (W.D. La. 2023)—it is Robert F. Kennedy, Jr. The Court should reaffirm its prior holding that standing exists here.

## PROCEDURAL AND FACTUAL STATEMENT

The *Kennedy* Plaintiffs—Mr. Kennedy; nonprofit organization Children's Health Defense ("CHD"); and healthcare professional Connie Sampognaro—filed this companion action to *Missouri v. Biden* in March, 2023 for one principal reason: to vindicate their freedom of speech in the event that the *Missouri* plaintiffs were found to lack standing.  On June 26, 2024, that eventuality came to pass.

On July 25, 2024, the Fifth Circuit "remand[ed] th[is] case to the district court for amendment of the allegations and for the record to be supplemented" concerning "the *Kennedy* Plaintiffs' standing in view of the Supreme Court's holding in *Murthy*," "based on … evidence particular to this case." ECF No. 49-2 at 2, 3 (quoting *MidCap Media Fin., L.L.C. v. Pathway Data, Inc.*, 929 F.3d 310, 315 (5th Cir. 2019)). Due to the expedited briefing schedule, Plaintiffs do not seek to amend their complaint, but instead submit three declarations:

(1) Declaration of Mary Holland ("Holland Dec."), Chief Executive Officer of CHD (attached hereto as Exh. 1);

4

(2) Declaration of Brigid Rasmussen ("Rasmussen Dec."), Chief of Staff of
Mr. Kennedy's presidential campaign (attached hereto as Exh. 2); and
(3) Declaration of Connie Sampognaro ("Sampognaro Dec.") (attached hereto
as Exh. 3).

As shown below, the facts set forth in these Declarations establish that each of the
*Kennedy* Plaintiffs has standing under *Murthy*.

## ARGUMENT

### I.    Standard of Review

Plaintiffs always bear the burden of proof on standing, but "[a]t earlier stages
of litigation … the manner and degree of evidence required to show standing is less
than at later stages. At the preliminary injunction stage, the movant must clearly
show only that each element of standing is likely to obtain." *Speech First, Inc. v.
Fenves*, 979 F.3d 319, 329-30 (5th Cir. 2020) (citation omitted). The well-known
elements of standing are "injury," "traceability," and "redressability." *Chavez v.
Plan Benefit Servs., Inc.*, No. 22-50368, 2024 U.S. App. LEXIS 17267, at *7 (5th
Cir. July 15, 2024).  Only a single plaintiff need have standing: "[i]f at least one
plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 600 U.S. 477, 489
(2023).  Here, all Plaintiffs have standing.

### II.   Under *Murthy*, All Three *Kennedy* Plaintiffs Have Standing.

#### A.    Mr. Kennedy and CHD have direct-censorship standing.

The Supreme Court in *Murthy* laid down two critical factual prerequisites for

standing that doomed the plaintiffs in that case but make Mr. Kennedy's and CHD's standing unassailable. The first concerns traceability, the second redressability.

First, causation. "The primary weakness" in the *Murthy* plaintiffs' traceability showing, the Court held, was "the lack of specific causation findings with respect to any discrete instance of content moderation. The District Court made none.  Nor did the Fifth Circuit." *Murthy v. Missouri*, 144 S. Ct. 1972, 1979 (2024). It was critical for plaintiffs to show that a Government defendant was "behind" at least one social-media restriction imposed on them:

> If a plaintiff demonstrates that a particular Government defendant was behind her past social-media restriction, it will be easier for her to prove that she faces a continued risk of future restriction that is likely to be traceable to that same defendant.  Conversely, if a plaintiff cannot trace her past injury to one of the defendants, it will be much harder for her to make that showing.  In the latter situation, the plaintiff would essentially have to build her case from scratch, showing why she has some newfound reason to fear that one of the named defendants will coerce her chosen platform to restrict future speech on a topic about which she plans to post.

