# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

STATE OF MISSOURI, *et al.*,

      *Plaintiffs*,

   v.

JOSEPH R. BIDEN, JR., in his official capacity as
President of the United States of America, *et al.*,

      *Defendants*.

No. 22-cv-1213

*Consolidated with No. 23-cv-381*

Judge Terry A. Doughty
Mag. Judge Kayla D. McClusky

## DEFENDANTS' SUPPLEMENTAL BRIEF CONCERNING KENNEDY PLAINTIFFS' ARTICLE III STANDING

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

I.     The *Missouri* Action ............................................................................................ 2

II.    This Action............................................................................................................. 4

LEGAL STANDARD.......................................................................................................... 5

ARGUMENT ...................................................................................................................... 6

I.     Plaintiffs Waived Any Speaker-Based Theory of Standing ................................. 6

II.    The New Declarations Fail To Show Plaintiffs Have Article III Standing As
       Speakers To Obtain An Injunction Against Defendants........................................ 7

       A.     The Rasmussen Declaration Lacks Specific Facts Showing Any Plaintiff's
              Speaker-Based Standing ............................................................................. 8

       B.     The Holland Declaration Lacks Specific Facts Showing Any Plaintiff's
              Speaker-Based Standing ........................................................................... 14

       C.     The Sampognaro Declaration Lacks Specific Facts Showing Listener
              Standing ..................................................................................................... 19

       D.     Plaintiffs Lack Specific Facts Showing Article III Standing To Obtain
              Injunctive Relief Against The FBI Or CISA ........................................... 20

III.   The *Kennedy* Plaintiffs' Joint-Action Theory Does Not Alter The Requirement To
       Show Article III Standing. ................................................................................... 23

CONCLUSION.................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Abdullah v. Paxton*,
    65 F.4th 204 (5th Cir. 2023) ................................................................. 12

*Broadway v. City of Montgomery*,
    530 F.2d 657 (5th Cir. 1976) ................................................................. 18

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................. 20, 23, 25

*Ctr. for Biological Diversity v. U.S. EPA*,
    937 F.3d 533 (5th Cir. 2019) ................................................................. 6

*E. F. Hutton & Co. v. Brown*,
    305 F. Supp. 371 (S.D. Tex. 1969) ................................................................. 18

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ................................................................. 5, 20

*Hollingsworth v. Perry*,
    570 U.S. 673 (2013) ................................................................. 14

*Inglett & Co. v. Everglades Fertilizer Co.*,
    255 F.2d 342 (5th Cir. 1958) ................................................................. 18

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ................................................................. 4

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ................................................................. 14

*Loa-Herrera v. Trominski*,
    231 F.3d 984 (5th Cir. 2000) ................................................................. 24

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................. 5, 21

*Martinez v. Texas Dep't of Crim. Just.*,
    300 F.3d 567 (5th Cir. 2002) ................................................................. 7

*Missouri v. Biden*,
    83 F.4th 350 (5th Cir. 2023) ................................................................. 2

*Missouri v. Biden*,
  680 F. Supp. 3d 630 (W.D. La. 2023)................................................................ 2

*Murthy v. Missouri*,
  144 S. Ct. 7 (2023) .......................................................................................... 2

*Murthy v. Missouri*,
  144 S. Ct. 32 (2023) ...................................................................................... 16

*Murthy v. Missouri*,
  144 S. Ct. 1972 (2024) .......................................................................... *passim*

*Phillips v. City of Dallas*,
  781 F.3d 772 (5th Cir. 2015) ....................................................................... 13

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) .......................................................................................... 9

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ........................................................................................ 9

*Thole v. U.S. Bank N.A.*,
  590 U.S. 538 (2020) ................................................................................. 5, 14

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ...................................................................................... 24

*United States v. Collier*,
  846 F.3d 813 (5th Cir. 2017) ......................................................................... 6

*Valley Forge Christian College v. Am. United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) ...................................................................................... 13

## **Statutes**

50 U.S.C. § 3369 ............................................................................................ 22

## INTRODUCTION

The Supreme Court's conclusion that the plaintiffs in *Murthy v. Missouri*, 144 S. Ct. 1972 (2024), lacked standing—both on a speaker theory (based on restrictions on their own posts on social-media platforms) and on a listener theory (based on restrictions on others' posts)—applies with equal force to the Plaintiffs in this action, *Kennedy v. Biden*, 3:23-cv-00381 (W.D. La.). Even if they had not waived a speaker theory of standing, Plaintiffs here—like the *Missouri* plaintiffs— have not shown that any particular platform moderated any particular instance of their speech *as a result of the actions* of any particular Defendant, much less an imminent prospect that any platform would do so in the future absent an injunction against Defendants. *Missouri* requires both showings to establish standing. Rather, as the Supreme Court held in *Missouri* on a substantively identical record, the evidence instead shows that "the platforms moderated similar content long before any of the Government defendants engaged in the challenged conduct," and the platforms "continued to exercise their independent judgment even after communications with the defendants began." 144 S. Ct. at 1987. Nor can plaintiffs establish listener standing, which *Missouri* held requires a "specific instance of content moderation that caused [a plaintiff] identifiable harm," traceable to the actions of a "particular Defendant," *id.* at 1988, 1996.

The Fifth Circuit's remand to this Court afforded Plaintiffs the opportunity to expand the record to bolster their standing in light of *Missouri*, but none of Plaintiffs' three new declarations compensates for the fundamental deficiencies *Missouri* exposed. Most importantly, Plaintiffs provide no specific facts showing that "continued pressure" by any Defendant (much less all of them) is resulting or will result in the platforms' taking content-moderation actions against Plaintiffs. And under *Missouri*, without "any concrete link between" Plaintiffs' asserted future "injuries and the defendants' conduct," Plaintiffs have no Article III case against Defendants. *See, e.g.*, 144 S. Ct. at 1997.

Plaintiffs' theory of speaker standing is that Kennedy and Children's Health Defense (CHD) have shown causation based on acts by the CDC, the Surgeon General's Office, and the White House in 2021 (Supp. Mem. ("Supp."), Dkt. 52 at 7-13); that the platforms have continued

to moderate their conduct in the ensuing years (Supp. 13-16), and that different government agencies—the FBI and CISA—have been in contact with the social-media platforms more recently than 2021 (Supp. 16-17).  That theory repeats numerous flaws that the Supreme Court identified. Plaintiffs have no new evidence to refute the Supreme Court's conclusion—based on the same record as in this case—that contact between the social-media platforms and the CDC, the Surgeon General's Office, and the White House had slowed considerably since the pandemic receded after 2021, creating gaps in a theory of causation.  They have no answer to the Supreme Court's conclusion that it is inadequate to rely on the platforms' continuing content moderation to establish causation and redressability as to the government because the platforms had demonstrated incentives and willingness to moderate content even apart from any action by the government. And they ignore the Supreme Court's teaching that the government should not be treated as a monolith by treating evidence of continued meetings between platforms and the FBI as a basis for concluding that content moderation ostensibly at the behest of other Defendants continues to this day.

Each of these flaws is a sufficient basis for concluding that the three new declarations lack specific facts showing that Plaintiffs have Article III standing to seek an injunction, and together, they make abundantly clear that no preliminary injunction is warranted.  Hence, the Court should dissolve the preliminary injunction for lack of subject-matter jurisdiction.