*Id*. at 1987. The *Murthy* majority went on to find that no plaintiff in that case had been specifically targeted for censorship by the Government, and no plaintiff had shown that any Government defendant was "behind" any specific social-media restriction imposed on them.  *Id*. at 1988-92.

Second, as to redressability, the *Murthy* majority emphasized that the plaintiffs in that case had shown only "***past***" censorship, which in itself does not establish a redressable injury for purposes of prospective relief:

"Past exposure to illegal conduct" can serve as evidence of threatened future injury but "does not in itself show a present case or controversy regarding injunctive relief"….

… The plaintiffs rely on allegations of past Government censorship as evidence that future censorship is likely.  But . . . the events of the past do little to help any of the plaintiffs establish standing to seek an injunction to prevent future harms.

*Id*. at 1987 (citation omitted), 1988-89.

The instant case is utterly different. Here, the facts show that the Defendants specifically targeted Mr. Kennedy and CHD for censorship, that particular Defendants were indeed "behind" their censorship, and that their censorship is not merely in the past, but is present and continuing today.

       1. *Mr. Kennedy and CHD have shown causation and hence traceability*.

While (according to the Supreme Court) this Court did not make "specific causation findings" as to the *Murthy* plaintiffs, it did make such findings with respect to the *Kennedy* Plaintiffs. Both Mr. Kennedy and CHD are members of the so-called "Disinformation Dozen," *see* Holland Dec. ¶ 10, and this Court has found that "public and private pressure from the White House" likely had the "effect" of causing "[a]ll twelve members of the 'Disinformation Dozen'" to be "censored" online. *Missouri v. Biden*, 680 F. Supp. 3d 630, 653-54 (W.D. La. 2023). This finding was amply supported by the record at the time the Court ruled, and Plaintiffs today set forth a more detailed description of the pertinent facts, providing even stronger support.  A summary of the key facts follows.

7

In April 2021, in oral meetings with Facebook, the White House demanded action against the so-called "Disinformation Dozen," twelve named individuals and organizations, including Mr. Kennedy and CHD, accused (falsely) of being the leading online disseminators of COVID-related "disinformation." Holland Dec. ¶ 14. But on May 1, Facebook emailed the White House resisting the deplatforming of the so-called Disinformation Dozen: "[W]e continue to review accounts associated with the 12 individuals identified in the … 'Disinformation Dozen' report, but many of those either do not violate our policies or have ceased posting violating content." *Id*. Facebook further stated that deplatforming the "Disinformation Dozen" could "reinforce the notion that there's a cover-up." *Id*.

The White House responded with a threat—and not a thinly veiled one.  Just a few days later, on May 5, 2021, the White House Press Secretary told media that with respect to "the major platforms," President Biden favors "a robust anti-trust program. So his view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; sometimes life-threatening information is not going out to the American public." Holland Dec. ¶ 15. In other words, the Press Secretary directly linked the threat of an anti-trust action with the White House demand for more aggressive censorship of COVID-related content. There are few threats in the federal government's arsenal more devastating to Meta than a threat to break up the company under federal anti-trust law. Mark Zuckerberg, Meta's founder and CEO, has referred

8

to a federal antitrust action against Meta as "an existential threat" to his company. Holland Dec. ¶ 16.

The day after this threat, May 6, 2021, White House Deputy Assistant to the President Rob Flaherty emailed Facebook and again chastised the company for failing to censor the so-called Disinformation Dozen: "Seems like your 'dedicated vaccine hesitancy' policy isn't stopping the disinfo dozen." Holland Dec. ¶ 17. Nevertheless, for the next two months, Facebook continued to refuse to deplatform them. Then, on July 15, at a joint press conference with Surgeon General Vivek Murthy, the White House Press Secretary demanded that platforms adopt "a robust enforcement strategy" against disfavored COVID information, again singling out the Disinformation Dozen: "[T]here's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms.  All of them remain active on Facebook, despite some even being banned on other platforms, including … ones that Facebook owns."  Holland Dec. ¶ 18.