## BACKGROUND

### I.   The *Missouri* Action

In *Missouri*, two States and several individuals sued an array of federal defendants regarding content moderation on social-media platforms.[1]  On June 26, 2024, the Supreme Court held in *Missouri* that "neither the individual nor the state plaintiffs have established standing to

---

[1]  This Court entered a preliminary injunction on July 4, 2023, after granting plaintiffs extensive discovery.  *Missouri v. Biden*, 680 F. Supp. 3d 630 (W.D. La. 2023).  The Fifth Circuit affirmed in part, reversed in part, vacated in part, and modified the injunction.  83 F.4th 350 (5th Cir. 2023). The Supreme Court granted certiorari and stayed the modified injunction pending its review. *Murthy v. Missouri*, 144 S. Ct. 7 (2023).

seek an injunction against any defendant." 144 S. Ct. at 1985. Accordingly, the Supreme Court "reverse[d] the judgment of the Fifth Circuit." *Id*. at 1997.

As to a speaker theory of standing, the Supreme Court held that "the plaintiffs must show a substantial risk that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one Government defendant." *Id.* at 1986. "And even where the plaintiff, platform, time, content, and defendant line up, the links must be evaluated in light of the platform's independent incentives to moderate content." *Id.* at 1988.

The Court determined that the plaintiffs had failed to make that showing. First, the Court concluded that the plaintiffs had not established "specific causation" because each plaintiff failed to show "that a particular defendant pressured a particular platform to censor a particular topic *before* that platform suppressed a particular plaintiff's speech on that topic." *Id.* at 1987-88. Assessing the asserted "direct censorship injuries" on a plaintiff-by-plaintiff, defendant-by-defendant, and platform-by-platform basis, the Court concluded that no plaintiff had established past injuries traceable to the government conduct at issue. The Court rejected the contention that plaintiffs' episodes of content moderation sufficed to confer Article III standing because there was no evidence that any of those episodes of content moderation had been caused by any action of the government. *Id.* at 1991-92.

Second, the Supreme Court emphasized that plaintiffs failed to show "'a real and immediate threat of repeated injury,'" as required to obtain prospective relief, *id.* at 1986 (citation omitted). The Court first disposed of plaintiffs who "fail[ed] to establish traceability for past harms," because that failure "substantially undermines" standing for future relief. *Id.* at 1993 (citation omitted). And even for Jill Hines, the plaintiff with "the best showing of a connection" of traceable past injury," the Supreme Court concluded that she lacked standing because "[b]y August 2022, when [that plaintiff] joined the case, the officials' communications about COVID-19 misinformation had slowed to a trickle." *Id.* at 1990, 1994. Thus, as to all plaintiffs, "without proof of an ongoing pressure campaign," the Supreme Court determined it was "entirely

speculative that the platforms' future moderation decisions will be attributable, even in part, to the defendants." *Id.* at 1993.

The Supreme Court also rejected plaintiffs' "right to listen" theory of standing. *Id.* at 1996-97 (citation omitted). Such a "startlingly broad" theory, the Court explained, "would grant all social-media users the right to sue over *someone else's* censorship," and the Court before "ha[d] 'never accepted such a boundless theory of standing.'" *Id.* at 1996 (citation omitted). The Court emphasized that a cognizable injury occurs "only where the listener has a concrete, specific connection to the speaker" who has allegedly been silenced. *Id.* (citing *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972)). The listener must also identify "a[] specific instance of content moderation that caused them identifiable harm." *Id.* The Court held that plaintiffs did not satisfy this requirement with a general assertion that access to "unfettered speech on social media is critical to their work as scientists, pundits, and activists." *Id.*

## II.   **This Action**

While *Missouri* was pending in this Court, the *Kennedy* Plaintiffs in March 2023 commenced this action, asserting substantially the same claims against the same defendants. Compl., Dkt. 1. Plaintiffs moved for a preliminary injunction, relying on "the same evidence previously introduced in *Missouri*." Mem. Ruling, Dkt. 38 at 2. This Court entered a preliminary injunction in this action "against the same Defendants and on the same grounds as in *Missouri*," *id.* at 22.[2]

---

[2]   This Court held that Plaintiffs Kennedy and CHD "can demonstrate standing" based exclusively on the Court's determinations in *Missouri* that the White House, the Surgeon General's Office, and the CDC had "coerced" or "significantly encouraged" social-media companies to remove content in 2021. Dkt. 38 at 11. This Court recognized that Plaintiff "Sampognaro submitted no direct evidence of content suppression," and found she had standing based only on the "right to listen" theory. *Id.* This Court did not assess whether any Plaintiff faced a substantial risk of content moderation in the near future as the result of actions by any Defendant. When assessing traceability and redressability, this Court rested entirely on its findings in *Missouri* that "the social-media platforms' [past] censorship decisions were likely [made], at least in part, due to the coercion and/or significant encouragement of the" Defendants. *Id.* at 12.

Defendants appealed.[3]   Following issuance of the *Missouri* decision, Defendants moved for an indicative ruling that this Court would dissolve the preliminary injunction in *Kennedy* or, in the alternative, a stay pending appeal.  *Missouri*, Dkt. 364.  This Court denied the motion based on its conclusion that it lacked jurisdiction to grant a stay while the Fifth Circuit appeal was pending, and declined to issue an indicative ruling.  *See* Mem. Order, *Missouri*, Dkt. 365 (W.D. La. July 9, 2024).   Defendants then sought a stay pending appeal from the Fifth Circuit, which administratively stayed the injunction and remanded "for the limited purpose of allowing" this Court "to consider the Kennedy Plaintiffs' standing in view of the Supreme Court's holding in [*Missouri*], and based on the parties' evidence particular to this case."  Order at 4, No. 24-30252 (5th Cir. July 25, 2024); Briefing Order, Dkt. 51 (W.D. La. July 25, 2024).

## LEGAL STANDARD

"To establish standing under Article III of the Constitution, a plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief."  *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020).  "And when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury."  *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).  At this stage Plaintiffs may not rest on "general allegations," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), but must adduce "specific facts" that make "a 'clear showing' that" each plaintiff "is 'likely' to establish each element of standing."  *See Missouri*, 144 S. Ct. at 1986, 1991 n.7.

Applying the established law on standing, *Missouri* further clarified the precise burden that the *Kennedy* Plaintiffs must carry when seeking to enjoin alleged government participation in the

---

[3] This Court stayed the *Kennedy* preliminary injunction "for ten (10) days after the Supreme Court sends down a ruling in *Missouri*," acknowledging that the Supreme Court's decision would "answer many of the issues raised in this case."  Dkt. 38 at 23.  After Defendants appealed, the Fifth Circuit held the appeal "in abeyance pending the Supreme Court's decision in *Murthy v. Missouri*, No. 23-411 (U.S.)."  *See* Order at 3, No. 24-30252 (5th Cir. Apr. 24, 2024); *see also Missouri*, Dkt. 348.

content-moderation decisions of third-party platforms.  For "direct censorship injuries," "the plaintiffs must show a substantial risk that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one Government defendant." *Id.* at 1986.  Likewise, for a listener theory of standing, "the listener" must identify a "specific instance of content moderation that caused them identifiable harm," *id.* at 1996-97, in addition to satisfying the standard traceability and redressability elements for any such injury, *id.* at 1987-96.