The latter statement was a specific reference to Mr. Kennedy.  At that time, Mr. Kennedy had been deplatformed from Instagram but not from Facebook. Holland Dec. ¶ 19. (In 2021, the overarching company that owned both the Instagram and Facebook platforms was also called Facebook; today, it calls itself Meta.) Moreover, because Mr. Kennedy was CHD's then-chairman and chief spokesman—whose fact

and opinion pieces appeared frequently in CHD's postings—calling for Mr. Kennedy to be deplatformed was also to call for CHD to be censored.  Holland Dec. ¶ 20.

The next day, July 16, the President publicly stated that Facebook and other platforms were "killing people" due to their refusal to censor speech that challenged the safety and efficacy of the COVID vaccines. Holland Dec. ¶ 21. That same day, the White House Press Secretary reinforced the White House's demand that Kennedy be banned across all platforms: "You shouldn't be banned from one platform and not others … for providing misinformation out there."  *Id*.

A few days later, on July 20, 2021, the White House Communications Director again linked President Biden's comment on "killing people" to an explicit threat of adverse regulatory action.  She "specified the White House is examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites." Holland Dec. ¶ 22. The White House's options "could include amending the Communications Decency Act, or Section 230 of the act.  'We're reviewing that and certainly they should be held accountable,' [the Communications Director] said. 'And I think you heard the president speak very aggressively about this.'"  *Id*.

Immediately after this ratcheting up of the Administration's pressure campaign, Facebook—which had for months resisted White House pressure to deplatform the

10

Disinformation Dozen—changed course and took aggressive action against them. On July 23, 2021, just three days after the White House Communications Director's threat, Facebook emailed Surgeon General Murthy and stated, "I wanted to make sure you saw the steps we took just this past week"—i.e., since President Biden's "killing people" comment on July 16, 2021—"to further address the 'disinfo dozen.'" Holland Dec. ¶ 24. Facebook reported to the Surgeon General that it had censored every member of the Disinformation Dozen, including Kennedy and Children's Health Defense, in compliance with the White House's demands: "We removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen (so a total of 39 Profiles, Pages, Groups, and IG accounts deleted thus far, resulting in every member of the disinfo dozen having had at least one such entity removed)." *Id*.

Facebook further reported that it was secretly censoring other accounts associated with the Disinformation Dozen as well: "We are also continuing to make 4 other Pages and Profiles, which have not yet met their removal thresholds, more difficult to find on our platform." *Id*.  The words "have not yet met their removal thresholds" are important: they mean that the accounts in question had ***not*** been found to be posting "misinformation" allowing removal under Facebook's terms of service. Holland Dec. ¶ 25. In other words, at the behest of the Federal Government, Facebook was censoring speech (shadow-banning it, making it "more difficult to find") even

though that speech was not and had not been deemed to be "misinformation" permitting removal under Facebook's own terms of service.  *Id*.

　　But the Administration wanted more than mere shadow-banning of the "Disinformation Dozen" or deletion of associated "pages" and "entities."  The White House had publicly and privately stated that it wanted complete de-platforming, and in mid-August, with respect to CHD, the Government got what it sought.  On August 18, 2021, Facebook again reported to the Surgeon General on additional censorship actions it was taking against the Disinformation Dozen.  Holland Dec. ¶ 26. These actions included the ***complete deplatforming of CHD, which took place on August 17, 2021.***  Holland Dec. ¶¶ 5, 26.