## ARGUMENT

### I.   Plaintiffs Waived Any Speaker-Based Theory of Standing

As an initial matter, Plaintiffs Kennedy and CHD belatedly attempt to assert Article III standing based on alleged content moderation of their own speech, but through their express disclaimers of any such standing theory to this Court, the Fifth Circuit, and the Supreme Court, they have waived such assertions.  *Ctr. for Biological Diversity v. U.S. EPA*, 937 F.3d 533, 542 (5th Cir. 2019) ("Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived.").  In their preliminary injunction papers, Plaintiffs *repeatedly* represented that "Plaintiffs bring this case not as censored speakers, but as social media users—viewers and listeners—challenging a denial of their right to receive information and ideas." Dkt. 20 at 4-5; *see also id.* at 2, 3, 8; Dkt. 6 at 16-17 (claiming "standing to assert the 'right to receive information and ideas' on behalf of social-media consumers nationwide").  Plaintiffs repeated their disavowal of speaker-based standing to both the Fifth Circuit[4] and the Supreme Court.[5]

Now, in a footnote in their supplemental brief, Plaintiffs protest that they did not knowingly waive the speaker-based theory.  Supp. Mem. 17-18 n.6.  But when a party tells the district court,

---

[4] *See Missouri v. Biden*, No. 23-30445, Brief Amicus Curiae Submitted By *Kennedy v. Biden* Plaintiffs, Dkt. 160-2 at 4 (5th Cir. Aug. 7, 2023) (representing that "plaintiffs in *Kennedy* do not sue as speakers alleging that their speech has been censored online").

[5] *See Murthy v. Missouri*, No. 23A243, *Kennedy* Plaintiffs' Amic. Br. in Opp'n to Stay, at 4, 2023 WL 6367533 at *4 (Sept. 20, 2023) ("plaintiffs in *Kennedy* do not sue as *speakers* alleging that their speech has been censored"); *Murthy v. Missouri*, No. 23-411, *Kennedy* Pls.' Mot. to Intervene, at 2 (Oct. 26, 2023) ("the *Kennedy* Plaintiffs assert the First Amendment claims of social media *viewers and listeners* all over the country"); *id.* at 3 (asserting "standing to assert [CHD's] members' First Amendment rights to receive information"); *id.* at 6 (repeating that Plaintiffs' "challenge does not depend on a claim that their specific speech has been (or will be) censored.").

the appellate court, and the Supreme Court that it is not pursuing a particular argument, the party knowingly abandons that argument.  *See, e.g.*, *United States v. Collier*, 846 F.3d 813, 814 (5th Cir. 2017) (repeated assertions show intentional waiver).  And Plaintiffs' notion that there could be no waiver until *Missouri* had been decided is untenable, because the Supreme Court in *Missouri* applied existing Article III standing precedent.   *See Martinez v. Texas Dep't of Crim. Just.*, 300 F.3d 567, 575 (5th Cir. 2002) (declining to consider newly raised argument despite intervening Supreme Court precedent).  Hence, the Court should reject Plaintiffs' attempt to revive their long-ago waived claims of speaker-based standing.

## II.   The New Declarations Fail To Show Plaintiffs Have Article III Standing As Speakers To Obtain An Injunction Against Defendants

Even if Plaintiffs had not waived speaker-based standing, their contentions would fail. Most importantly, the new declarations from Rasmussen and Holland, which Plaintiffs offer to support their speaker theory of standing (Supp. 7-13), fail to demonstrate any "real and immediate threat of future injury" any more than the record previously did.  *Missouri*, 144 S. Ct. at 1986.  In assessing the future injury requirement, the Supreme Court emphasized that, "without proof of an ongoing pressure campaign" by Defendants against platforms, "it is entirely speculative that the platforms' future moderation decisions will be attributable, even in part, to the defendants."  *Id.* at 1993.  And the Court concluded that "[o]n this record"—namely, the *Missouri* record that, apart from the three new declarations, is the only record in this case—the alleged "frequent, intense communications that took place in 2021 between the Government defendants and the platforms had considerably subsided by 2022," such that "[b]y August 2022, . . . the officials' communications about COVID-19 misinformation had slowed to a trickle."  *Id.* at 1994.  For its part, this Court had previously focused on White House and Surgeon General's Office communications *in 2021*, regarding the then-acute COVID-19 pandemic, without accounting for the "considerabl[e]" change in circumstances, *id.*, by the time the *Kennedy* plaintiffs filed their complaint in March 2023.  Yet evidence of governmental communications in 2021, the Supreme Court explained, would fall far short of demonstrating a present likelihood of future injury caused

by any of the Defendants (much less all of them) and redressable by an injunction against them: Because "the Federal Government has wound down its own pandemic response measures," an injunction directed at the government "is unlikely to affect the platforms' content-moderation decisions" in the future. *Id.* at 1995-96.

None of the Plaintiffs' new declarations cures the deficiency the Supreme Court identified in *Missouri* concerning the requirement to show *future* injury caused by the Defendants and redressable by an injunction against them. That is a sufficient basis to conclude that Plaintiffs have not demonstrated Article III standing without addressing the many other defects in their submissions on standing. And, in any event, although there is no need to reach the *past* injury component, if the Court were to examine that component, the declarations are also inadequate, because they do not offer specific facts linking particular Defendants to the past moderation of particular posts by any Plaintiff in a manner that properly accounts for the platforms' independent incentives to moderate content.

### A. The Rasmussen Declaration Lacks Specific Facts Showing Any Plaintiff's Speaker-Based Standing

#### 1. The Rasmussen Declaration does not attribute any platform decisions to Defendants' conduct

Plaintiffs submit the Rasmussen Declaration, which purports to show alleged censorship activities by Meta against the Plaintiff Kennedy's presidential campaign. Supp. 13-16. That declaration does not demonstrate any "real and immediate threat" of future injury from any Defendant against any Plaintiff that could support the injunction sought against Defendants, because it does not purport to describe any conduct by the Government at all.

Rasmussen is the chief of staff of Kennedy's campaign, *i.e.*, a campaign committee registered with the Federal Election Committee under the name Team Kennedy. Rasmussen Decl. ¶¶ 2-3; *see* Ex. A (FEC Form 1 (July 23, 2024)). Rasmussen describes "some of the major examples" of "screenshots and testimonies that our staff, supporters, and volunteers have sent" the campaign when their social media posts regarding the campaign are subject to platform content moderation. *Id.* ¶¶ 3-4. But Rasmussen does not purport to attribute responsibility for the harms

she describes to any Defendant.  To the contrary, she chiefly attributes those actions to "*one corporation*": Meta, which owns Facebook and Instagram (among other platforms).  *Id.* ¶ 36 (emphasis added).[6]

But, of course, Meta is a "third party not before the court," whose "independent action," even when it results in injury to a plaintiff, "a federal court *cannot redress*" in this suit brought against the government alone.  *Missouri*, 144 S. Ct. at 1986 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)) (emphasis added).  The Supreme Court held in *Missouri* that the record demonstrated that the government had wound down its COVID-19 pandemic related communications with platforms, thus negating causation and redressability as to the government at the time of the lawsuit, and the Rasmussen declaration does nothing to suggest otherwise, so Plaintiffs' allegations of future injury are foreclosed by *Missouri*.