　　The above facts demonstrate that this Court was entirely correct when it found that Facebook's censorship of the so-called Disinformation Dozen in mid-2021 was no mere coincidence, but was rather the direct result of White House pressure. Even the *Murthy* majority acknowledged that the White House pressured Facebook to censor the Disinformation Dozen, specifically including Mr. Kennedy: "White House officials … pushed Facebook to remove the accounts of the 'disinformation dozen,' 12 people (including Kennedy) supposedly responsible for a majority of COVID–19-related misinformation." *Murthy*, 144 S. Ct. at 1991. Until mid-2021, Facebook resisted this pressure. Its independent judgment was that the so-called Disinformation Dozen should not be deplatformed because much of their content was

12

not in violation of Facebook's terms of service and because censoring them could be viewed as a "cover-up." Yet after the White House threatened Facebook with devastating antitrust and Section 230 consequences, Facebook quickly took aggressive action against every member of the Disinformation Dozen, including Mr. Kennedy, and this aggressive action culminated in the complete deplatforming of CHD.[2]  Accordingly, Mr. Kennedy and CHD have unquestionably shown a likelihood of traceability at least as against President Biden, the Surgeon General, and the other White House Defendants.

> 2.  *Mr. Kennedy and CHD, whose censorship is present and ongoing, have shown redressability.*

To establish redressability, a plaintiff is never required—even at the final, trial-stage of the proceedings—to show that the sought-for relief is "certain" to prevent injury. *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Rather, if an injunction would "reduce the total amount of risk" of injury, "[s]uch a reduction satisfies the redressability required to establish standing." *Consumer Data Indus. Ass'n v. Texas*, No. 21-51038, 2023 U.S. App. LEXIS 19007, at *13 (5th Cir. July 25, 2023) (citing *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) ("When 'establishing redressability, [a plaintiff] need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would

---

[2]  Similar evidence exists showing a likelihood that YouTube's September 2021 deplatforming of CHD was also caused by White House pressure. *See* Holland Dec. ¶¶ 28-32.

completely remedy the harm.'"). And at the preliminary injunction stage, where the "degree of evidence required to show standing is less than at later stages," plaintiff need only show that such a reduction in risk is "likely." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329-30 (5th Cir. 2020). To show likely redressability, plaintiffs are permitted to rely "on the predictable effect of Government action on the decisions of third parties." *DOC v. New York*, 588 U.S. 752, 768 (2019).

The *Murthy* plaintiffs could not show redressability because they alleged only "past" censorship, rendering too speculative their claims of redressable future injury. *See Murthy*, 144 S. Ct. at 1988-89 ("The plaintiffs rely on allegations of past Government censorship as evidence that future censorship is likely.  But . . . the events of the past do little to help any of the plaintiffs establish standing to seek an injunction to prevent future harms."). But it is hornbook law that unlike past injury, a present, "continuing injury" *is* "sufficient to create standing for injunctive relief." *Gonzalez v. Blue Cross Blue Shield Ass'n*, 62 F.4th 891, 902 (5th Cir. 2023); *see also, e.g.*, *Steel Co.* v. *Citizens for Better Environment,* 523 U.S. 83, 109 (1998) (standing can be predicated on either "*present* or threatened injury") (emphasis added); *O'Shea v. Littleton*, 414 U. S. 488, 495-96 (1974) ("past" injury fails in itself to establish standing only "*if unaccompanied by any continuing, present adverse effects*") (emphasis added); *see, e.g.*, *Consumer Data Indus.*, 2023 U.S. App. LEXIS 19007, at *7 n.6 (standing requires either "*present* or threatened injury") (emphasis

14

added) (citing *Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167, 189-94 (2000)).

In contrast to the *Murthy* plaintiffs, Mr. Kennedy and CHD are still being censored by major social-media platforms.  Initially deplatformed from Facebook and Instagram in August 2021, CHD remains deplatformed from Facebook and Instagram today. Holland Dec. ¶¶ 5, 26. Initially deplatformed from YouTube in September 2021, CHD remains deplatformed from YouTube today. Holland Dec. ¶ 6. And while Mr. Kennedy is not deplatformed, the social-media censorship inflicted on him is not only continuing today; it is intensifying.