Notably absent are any specific facts in her declaration about any Defendant.  Rasmussen does not assert that any Defendant in any way caused any of the content moderation episodes she describes.  Nor does she describe any facts from which it would be possible to infer that any Defendant had any control over such features as Meta's "technical glitch[es]," Meta's determinations that particular posts were "violating" the company's "community standards," or Meta's AI "chatbot."  Rasmussen Decl. ¶¶ 11, 22, 25.  Hence, the *only* inference the declaration supports is that, as to the content moderation episodes Rasmussen describes, Facebook and

---

[6] For example, when campaign supporters attempted to "share" online a biographical film about Kennedy released in May 2024, although "some posts" were "taken down from or failed to upload to YouTube" (owned by Google), Rasmussen observes "the vast majority of examples" of episodes in which circulation of the film was impeded "came from Meta (Facebook and Instagram)." Rasmussen Decl. ¶ 8.  "Meta told us," Rasmussen avers, "that there was or had been a 'technical glitch' in their system, but assured us that they had resolved so that people could post the film." *Id.* ¶ 11.  And when the problems continued, Team Kennedy undertook "efforts to more systematically track what *Meta was doing* to our supporters," *id.* ¶ 13 (emphasis added); *see also id.* ¶ 15.  When campaign supporters later "shared their feelings about" the June 27, 2024 presidential candidate debate (in which Kennedy did not qualify to participate), they did so "by commenting on Facebook and Instagram, only to get their comments removed." Rasmussen Decl. ¶ 20.  Rasmussen faults "Meta's purported 'reasons'" for such content moderation, which "commonly included 'trying to get likes, comments, follows, and views in a misleading way', and 'violating community standards' for a variety of reasons that did not make sense." *Id.* ¶ 22.  And Rasmussen also asserts that "Meta's" artificial intelligence (AI) "chatbot provides inaccurate information in response to queries on Meta's portal." *Id.* ¶ 25.

Instagram "exercise[d] their independent judgment" over content users posted to those platforms. *Missouri*, 144 S. Ct. at 1987.  The declaration provides no evidence of Defendants' "play[ing] a role" in those "choices."  *Cf. id.* at 1987-88 (concluding that entire record "indicates that the platforms had independent incentives to moderate content and often exercised their own judgment," and that, although "the Government defendants played a role in at least some of the platforms' moderation choices [during the height of the pandemic]," it was erroneous to "attribut[e] *every* platform decision at least in part to the defendants").

Rasmussen therefore supplies no specific facts of "ongoing" conduct by Defendants against platforms, leaving "it . . . entirely speculative that the platforms' future moderation decisions will be attributable, even in part, to the defendants." *Missouri*, 144 S. Ct. at 1993.  Her declaration thus fails to show "a substantial risk that, in the near future, at least one platform will restrict the speech of" Kennedy "in response to the actions of at least one Government defendant," and hence does not support his Article III standing, or anyone else's.  *Id.* at 1986.

### 2. The Rasmussen Declaration also fails to show repetition of past injury and improperly relies on asserted harms to nonparty individuals

The Rasmussen Declaration also suffers from at least two additional defects.  Those defects reflect a failure by Plaintiffs to heed the teaching in *Missouri*, which applies with equal force to this case:  "Different groups of defendants communicated with different platforms, about different topics, at different times.  And even where the plaintiff, platform, time, content, and defendant line up, the links must be evaluated in light of the platform's independent incentives to moderate content."  144 S. Ct. at 1988.

*First*, as to topics (or content) of speech:  The Rasmussen Declaration does not connect the 2024 asserted injuries of Team Kennedy's staff and supporters from moderation by Meta of content *about the ongoing electoral campaign* to the purported 2021 communications by some Defendants with platforms *about the COVID-19 pandemic*. There is no alignment of "content." *Id.*

Although Kennedy was one member of the "Disinformation Dozen" identified by certain White House officials as "supposedly responsible for a majority of COVID–19-related

misinformation" in 2021, *Missouri*, 144 S. Ct. at 1991, the record lacks evidence establishing that any platform's action against Kennedy's accounts can be attributed to a governmental actor, then or now.  In opposing the *Kennedy* Plaintiffs' preliminary injunction motion, Defendants explained that the record as it then existed showed Defendants did not threaten platforms with sanctions if the platforms failed to take particular actions against the "Disinformation Dozen."  Dkt. 17 at 6 n.3 (citing *Missouri*, Dkt. 174-1 at 42).  For example, in the e-mail correspondence on which Plaintiffs have relied, between the White House and Facebook on May 6, 2021, a White House official questioned the mechanics and sufficiency of Facebook's moderation of the so-called "Disinformation Dozen" (which included Kennedy and CHD), but the e-mail did not threaten Facebook with sanctions.  *Missouri*, Dkt. 174-1 at 41.  And when Facebook in August 2021 took "some action against pages associated with the 'disinformation dozen,'" it *declined* to "remove[] every account linked to the group," including a page "belong[ing]" to Kennedy.[7]

The proper inference, paying careful attention to "the platform's independent incentives to moderate content," *Missouri*, 144 S. Ct. at 1988, is that the relevant actions reflected the platform's own decisions, not any governmental action.  *See id.* at 1987 ("For instance, Facebook announced an expansion of its COVID-19 misinformation policies in early February 2021, before White House officials began communicating with the platform. And the platforms continued to exercise their independent judgment even after communications with the defendants began. For example, on several occasions, various platforms explained that White House officials had flagged content that did not violate company policy."); *see also id.* at 1992 n.8.

But even if Kennedy had properly traced platform content moderation to past acts of some Defendants during the pandemic, that is not the sort of content moderation addressed by the Rasmussen Declaration.  Instead, the Team Kennedy staff and supporter posts discussed in the

---

[7]  *Missouri*, Dkt. 10-1 at 483 (CNN article of Aug. 18, 2021 citing Facebook announcement); *see* Defs. Prelim. Inj. Opp. 164-65 & Ex. 145, *Missouri* Dkt. 266-6 at 349 (Aug. 18, 2021 Facebook announcement, which stated:  "the remaining accounts associated with these individuals are not posting content that breaks our rules, have only a posted a small amount of violating content, which we've removed, or are simply inactive.").

declaration concerned Kennedy's candidacy—starting with his 2024 biographical film, which Rasmussen attests "makes almost no references to COVID at all," Rasmussen Decl. ¶¶ 5-10, and continuing through the 2024 debate, *id.* ¶¶ 22-25.  Neither the declaration nor Plaintiffs' brief (Supp. 14-16) links recent content moderation episodes to the same governmental communications with platforms in 2021 concerning COVID-19 misinformation that underpinned the asserted past harm.  That shirks the obligation to "line up" the "plaintiff, platform, time, content, and defendant." *Missouri*, 144 S. Ct. at 1988.  So even if Kennedy could show past harm by proving that those communications became coercive or "significantly encouraging," Plaintiffs do not show through the Rasmussen Declaration (or any other evidence) that those harms are repeating now.

That is, nothing in the Rasmussen Declaration would support an assumption that the Defendants' past acts, years ago, concerning COVID-19 misinformation somehow have resulted in ongoing or future content moderation decisions by platforms on an entirely different topic— Kennedy's presidential campaign.  (As explained below, the Holland Declaration attempts but fails to address this disconnection.)  Plaintiffs' reliance on the Rasmussen Declaration thus does not heed the Supreme Court's admonition that they may not offer only "guesswork as to how" the "third-party platforms," who are "independent decisionmakers," will "exercise their judgment." *Missouri*, 144 S. Ct. at 1986.  Instead, the Court instructed, Plaintiffs must "show that the third-party platforms will likely react in predictable ways to the defendants' conduct."  *Id.* (quotation omitted).  The Rasmussen Declaration fails to offer any such evidence.