Since early May, Meta has begun censoring Mr. Kennedy's political speech to a shocking, unprecedented extent.  Rasmussen Dec. ¶ 4. In May, Meta blocked a thirty-minute film in which Mr. Kennedy spoke about his beliefs and values, and Meta continues to shadow-ban that film today. Rasmussen Dec. ¶¶ 4-12. In late June, Meta blocked Instagram and Facebook users from posting links to an online campaign event called the "Real Debate," in which Mr. Kennedy answered in real time the debate questions posed to candidates Biden and Trump. Rasmussen Dec. ¶¶ 20-22. Meta has shut down regional pages of the Kennedy campaign. Rasmussen Dec. ¶ 19. Meta is currently removing links to news coverage of Kennedy campaign events. Rasmussen Dec. ¶ 24 Astoundingly, it is now even blocking users' expressions of support for Mr. Kennedy such as "Kennedy all the way!", "VOTE KENNEDY," and "Time to add Kennedy to the mix." Rasmussen Dec. ¶ 23. In every

case, Meta has provided either no explanation of this censorship or patently false explanations. Rasmussen Dec. ¶¶ 9-10, 22, 26.

Moreover, there is evidence that this intolerable electoral interference has been caused by Defendants' resuming their communications with social media platforms. In early May, 2024—i.e., at the same time as Meta began its intensifying burst of censorship against Mr. Kennedy's campaign advocacy—Sen. Mark Warren, chair of the Senate Intelligence Committee, "told reporters that federal agencies such as the FBI and Cybersecurity and Infrastructure Security Agency (CISA) [had] restarted discussions with Big Tech platforms."[3] The renewed coordination was said to be intended (once again) to cause social media platforms to "remov[e] disinformation on [their] sites as the November presidential election nears." The DOJ has now confirmed this report, publicly announcing a resumption of the FBI's social-media election operations following the "pausing" of those operations during the pendency of the *Murthy* Supreme Court appeal.[4]

As stated above, the *Murthy* Court relied on a contrary representation: "the Government has represented that it will not resume [its FBI and CISA social-media]

---

[3] The Federalist, *FBI Confirms It's Restarting Online Censorship Efforts Ahead Of 2024 Election Reason*, May 8, 2024, https://thefederalist.com/2024/05/08/fbi-confirms-its-restarting-online-censorship-efforts-ahead-of-2024-election.

[4] DOJ Memorandum, *supra* note 2, at 3-4. The Court may consider the DOJ memorandum either as a party admission or by judicial notice. *See, e.g.*, *U.S. WeChat Users Alliance v. Trump*, 488 F. Supp. 3d 912, 916 n.2 (N.D. Cal. 2020) ("the government [does] not contest that the court could consider — whether as a party admission or by judicial notice — the Secretary's statement or other public officials' statements").

operations for the 2024 election." *Murthy*, 144 S. Ct. at 1993. The Court's reliance on this misleading representation was critical to its redressability ruling, which rested on the supposition that Defendants' challenged conduct had ceased.  But by the Government's own admission, it has not ceased, and redressability is now satisfied.

While conclusive proof does not yet exist that the FBI's and CISA's resumed operations are the cause of Meta's recent intensifying censorship of Mr. Kennedy, there can be no doubt that restoring the injunction against the FBI will "reduce the . . . risk" of censorship going forward and will "potentially lessen" Mr. Kennedy's injury, satisfying redressability under controlling Fifth Circuit precedent. *See Consumer Data Indus.*, 2023 U.S. App. LEXIS 19007, at *13; *Sanchez v. R.G.L.*, 761 F.3d at 506.[5] The same is true of CHD. Because CHD was completely deplatformed from Facebook and Instagram as a direct result of White House threats, and because CHD's status on those platforms has not changed since, it is likely that an injunction will increase the chances that CHD will be restored to those platforms. That is more than enough to create a "present case or controversy," *Murthy*, 144 S. Ct. at 1987 (citation omitted), and give CHD standing to seek relief.[6]

---

[5]  Thus Mr. Kennedy's standing runs not only against the Defendants listed above—Biden, the other White House Defendants, and the Surgeon General—but also against the FBI and CISA.