*Second*, as to the identity of speakers:  Plaintiffs fail to explain how the asserted content moderation experienced by Team Kennedy's "staff, supporters and volunteers . . . supporting Kennedy's candidacy or urging citizens to vote for him," Rasmussen Decl. ¶ 3, can establish Kennedy's Article III standing—given that, after all, it is Kennedy, and not the Team Kennedy campaign committee, nor any individual "staff, supporters and volunteers," who is a Plaintiff before the Court.  A plaintiff raising a First Amendment claim "cannot assert arguments based only on other's rights" to speak.  *See Abdullah v. Paxton*, 65 F.4th 204, 210 (5th Cir. 2023) (plaintiff "must assert *his own legal rights and interests*, and cannot rest his claim to relief on the legal rights

12

or interests of third parties") (quoting *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) (emphasis by Fifth Circuit)); *see also Missouri*, 144 S. Ct. at 1990 ("It is unclear why" plaintiff "Jim Hoft would have *standing to sue for his brother's injury*" stemming from Twitter content moderation of past post by Hoft's brother) (emphasis added).

Indeed, Rasmussen's account of the content moderation episodes experienced by the campaign's staff, supporters, and volunteers raises precisely the sort of reliability problems that courts avoid by requiring plaintiffs to rely on their own rights and not on the rights of third parties. Rasmussen is unable to specify who made the moderated posts, exactly what final decision the platform rendered regarding the posts, and what content moderation policies or terms of service underpinned those final decisions.  Instead, she summarizes the complaints at a high level of generality, repeating the sort of hazy imprecision rejected in *Missouri*, where the Court admonished that the "plaintiff, platform, time, content, and defendant[]s" must be "line[d] up," and even then, "evaluated in light of the platform's independent incentives to moderate content." 144 S. Ct. at 1988.  Although Rasmussen attests that "at least a dozen supporters" are "willing to sign an affidavit about what happened to them . . . when they post[ed] about" Kennedy's candidacy, Rasmussen Decl. ¶ 30, Plaintiffs have neither obtained such affidavits nor added those supporters as Plaintiffs to this action.  But Plaintiffs never explain on what grounds Kennedy can pursue claims on behalf of his supporters.  *See Phillips v. City of Dallas*, 781 F.3d 772, 782 n.12 (5th Cir. 2015) (candidate "lacks standing to pursue claims on behalf of" anticipated "voters, who are not plaintiffs in this litigation").

Courts sensibly avoid proof problems of the sort raised by Kennedy's attempt to rely on the moderation of the content posted by absentee staff and supporters by adhering to the third-party standing doctrine.  That doctrine provides a "limited . . . exception" to the general rule against asserting the rights of third parties when the plaintiff can "make two additional showings" beyond an Article III injury of its own:  that it has "a 'close' relationship with the person who possesses the right," and that "there is a 'hindrance' to the possessor's ability to protect his own interests."

*See Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004); *Thole*, 590 U.S. at 543 ("to claim 'the interests of others, the litigants themselves still must have suffered an injury in fact, thus giving' them 'a sufficiently concrete interest in the outcome of the issue in dispute.'") (quoting *Hollingsworth v. Perry*, 570 U.S. 673, 708 (2013)).  Kennedy has not attempted to make those showings required by the third-party standing doctrine.

Again, because the Rasmussen Declaration is insufficient to show threat of future injury to Kennedy under Article III, this Court need not devote attention to the other problems the declaration presents.  But if the Court reaches that question, the proper course is to reject Plaintiffs' effort to rely on the content moderation episodes of nonparties as purported evidence of Mr. Kennedy's Article III standing.

### B.  The Holland Declaration Lacks Specific Facts Showing Any Plaintiff's Speaker-Based Standing

Plaintiffs submit the Holland Declaration to attempt to establish CHD's standing.  Supp. 7-13.  But Holland's declaration also fails to provide specific facts supporting Article III standing, and instead underscores two deficiencies in Plaintiffs' contentions.  First, even if CHD could show past injury from some Defendants' past communications with platforms about COVID-19, those communications have "subsided . . . given the changed state of the pandemic."  *Missouri*, 144 S. Ct. at 1994.  So any continuing platform moderation of CHD must be understood as reflecting independent judgment by platforms that an injunction now against Defendants would not redress—and Plaintiffs have no evidence to the contrary.  In other words, there is no prospect of future injury by defendants that is the prerequisite for injunctive relief against defendants.  Second, although there is no need to reach the question, Holland's effort to show Defendants' communications caused CHD's past injuries hinges on unfounded assertions and assumptions, not on specific facts sufficient to bear Plaintiff's burden.

#### 1.  The Holland Declaration does not show ongoing or future injury that an injunction against Defendants here would remedy

*First*, even if Holland's recitation of past events were sufficient to satisfy Article III causation of a *past* injury (an assumption that fails for the reasons below), that would put CHD

and Kennedy in a position similar to that of *Missouri* plaintiff Hines, who lacked standing, the Supreme Court held, because she had not shown future injury that an injunction against Defendants would remedy.  The Supreme Court explained that, even if Hines could establish causation predicated on past COVID-related communications, the record in *Missouri* (on which Holland heavily relies, *see, e.g.*, Holland Decl. ¶¶ 9, 14-18, 21-22, 24, 26) contains no "evidence of continued pressure" from the Defendants extending to the point in 2022 when Hines became a plaintiff.  *Missouri*, 144 S. Ct. at 1995.  To the contrary, that record shows that "the frequent, intense communications that took place in 2021 had considerably subsided by 2022."  *See id.* at 1994 (discussing conduct of White House, CDC, Surgeon General's Office, and other defendants).  "Enjoining the Government defendants" is thus "unlikely," the Court explained, "to affect the platforms' content-moderation decisions" *in the future.  Id.* at 1995-96.  That is especially so because of the "evidence"—the same evidence present in the record here—"indicat[ing] that the platforms had independent incentives to moderate content and often exercised their own judgment." *Id.* at 1987-88; *see id.* at 1988 (once "plaintiff, platform, time, content, and defendant" are "line[d] up, the "links *must* be evaluated in light of the platform's *independent* incentives to moderate content") (emphasis added).  CHD became a plaintiff when this action commenced in 2023, so the Court's analysis of that standing deficiency applies with even greater force to CHD.

In that regard, although Holland represents that CHD was unable to post on Facebook, Instagram, and YouTube as recently as July 2024 (Holland Decl. ¶ 4), Plaintiffs do not connect those platform decisions to ongoing governmental action (Supp. 7-13).  In *Missouri*, the plaintiffs similarly argued that the platforms had continued to moderate their content, but the Court held that the plaintiffs had failed to establish that any such moderation was traceable to the government.  Rather, the Court concluded that "the available evidence indicates that the platforms have enforced their policies against COVID-19 misinformation even as the *Federal Government has wound down its own pandemic response measures." Missouri*, 144 S. Ct. at 1995 (emphasis added).  So too here.