[6]  Defendants contended on appeal (ECF No. 28 at 7) that the *Kennedy* Plaintiffs "waived" direct-censorship standing by arguing earlier in this case that that they indisputably had right-to-listen standing. This contention is absurd. First, it flies in the face of this Court's ruling last February, which expressly held that the *Kennedy* Plaintiffs had not only asserted direct-

C.     **Plaintiff Sampognaro Has Right-To-Listen Standing**.

The Supreme Court rejected the *Murthy* plaintiffs' right-to-listen standing because the plaintiffs in that case had "not identified any specific speakers or topics that they have been unable to hear or follow." *Murthy*, 144 S. Ct. at 1980-81. By contrast, Plaintiff Connie Sampognaro has satisfied these requirements.

Ms. Sampognaro is a healthcare professional who is "potentially immuno-compromised" and acutely in need, for her own health, of accurate, up-to-date information about COVID and the possible treatments therefor. Sampognaro Dec. ¶¶ 2-4. She relies on social media for health information for herself, her family, and her husband's cardiology patients, all of whom are "high risk." Sampognaro Dec. ¶ 5. She has identified three specific individuals and organizations she particularly relies on for "valuable," "hard-to-find" information and viewpoints about COVID challenging the "orthodox" narrative, and particularly for information concerning adverse effects of the COVID vaccines as well as vitamins, supplements and alternative medicines that could boost a person's immune citizen to help fight

---

censorship standing, but had established such standing. *Kennedy*, 2024 U.S. Dist. LEXIS 26751, at *13-14. Second, the Complaint expressly alleges that Mr. Kennedy had been censored online as a result of Defendants' conduct, and in their Preliminary Injunction motion, Plaintiffs relied on the record amassed in *Missouri v. Biden*, alleging the "same … harms … as those alleged by the *Missouri* Plaintiffs." Most fundamentally, "waiver is the intentional relinquishment or abandonment of a known right," *Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17, 20 n.1 (2017), and the notion that Plaintiffs knowingly waived their claim to direct-censorship standing under *Murthy*—which had ***not yet been decided***—is a legal impossibility. *Murthy* has newly explained how a direct-censorship standing claim is to be established in cases like these; Plaintiffs cannot have waived a claim arising under a case that had not yet been decided.

COVID. Sampognaro Dec. ¶ 8. The identified individuals and organizations are Children's Health Defense, Dr. Joseph Mercola, and GreenMedInfo, and on many occasions the platforms have made their social media content unavailable or difficult to locate, with such censorship persisting to this day. Sampognaro Dec. ¶ 8, 12. Ms. Sampognaro points out that while the COVID pandemic crisis may have passed, the disease is still prevalent and dangerous for immuno-compromised individuals. Sampognaro Dec. ¶ 12. As a result, social media censorship prevents her "from accessing information from sources" she wants to listen to "on a subject of life-or-death importance." Sampognaro Dec. ¶¶ 11-12.

Thus Ms. Sampognaro has "identified ... specific speakers and topics that [she has] been unable to hear or follow," establishing a likelihood of right-to-listen standing under well-settled Supreme Court precedent. As the High Court put it in *Murthy*, "in *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, [425 U. S. 748, 756–757 (1976),] we concluded that prescription-drug consumers had an interest in challenging the prohibition on advertising the price of those drugs." *Murthy*, 144 S. Ct. at 1996. Like the prescription-drug consumers in *Virginia*, Ms. Sampognaro has a concrete, life-or-death interest in challenging government-induced censorship of medical information.[7]

---

[7] Ms. Sampognaro's standing thus runs against all Defendants that this Court found to have participated in the Government's successful efforts to censor protected COVID-related speech.