Neither Holland nor any other Plaintiff provides specific facts showing that the "pandemic response measures" have *not* "wound down" or "considerably subsided" by 2023 even more than they had by 2022.  *See id.* at 1994-95.  Hence, an injunction against Defendants today would not redress the purported "de-platform[ing]" of CHD, Holland Decl. ¶ 4, and Plaintiffs thus have failed to show redressability for purposes of seeking prospective relief, as the Court held in *Missouri* when rejecting Article III standing for Hines.  *Missouri* held that, even if the platforms' past decisions had been influenced by the government's actions, that would not show that an injunction against the government defendants would likely prevent future injuries.  That is because, absent an ongoing "pressure campaign," enjoining the government defendants "is unlikely to prompt [the platforms] to stop enforcing" their policies.  There is no evidence of such a campaign, and as result, Holland's declaration fails to show redressability.  *Missouri*, 144 S. Ct. at 1996 n.11.

Plaintiffs cannot compensate for that deficiency by relying (Supp. 2-3) on Justice Alito's dissent from the Supreme Court's denial of Plaintiffs' motion to intervene in *Missouri*.  That dissent's conclusion that Kennedy has Article III standing because he was "mentioned explicitly in communications between the Government and social media platforms," *Murthy v. Missouri*, 144 S. Ct. 32, 32 (2023) (Alito, J., dissenting), cannot be reconciled with the Court's subsequent decision in *Missouri*, which, unlike the stay dissent, is binding precedent.

### 2. The Holland Declaration does not show past injuries to CHD fairly traceable to Defendants

*Second*, although CHD's failure to show redressability in the absence of ongoing government conduct directed to CHD is sufficient to defeat Article III standing, the Holland Declaration also reflects a failure to show any Defendant caused past injury to CHD stemming from platform content moderation measures taken against CHD.  Instead, the Holland Declaration ignores (1) the *Missouri* record, (2) the Supreme Court's analysis in *Missouri*, and (3) traditional rules limiting declarations to facts rather than legal argument.  And Plaintiffs' reliance on the Holland Declaration is therefore inadequate to establish standing.  Supp. 7-13.

16

To begin with, Holland's examination of the record in *Missouri* is incomplete.  The declaration purports to describe a "few of the many facts that support" her legal "conclusion" of causation "[w]herever possible" with "documentary sources . . . from the *Missouri v. Biden* record."  Holland Decl. ¶ 9.  But the declaration discloses no personal knowledge of those facts beyond what Holland gleaned from reading portions of the *Missouri* record.  And the declaration lacks credibility because it selectively quotes only those portions of the record that favor Holland's narrative, while ignoring the many other portions of the record that do not.  To take one example: Holland echoes (*id.* ¶ 17) Plaintiffs' prior effort to blame the White House and the Office of the Surgeon General for past content moderation by Facebook against the "Disinformation Dozen." But in doing so, Holland ignores all of the contrary evidence and the platform's independent incentive to moderate that content, as addressed above.  *See* pp. 10-11, *supra*.[8]

Moreover, the Holland Declaration, and the brief which relies on it, fails to apply the Supreme Court's teachings in *Missouri*.  For example, the declaration announces:  "I can state from CHD's first-hand experience as a victim of this 2020 censorship that it was *not* '*independent*' of government involvement."  Holland Decl. ¶ 32 (emphasis added). But Holland's argumentation does not address the platforms' independent incentives to moderate content at all, which, under *Missouri*, is critical to the analysis of Article III standing for the type of claim CHD asserts.  The Holland Declaration does attest to facts meeting the requirement that once "plaintiff, platform, time, content, and defendant" are "line[d] up, the "links must be evaluated in light of the platform's independent incentives to moderate content." *Missouri*, 144 S. Ct. at 1988.  Holland's professed basis for her assertion of non-independence stems from CHD's allegations about Facebook's

---

[8] Holland's examination of the *Missouri* record does not address Defendants' brief in opposition to the preliminary injunction.  Nor does she address Defendants' responses to the *Missouri* Plaintiffs' proposed findings of fact, Missouri Dkt. 266-8 (Defs. Resp. PFOF).  Multiple assertions in the Holland Declaration are refuted by those responses.  For example: *Compare* Holland Decl. ¶ 15 *with* Defs. Resp. PFOF 124; Holland Decl. ¶ 16 *with* Defs. Resp. PFOF 3; Holland Decl. ¶ 17 *with* Defs. Resp. PFOF 128; Holland Decl. ¶ 24 *with* Defs. Resp. PFOFs 354-55.  Holland also recites (¶¶ 28-29) certain statements from this Court's July 4, 2023 opinion in *Missouri* without addressing the Supreme Court's rejection in *Missouri* of this Court's and the Fifth Circuit's treatment of such statements.  *See, e.g.*, 144 S. Ct. at 1987-88 & n.4.

moderation of CHD's vaccine-related content prior to 2021, which she connects to public statements by CDC in 2019 and by Facebook in 2021 describing common "work" about vaccine misinformation.  Holland Decl. ¶¶ 33-35.  Holland's assertions about those public statements, which are not by their terms particularized to CHD, simply repeat multiple errors the Supreme Court rejected in *Missouri*.  *See, e.g.*, 144 S. Ct. at 1988.  Among other errors, she appears to assume that mere communications between a platform and an agency constitutes "coercion" or "significant encouragement," which is an assumption the Supreme Court squarely rejected, when it instead determined that "the challenged conduct" at issue "is 'coercion' and 'significant encouragement,' not mere 'communication.'"  144 S. Ct. at 1993.

Additionally, although Plaintiffs have attempted to use the Holland Declaration to advance argumentation concerning Defendants' purported causation of past content moderation episodes against CHD (Holland Decl. ¶¶ 8, 27-28), Holland does not attest to facts within her personal knowledge that could support such argumentation, beyond her selective review of the *Missouri* record, as described above, and a handful of publicly-available documents.  "If the 'facts' are really facts, they should be put forward as such *without interstitial argumentation*."  *Inglett & Co. v. Everglades Fertilizer Co.*, 255 F.2d 342, 349-50 (5th Cir. 1958) (emphasis added); *cf. Broadway v. City of Montgomery*, 530 F.2d 657, 660 (5th Cir. 1976) (rejecting affidavit "constitut[ing] nothing more than a recital of unsupported allegations, conclusory in nature"); *E. F. Hutton & Co. v. Brown*, 305 F. Supp. 371, 383 (S.D. Tex. 1969) ("Affidavits are vehicles for the presentation of facts to the Court, not legal arguments.  They should be restricted to the statement of facts within the personal knowledge of the affiant.  Argument of the facts and the law appropriately should appear in briefs.").

In short, although there is no need to address Holland's assertions about causation of past injury because of the failure of proof of redressability discussed above, if the Court reaches the causation question, it should reject CHD's standing as unsupported by specific facts.

**C.  The Sampognaro Declaration Lacks Specific Facts Showing Listener Standing**

Plaintiffs use Sampognaro's new declaration to advance, again, a listener theory of standing, even though that is a theory of standing the *Missouri* Court rejected.  Supp. 18-19.  It is not sufficient, the Supreme Court explained, for plaintiffs to "claim an interest in [someone else's] speech" or even to assert an interest in "hearing unfettered speech on social media that is critical to" some aspect of the plaintiffs' lives.  *See Missouri*, 144 S. Ct. at 1996 (rejecting standing based on claims that plaintiffs relied on "unfettered speech" for their "work as scientists, pundits, and activists").  Rather, each plaintiff must "point to a[] specific instance of content moderation that caused [her] identifiable harm" and has a "causal link" to a particular defendant's conduct—and, in an action seeking prospective relief, each plaintiff must "proffer evidence that the defendants' 'allegedly wrongful behavior w[ould] *likely* occur or continue'" absent an injunction.  *Id.* at 1989, 1993, 1996.  Sampognaro's declaration (and Plaintiffs' brief) does not meet those requirements.