III.   **The *Kennedy* Plaintiffs' Standing is Further Strengthened by Their Additional State Action Theories.**

There is another important distinction between this case and *Murthy*, further strengthening the *Kennedy* Plaintiffs' standing.   *Murthy* went up to the Supreme Court solely on a coercion/significant-encouragement theory of state action, whereas the injunction here is before this Court and the Fifth Circuit is also based on this Court's finding of ***joint action*** between the platforms and federal actors. *Kennedy v. Biden*, 2024 U.S. Dist. LEXIS 26751, at *25. In addition, the *Kennedy* Plaintiffs have alleged conspiracy as a basis of state action, and Plaintiffs are entitled to seek affirmance on that ground too.

These additional state action theories strengthen Plaintiffs' standing for three pivotal reasons. First, they ***increase the number of Defendants*** against whom standing exists. For example, there is a wealth of evidence (as this Court has already found) that the Centers for Disease Control ("CDC") engaged in joint action with the platforms to censor users, such as Mr. Kennedy and CHD, who engaged in COVID-related speech contradicting or challenging CDC recommendations, assertions, and policy. *See, e.g.*, *Missouri v. Biden*, 680 F. Supp. 3d at 666-67. Accordingly, regardless of whether the Plaintiffs' censorship can be traced to CDC ***coercion***, the record nevertheless establishes likely ***joint-action*** traceability, redressability and therefore standing against the CDC.

20

Second, the joint activity theory of state action **expands traceability and redressability**. Numerous acts of platform censorship (for example, of the lab-leak hypothesis of COVID's origins or the Hunter Biden laptop story) that may not be specifically traceable to government coercion can be traced to the Defendants' joint activity with the platforms. And the fact (if true) that the Defendants are no longer sending coercive messages to the platforms does not mean they are no longer engaged in collusive joint action with them—joint action that can and should be redressed by an injunction.

Finally, these additional theories of state action **render non-independent** the platforms' 2020 censorship of COVID-related speech. Critically, in *Murthy*, the Supreme Court found that the platforms were "independently" censoring COVID-related content "before any of the Government defendants engaged" in the communications deemed coercive, which the Court dated to some time after "early February 2021." *Murthy*, 144 S. Ct. at 1987. Because only a coercion-based theory of state action was on the table, the platforms' (supposedly uncoerced) 2020 COVID-related censorship was therefore necessarily "independent" of improper governmental influence, *id.*, undermining both traceability and redressability. But there is extremely strong evidence (indeed, party admissions) that the platforms' COVID-related censorship in 2020 was the result of joint action with Defendants, particularly with the CDC. Holland Dec. ¶¶ 32-34. Hence with joint action back on

21

the table, the platforms' 2020 censorship of COVID-related speech cannot be deemed an exercise of "independent judgment." It was instead directly traceable to Defendants, further bolstering standing.

## CONCLUSION

For the foregoing reasons, the Court should reaffirm that the *Kennedy* Plaintiffs have standing, reaffirm the preliminary injunction, and reaffirm that that injunction is now in effect.


DATED: August 1, 2024

Respectfully Submitted,

/s/ G. Shelly Maturin, II
G. SHELLY MATURIN, II
(La. Bar#26994)
Welborn & Hargett, LLC
1540 W. Pinhook Road
Lafayette, LA 70503
Telephone: 337-234-5533
E-mail: shelly@wandhlawfirm.com

JED RUBENFELD
(NY Bar # 2214104)
(*pro hac vice* forthcoming)
1031 Forest Road
New Haven CT 06515
Telephone: 203-432-7631
E-mail: jed.rubenfeld@yale.edu

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 1, 2024, the above Brief in

Opposition to Defendants' Motion for Stay was filed with this Court via the

CM/ECF system, which will send notice of said filing to all counsel of record.

Dated: August 1, 2024

_____/s/ G. Shelly Maturin, II_____
G. SHELLY MATURIN, II (#26994)
WELBORN & HARGETT, LLC
1540 W. Pinhook Road
Lafayette, LA 70503
Telephone: (337) 234-5533
Facsimile: (337) 769-3173
shelly@wandhlawfirm.com