To begin with, Sampognaro's identification of COVID-19 topics and speakers that she has at times been prevented from hearing in the past is no different from the *Missouri* plaintiffs' identification of topics and speakers that they asserted were "critical" to their lives.  *Compare* Supp. at 18-19 and Decl. ¶¶ 7-9, *with Missouri*, 144 S. Ct. at 1996 (rejecting, for listener theory, plaintiffs averment "that hearing unfettered speech on social media is critical to their work as scientists, pundits, and activists").[9]  And like the *Missouri* plaintiffs found to lack listener standing, Sampognaro fails to identify "any specific instance of content moderation that caused [her] identifiable harm."  *Missouri*, 144 S. Ct. at 1996.

Notably, Sampognaro's declaration concerns platform moderation of content about the COVID-19 pandemic, a subject on which, the Court observed, platforms had enforced their policies "before the defendants entered the scene."  144 S. Ct. at 1995.  She proffers no evidence "that a particular defendant pressured a particular platform" to undertake the content moderation she challenges "*before* that platform" engaged in that particular content moderation.  *Missouri*,

---

[9] *See also* Kulldorff Supp. Decl. ¶¶ 4-5, *Missouri*, Dkt. 227-6 ("Having access to the uncensored views about science is central to my work as a scientist."); Bhattacharya Supp. Decl. ¶¶ 4-5 *Missouri*, Dkt. 227-5 (similar); Kheriaty Supp. Decl. ¶¶ 4-5, *Missouri*, Dkt. 227-7 (similar).

144 S. Ct. at 1988.  Nor does Sampognaro connect restrictions on her ongoing inability to obtain "full" information from certain social media accounts to the ongoing conduct of any Defendant. Sampognaro Decl. ¶ 12.

Sampognaro also recognizes that "the pandemic is no longer the crisis it was a couple of years ago."  Decl. ¶ 12.  To the extent the platforms continue to "enforce[] their policies against COVID-19 misinformation even as the Federal Government has wound down its own pandemic response measures," that cannot be attributed to Defendants, whose communications with the platforms regarding COVID "had considerably subsided by 2022."  *Missouri*, 144 S. Ct. at 1994-95.  Hence, the Sampognaro Declaration contains no specific facts showing current or future harm as a listener traceable to any Defendant's actions, or that an injunction against any Defendant "is []likely to affect the platforms' content-moderation decisions." *Id.* at 1996-96.

### D.  Plaintiffs Lack Specific Facts Showing Article III Standing To Obtain Injunctive Relief Against The FBI Or CISA

None of the supplemental declarations provides specific facts, or even allegations, about the past or present conduct of the FBI or CISA in communicating with (let alone coercing or "significantly encouraging") platforms respecting election-related misinformation.  *Id.* at 1993. The declarations do not show any risk, let alone "a substantial risk," that "in the near future, at least one platform will restrict the speech of" any Plaintiff "in response to the actions of" the FBI or CISA.  *Id.* at 1986; *see id.* at 1993 (holding as to FBI that Plaintiff Hoft "cannot satisfy his burden with . . . conjecture").  Such a harm, unaddressed in the declarations, is "too speculative," *All. for Hippocratic Med.*, 602 U.S. at 383, and cannot be "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).  Hence, no Plaintiff has shown Article III standing to obtain an injunction against the FBI or CISA, even if they had shown standing to obtain an injunction against other Defendants.  Notably, although the injunction defines CISA as including the U.S. Department of Homeland Security ("DHS") and DHS personnel Robert Silvers and Jeohn Salone Favors (successor to Samantha Vinograd), Plaintiffs omit any mention of DHS in their supplemental submissions, so at a minimum they lack Article III standing to enjoin DHS.  As to

CISA and FBI, Plaintiffs' assertion of standing (Supp. 2, 16-17) is predicated on exactly the sort of "conjecture" the Supreme Court rejected in *Missouri*, and is mistaken at every turn.

*First*, Plaintiffs understate their complete absence of proof of standing as to the FBI and CISA when they acknowledge (Supp. 17) that "conclusive proof does not yet exist that" what they call "the FBI's and CISA's resumed operations are the cause of Meta's recent intensifying censorship of Mr. Kennedy" while nevertheless asserting that they can continue to seek an injunction against those agencies.  Not only do Plaintiffs lack "conclusive proof" as to the FBI and CISA—Plaintiffs have *no specific facts as to those agencies at all*, which *Missouri* clarified is required:  "[T]he plaintiffs bear the burden to establish standing by setting forth 'specific facts.'" 144 S. Ct. at 1991 n.7 (quoting *Lujan*, 504 U.S. at 561).  That deficiency forecloses any injunction against those agencies in this action.  Plaintiffs presuppose that their allegations linking past platform moderation of Kennedy's content about COVID-19 misinformation to the White House sustain their bid for injunctive relief against all Defendants, including the FBI and CISA.  But any such argument simply repeats the error rejected in *Missouri*, where the Court faulted the plaintiffs for "treat[ing] the defendants as a monolith," and underscored that courts are obligated to "confirm that *each* Government defendant continues to engage in the challenged conduct, which is 'coercion' and 'significant encouragement,' not mere 'communication.'"  *Id.* at 1993.

*Second*, Plaintiffs' attempted reliance on a summary of the FBI's recent clarification of its standard operating procedures for communications with social media platforms about Foreign Malign Influence (FMI) threat information is mistaken.  Plaintiffs' argument about the FBI offers only conjecture, not found even in their supplemental declarations, that they are somehow affected by any such FBI communications.

In that regard, Plaintiffs do not even attempt to show, with specific facts, the four components *Missouri* clarified were required for plaintiff Hoft to show standing to seek forward-looking relief as to FBI:  (1) his "future posts (presumably about the 2024 Presidential election) must contain content that falls within a misinformation trend that the FBI has identified or will identify in the future"; (2) the "FBI must pressure the platforms to remove content within that

21

category"; (3) that "platform must then suppress Hoft's post"; and (4) that platform "must do so at least partly in response to the FBI, rather than in keeping with its own content-moderation policy." *Id.* at 1994.  As explained above, Plaintiffs do not show even the first of these four steps, let alone all of them.

Indeed, as to the second of those components, the FBI's standard operating procedures as recently summarized, to which Plaintiffs call attention, underscore the difficulties Plaintiffs would face in making the required showing.  In analyzing standing for a claim such as Plaintiffs,' "the challenged conduct . . . is 'coercion' and 'significant encouragement,' not mere 'communication.'" *Id.* at 1993.  The record contains no evidence that the FBI went beyond "mere 'communication.'" *Id.*; *see* Defs. Prelim. Inj. Opp. 91-101, *Missouri*, Dkt. 266.  And the standard operating procedures clarify further that ongoing FBI communications with platforms do not go beyond "mere communication."  The summary of the standard operating procedures that the FBI released is attached.  Ex. B. As the summary explains, the FBI's meetings with platforms respect "the sense of Congress," in 50 U.S.C. § 3369, "[that] information from law enforcement and the intelligence community is . . . important in assisting efforts by these social media companies to identify foreign information warfare operations."  Importantly, the standard operating procedures provide that "[a]ll communications to and with" a pertinent platform "are made in a way that makes clear," among other things, that "the FBI is not asking the Platform to take any action in response to the sharing of the information, and the Platform has no obligation to do so," that "the FBI is not asking the Platform to change or amend its terms of service," and that "no adverse action will be taken by the FBI based on the Platform's decision about whether or how to respond to the information being shared."  Ex. B.  Plaintiffs lack any specific facts showing that their social media posts are implicated in any FBI communications with platforms under the standard operating procedure.

*Third*, beyond understating their total lack of proof of substantial risk of harm as to FBI or CISA, Plaintiffs err in accusing any agency of a "misleading" representation (Supp. 16-17) that Plaintiffs contend "may have hoodwinked" the Supreme Court in *Missouri* (Supp. 2).  Plaintiffs'

accusation is that the Government has resumed activities it told the Court it had stopped.  That misunderstands a sentence in the Supreme Court's opinion.

The sentence as it reads in the Court's opinion is as follows:  "CISA, meanwhile, stopped switchboarding in mid-2022, and the Government has represented that it will not resume operations for the 2024 election."  *Missouri*, 144 S. Ct. at 1993; *see id.* at 1983 ("Until mid-2022, CISA, through its 'switchboarding' operations, forwarded third-party reports of election-related misinformation to the platforms.").[10]

When quoting the Supreme Court sentence about CISA having "stopped switchboarding," Plaintiffs misstate it as follows:  "the Government has represented that it will not resume *[its FBI and CISA social-media]* operations for the 2024 election."  Supp. 2-3 (emphasis added).  So it is the bracketed phrase that Plaintiffs inserted that recasts a Supreme Court sentence about the Government's representation concerning *the status of CISA switchboarding* into a dramatically different statement about "FBI and CISA social-media operations."   The Government's representation about the status of CISA switchboarding was accurate.

### III.    The *Kennedy* Plaintiffs' Joint-Action Theory Does Not Alter The Requirement To Show Article III Standing.

Plaintiffs further contend (Supp. 20) that their "additional state action theories" of joint action "strengthen Plaintiffs' standing."   Plaintiffs err in contending that their choice of "state action" theory somehow could lessen their proof requirements for Article III standing.  For each claim advanced against each defendant, *Missouri*, 144 S. Ct. at 1988, Plaintiffs must still establish an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling," *Clapper*, 568 U.S. at 409.  These "three elements" are the "'irreducible constitutional minimum' of standing" that "the party invoking federal jurisdiction" always "bears the burden of establishing," *see Spokeo, Inc. v. Robins*, 578 U.S. 330,

---

[10] CISA undertook switchboarding "during the 2018 and 2020 election cycles," and "did not engage in" it "for the 2022 election cycle and has no intention to engage in switchboarding for the next election."  Defs. Prelim. Inj. Opp. 77 & Ex. 97, *Missouri* Dkt. 266-5, Hale Decl. ¶¶ 70, 78.

338 (2016).   Merely relabeling the legal theory underpinning a claim does not modify these showings.

Plaintiffs nonetheless argue (Supp. 20) that asserting joint action theories "increase the number of Defendants against whom standing exists."  But this type of generalized conflation of third-party platforms with the government defendants is precisely what the Supreme Court concluded was incorrect:  "[T]he Fifth Circuit, by attributing every platform decision at least in part to the defendants, glossed over complexities in the evidence."  *Missouri*, 144 S. Ct. at 1988; *see also id.* at n.4 (listing, among lower court "factual findings, many of which unfortunately appear to be clearly erroneous," statement "that the defendants and the platforms had an 'efficient report-and-censor relationship'").

Nor does Plaintiffs' specific assertion of joint action—"that the [CDC] engaged in joint action with the platforms to censor users . . . who engaged in COVID-related speech," Supp. 20—establish Article III standing to seek an injunction against that specific defendant.  Even if that joint-action theory could validly have been asserted at one point in the past, by the time the Complaint was filed in 2023, any such validity dissipated:  "[b]y August 2022," well before the Plaintiffs brought this case, "the officials' communications [with platforms] about COVID–19 misinformation had slowed to a trickle."  *Missouri*, 144 S. Ct. at 1994.  If government officials and platforms were not even communicating about COVID-19 misinformation, they certainly could not have been intertwined or enmeshed to the degree that could even conceivably have made them joint actors at the time the complaint was filed.  And "[i]n identifying an injury that confers standing, courts look exclusively to the time of filing."  *Loa-Herrera v. Trominski*, 231 F.3d 984, 987 (5th Cir. 2000) (citation omitted).  In any event, even if the joint-action allegation were fully credited notwithstanding the contrary record evidence, that allegation could support an injunction only against the CDC, not the broad relief awarded as to a much larger group of Defendants.  *See Missouri*, 144 S. Ct. at 1988 ("'[P]laintiffs must demonstrate standing for each claim they press' against each defendant.") (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)).

Plaintiffs also err in contending (Supp. 21) that "the joint activity theory of state action expands traceability and redressability."  Plaintiffs must still establish that the injury they have suffered is "fairly traceable to the challenged action" of Defendants that they seek to enjoin, *Clapper*, 568 U.S. at 409, which means each Plaintiff must show that it was government conduct that resulted in a platform's content moderation measures taken against that Plaintiff, *Missouri*, 144 S. Ct. at 1989, 1993, 1996.  Hence, Plaintiffs' argument that their joint-activity theory could be capable of rendering Defendants responsible, for Article III causation purposes, for all content moderation decisions made by social-media platforms at all points in time, regardless of Defendants' involvement is unsupported by precedent, and incompatible with *Missouri*.

In any event, the joint-action theory has no bearing on redressability, because even if some past content moderation were fairly traceable to joint activity, the reduction in communications between certain Defendants and platforms about COVID-19 means that the responsibility for still continuing content moderation against plaintiffs lies with the platforms:  because Defendants "have already abandoned their pressure campaign, enjoining them is unlikely to prompt Facebook to stop enforcing the policy (thus failing redressability)."  *Id.* at 1996 n.11.

## CONCLUSION

For the foregoing reasons, under the Supreme Court's analysis in *Missouri*, the *Kennedy* Plaintiffs lack specific facts supporting their Article III standing to seek the preliminary injunction they sought.  Hence, the Court should dissolve the injunction for lack of subject-matter jurisdiction. If this Court nevertheless concludes that the *Kennedy* Plaintiffs have sufficiently shown they have Article III standing and renews the preliminary injunction, Defendants respectfully request that any such renewed injunction be stayed for ten days to allow Defendants to seek appellate relief.

Dated: August 8, 2024                  Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Principal Deputy Assistant Attorney General

                                       JOSHUA E. GARDNER
                                       Special Counsel, Federal Programs Branch

                                       JOSEPH E. BORSON
                                       Assistant Director, Federal Programs Branch

                                       */s/ Alexander W. Resar*
                                       INDRANEEL SUR (D.C. Bar No. 978017)
                                       Senior Counsel
                                       ALEXANDER W. RESAR (N.Y. Bar No. 5636337)
                                       CATHERINE M. YANG (N.Y. Bar No. 5319736)
                                       Trial Attorneys
                                       U.S. Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street, NW, Washington D.C. 20005
                                       Tel: (202) 616-8188
                                       alexander.w.resar@usdoj.gov

                                       *Attorneys for Defendants*