No. 23-cv-0381

═══════════════════════════════════════════════

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA**

───────────────────────────────────────────────

ROBERT F. KENNEDY, JR.; CHILDREN'S HEALTH DEFENSE; CONNIE SAMPOGNARO,
*Plaintiffs*,
v.
JOSEPH R. BIDEN, JR.; KARINE JEAN-PIERRE; VIVEK H. MURTHY; XAVIER BECERRA; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,
*Defendants*.

───────────────────────────────────────────────

*having been consolidated with No. 22-cv-01213*

STATE OF MISSOURI, et al.,
*Plaintiffs*,
v.
JOSEPH R. BIDEN, JR., et al.,
*Defendants*.

───────────────────────────────────────────────

***KENNEDY* PLAINTIFFS' REPLY BRIEF ON STANDING**

───────────────────────────────────────────────

| | | |
|---|---|---|
| **G. SHELLY MATURIN, II** | **JED RUBENFELD** | **ROGER TEICH** |
| La. Bar # 26994 | NY Bar # 2214104 | Cal. Bar #147076 |
| Welborn & Hargett, LLC | pro hac vice | (pro hac forthcoming) |
| 1540 W. Pinhook Road | 1031 Forest Rd. | 337 Liberty Street |
| Lafayette, LA 70503 | New Haven, CT 06515 | San Francisco, CA 94114 |
| Tel: 337-234-5533 | Tel.: 203-432-8715 | Tel.: (415) 948-0045 |
| shelly@wandhlawfirm.com | jed.rubenfeld@yale.edu | rteich@juno.com |

**Attorneys for Plaintiffs**

## *KENNEDY* PLAINTIFFS' REPLY BRIEF ON STANDING

### INTRODUCTION

Defendants' brief never comes to grips with three critical facts distinguishing the *Kennedy* Plaintiffs from the *Murthy* plaintiffs: (1) the *Kennedy* Plaintiffs were *specifically targeted* for censorship by the White House; (2) as a *direct result*, Plaintiffs Kennedy and Children's Health Defense (CHD) were deplatformed by major social media companies; and (3) in the case of CHD, this deplatforming has remained *unchanged ever since*.

These facts are set forth in detail in the Holland Declaration and backed up by copious record evidence. Even if, as Defendants maintain, "by August 2022" federal "officials' communications [with platforms] about COVID-19 misinformation had slowed to a trickle" (ECF No. 53 at 28 (quoting *Murthy v. Missouri*, 144 S. Ct. 1972, 1994 (2024)), CHD was already deplatformed by that time as a direct result of governmental pressure and joint action, and no break in the chain of causation has occurred since then. Nor have the White House's threats, through which this deplatforming was brought about, ever been withdrawn.

It is inconceivable that parties specifically and successfully targeted for social-media censorship by the White House (as well as the Surgeon General, the CDC, and other Defendants), and whose censorship is still ongoing today, do not have standing to challenge the constitutionality of Defendants' campaign—recently resumed—to induce social-media companies to suppress speech the Government disfavors.  If the *Kennedy* Plaintiffs don't have standing to bring such a claim, no one does, and if no one has standing, then that campaign—"arguably … the most massive attack against free speech in United States' history"[1]—will forever evade review. That's a result *Murthy* did not call for and does not support.

---

[1] *Missouri v. Biden*, 680 F. Supp. 3d 630, 641 (W.D. La. 2023).

1

**ARGUMENT**

I. **Standard of Review**

Defendants commit a flagrant error when they say "Plaintiffs . . . must [show] that *each* plaintiff" has standing. (ECF No. 53 at 5 (emphasis added).) On the contrary, *only one* plaintiff need have standing. *See Biden v. Nebraska*, 600 U.S. 477, 489 (2023) ("If at least one plaintiff has standing, the suit may proceed."). "[I]n an injunctive case [the] court need not address standing of each plaintiff if it concludes that one plaintiff has standing." *Save the Bull Trout v. Williams*, 51 F.4th 1101, 1106 n.2 (9th Cir. 2022) (citation omitted).

Defendants also err when they say Plaintiffs must demonstrate a "threat of future injury." (ECF No. 53 at 7.) A threat of *future* injury need not be shown if there is *present* injury. *See Steel Co.* v. *Citizens for Better Environment,* 523 U.S. 83, 109 (1998) (standing can be predicated on either "present or threatened injury"); *Gonzalez v. Blue Cross Blue Shield Ass'n*, 62 F.4th 891, 902 (5th Cir. 2023) ("continuing injury" is "sufficient to create standing for injunctive relief"). The *Murthy* plaintiffs had to show a threat of future injury because they asserted only "past" censorship. *Murthy v. Missouri*, 144 S. Ct. 1972, 1987 (2024). By contrast, the *Kennedy* Plaintiffs have *present* injury and thus do not have to show a "threat of future injury." This is a fundamental difference between the two cases, sufficient in itself to warrant a different holding on standing.

Finally, Defendants imply throughout their papers that Plaintiffs must prove that Defendants caused their censorship, prove that an injunction will end their censorship, and so on. But Plaintiffs do not have to prove anything on this motion. "At earlier stages of litigation … the manner and degree of evidence required to show standing is less than at later stages. At the preliminary injunction stage, the movant must clearly show only that each element of standing is likely to obtain." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329-30 (5th Cir. 2020) (citation omitted). Plaintiffs have more than met that standard here.

II.     **Defendants' Baseless Waiver Argument Has Already Been Rejected.**

Defendants briefly restate the waiver argument they made in the Fifth Circuit. (ECF No. 53 at 6-7.) But the Fifth Circuit implicitly rejected that argument by remanding this case for further factual development on standing (a waived claim would not be entitled to further factual development). More fundamentally, Defendants' waiver argument—that the *Kennedy* Plaintiffs never asserted direct-censorship injury—contradicts this Court's express holding that the "*Kennedy* Plaintiffs assert an 'injury-in-fact' based on their [own] censorship." *Kennedy v. Biden*, No. 3:23-CV-00381, 2024 U.S. Dist. LEXIS 26751, at *13 (W.D. La. Feb. 14, 2024).

In any event, the waiver issue is a red-herring. Amendments to cure jurisdictional defects are freely permitted,[2] and the Fifth Circuit expressly authorized "amendment of the allegations" here. Thus the *Kennedy* Plaintiffs could simply amend the Complaint to add the Holland and Rasmussen Declarations' descriptions of direct censorship of CHD and Mr. Kennedy. But surely such an amendment would be wasteful and unnecessary. Direct censorship was expressly pleaded in the complaint,[3] and this Court should adhere to its holding that the *Kennedy* Plaintiffs, far from waiving direct-censorship injury, have asserted it since the day this case was filed.

III.    **Plaintiff CHD Has Standing.**

Defendants twist themselves into knots arguing that the Declaration submitted by Mary Holland (CHD's CEO) does not prove the Government caused CHD's deplatforming. But Plaintiffs need only show that Defendants were the ***likely*** cause of CHD's censorship, and the facts

---

[2] *Whitmire v. Victus Ltd.*, 212 F.3d 885, 889 (5th Cir. 2000). Standing is jurisdictional.
[3] *See, e.g.*, ECF No. 1 ¶ 305 ("After this series of public statements, responding to 'White House pressure,' Facebook censored the accounts of the 12 specific disfavored speakers (including Plaintiff Kennedy) whom Psaki accused of spreading health misinformation."); *id.* at ¶ 435 ("In addition, as a result of Defendants' censorship campaign, Kennedy has also been directly censored on social media and de-platformed entirely from major platforms. Just recently, in March 2023, an important public political speech given by Kennedy in New Hampshire was blocked by YouTube and therefore could not be viewed by most online news consumers.").

set forth in the Holland Declaration easily satisfy that test:

- in 2021 the White House demanded social-media deplatforming of the "Disinformation Dozen" (a group including CHD and Mr. Kennedy);
- for months Facebook refused, telling White House officials that the "Disinformation Dozen" were not violating Facebook's terms of service and that shutting them down could look like a "cover-up";
- the White House responded by threatening Facebook with devastating government action (either an antitrust break-up or repeal of Section 230 immunity); and
- immediately thereafter, Facebook finally did comply, censoring every member of the "Disinformation Dozen" and deplatforming CHD completely.

*See* Holland Dec. ¶¶ 14-26.

These facts are more than enough to show that White House communications to Facebook were the likely cause of CHD's deplatforming. This Court already so found last February. *See Missouri v. Biden*, 680 F. Supp. 3d 630, 653-54 (W.D. La. 2023) (concluding that. "public and private pressure from the White House" likely had the "effect" of causing "[a]ll twelve members of the 'Disinformation Dozen'" to be "censored" on social media). The Fifth Circuit reached the same conclusion. *See Missouri v. Biden*, 83 F.4th 350, 363 (5th Cir. 2023) ("[T]he platforms began taking down content and deplatforming users they had not previously targeted. For example, Facebook started removing information posted by the 'disinfo dozen' … despite earlier representations that those users were not in violation of their policies."). This Court should adhere to that correct finding now.

This showing of causation crucially distinguishes the instant case from *Murthy*. The *Murthy* Court found no standing because it found no showing of "specific causation"—no showing that any Government defendant was "behind" any specific social-media restriction imposed on any plaintiff. *Murthy*, 144 S. Ct. at 1979, 1987. Here, the facts show that the White House was "behind" the censorship of the Disinformation Dozen and specifically behind the deplatforming of CHD. Hence CHD has standing, even though the *Murthy* plaintiffs did not.

4

Defendants try to avoid this conclusion by arguing that CHD somehow fails to satisfy redressability, but Defendants never confront the fact that the deplatforming CHD suffered in 2021 has remain unchanged since then and—so far as the public record reveals—Defendants have never withdrawn the threats they made at that time. This continuing injury, together with the un-rescinded threats, completely distinguishes CHD from the *Murthy* plaintiffs. In *Murthy*, the Court found that the plaintiffs, who pleaded only "past" censorship, had to base their claims of redressability on a series of speculative propositions built "from scratch" about future injury and future government conduct. *See Murthy*, 144 S. Ct. at 1987 ("plaintiff[s] have to build [their] case from scratch, showing why [they have] some newfound reason to fear that one of the named defendants will coerce [their] chosen platform to restrict future speech on a topic about which [they] plan[] to post"). CHD's situation could not be more different. CHD is not claiming that that the Defendants may in the "future" try to coerce CHD's "chosen platform to restrict speech on a topic about which [CHD] plans to post." CHD is **deplatformed right now** from Facebook and YouTube, **unable to post anything on those major platforms**, because **Defendants caused them to deplatform CHD** through threats that **have never been rescinded**. As stated above, if CHD does not have standing to challenge the Government's conduct, no one does.

Just as the *Murthy* Court should not have credited the Government's claims that FBI/CISA social-media operations would not resume for the 2024 election, so too this Court should not credit the notion that the CDC's deep entanglement with the platforms has come to an end.[4] In any event,

---

[4] One of the hallmarks of the constitutional vice at issue here is that so much of the government's coercion, significant encouragement, and joint action occurred in *covert* communications with the platforms. By its own admission, the CDC has partnered with social media platforms since 2019 to "stop myths" and "contain the spread of misinformation." *See* CDC, Vaccinate with Confidence, Oct. 11, 2019, https://www.cdc.gov/vaccines/partners/downloads/Vaccinate-Confidently-2019.pdf.  The Fifth Circuit expressly discussed how the CDC covertly "entangled themselves in platform decision-making," "directed changes to the platforms' moderation policies," met regularly with the platforms, and "frequently flagged content for removal"—all in

as a matter of logic and common sense, there can be no doubt that an injunction prohibiting Defendants from coercing or significantly encouraging social media censorship of disfavored speech will materially increase CHD's chances of being restored to Facebook, which is all that standing requires. *See Consumer Data Indus. Ass'n v. Texas*, No. 21-51038, 2023 U.S. App. LEXIS 19007, at *13 (5th Cir. July 25, 2023) (where injunction would "reduce the … risk" of injury, such "reduction satisfies the redressability required to establish standing"); *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) ("When 'establishing redressability, [a plaintiff] need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm.'"). And at the preliminary injunction stage, where the "degree of evidence required to show standing is less than at later stages," plaintiff need only show that such a reduction in risk is "likely." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329-30 (5th Cir. 2020). CHD has more than satisfied that standard.

IV.     **Plaintiff Kennedy Has Standing**.

The same facts that show "specific causation" of CHD's censorship also show "specific causation" of Mr. Kennedy's censorship. Indeed the *Murthy* Court itself acknowledged that the White House was "behind" Mr. Kennedy's ouster from Facebook: "White House officials … pushed Facebook to remove the accounts of the 'disinformation dozen,' 12 people (including Kennedy) supposedly responsible for a majority of COVID–19-related misinformation." *Murthy*, 144 S. Ct. at 1991. And like CHD—but unlike the *Murthy* plaintiffs—Mr. Kennedy is not claiming only past censorship; he is still suffering censorship in the present. Indeed, as shown in the Rasmussen Declaration, censorship against Mr. Kennedy and his presidential campaign has since

---

secret. *Missouri*, 83 F.4th at 390. It would be naïve at best to assume that the CDC's deep entanglement with and pressure on the platforms to "contain the [online] spread" of disfavored vaccine speech, *which predates COVID-19*, has ended because the pandemic has subsided.

6

early May exploded on Facebook. *See* Rasmussen Dec. ¶¶ 4-26.

Defendants spend pages attacking the Rasmussen Declaration on the ground that it does not prove that the Government is behind this recent explosion of censorship against Mr. Kennedy. But Defendants miss the point of the Rasmussen Declaration, which does not purport to show causation. Rather, it establishes that Mr. Kennedy is suffering ***present***, ongoing censorship, distinguishing him from the *Murthy* plaintiffs, who had only asserted ***past*** censorship.[5]

Plaintiffs acknowledge that proof of traceability does not yet exist for this recent explosion of censorship, but proof is not the standard here. As shown in Plaintiffs' opening brief, in early May of this year the FBI and CISA resumed their covert social-media operations—i.e., their meetings with social media companies to induce suppression of election-related speech the Government disfavors—after "pausing" those operations due to this Court's and the Fifth Circuit's rulings.[6] It could be, as Defendants suggest, random coincidence that Facebook's sudden burst of censorship against Mr. Kennedy's campaign began exactly when the FBI/CISA resumed their social-media operations. But the past success and entanglements of the FBI/CISA operations,[7] together with this confluence of timing, permit a reasonable inference that the two are connected.

And critically, the *Murthy* Court expressly relied on the Government's representation that

---

[5] Defendants argue that Plaintiffs are improperly asserting third-party rights when the Rasmussen Declaration describes Facebook's censorship of posts like "VOTEKENNEDY"—i.e. posts expressing support for Mr. Kennedy or urging others to vote for him. But a political candidate obviously suffers injury-in-fact when such speech is censored, and in any event the Rasmussen Declaration also describes direct censorship of Mr. Kennedy's own speech and that of his Campaign. Rasmussen Dec. ¶¶ 4-12, 19.

[6] The Federalist, *FBI Confirms It's Restarting Online Censorship Efforts Ahead Of 2024 Election Reason*, May 8, 2024, https://thefederalist.com/2024/05/08/fbi-confirms-its-restarting-online-censorship-efforts-ahead-of-2024-election.

[7] *See Missouri*, 83 F.4th at 364-65 (stating that "the FBI's activities were not limited to purely foreign threats" and that the FBI and CISA "held regular industry meetings with the platforms concerning their moderation policies, pushing them to adopt CISA's proposed practices for addressing'"mis-, dis-, and mal-information[]'").

7

the FBI and CISA would ***not*** be resuming their social-media operations for the 2024 election. *See Murthy*, 144 S. Ct. at 1993 ("the Government has represented that it will not resume [its FBI and CISA social-media] operations for the 2024 election"). The Government cannot be permitted to evade review by "pausing" its social-media censorship operations during judicial proceedings, representing to the Supreme Court of the United States that it will not resume those operations for the 2024 elections, and then resuming them. Because of this unethical or at least manipulative conduct, this Court should hold Defendants estopped from claiming that the resumed FBI/CISA social-media operations have nothing to do with the exactly contemporaneous explosion of social-media censorship of a rival presidential candidate.

In addition to establishing that social-media censorship against Mr. Kennedy has recently exploded, the Rasmussen Declaration establishes another fact critical to this preliminary injunction motion: immediate irreparable harm not only to Mr. Kennedy, but to the entire nation. The Fifth Circuit utilizes a "sliding scale" for preliminary injunctions. *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (quoting *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975)). Under this sliding-scale analysis, "the nature of the [likelihood-of-success] requirement can vary significantly, depending upon the magnitude of the injury which would be suffered by the movant in the absence of interlocutory relief and the relative balance of the threatened hardship." *Seatrain Int'l*, 518 F.2d at 180. The "magnitude of the injury" here is difficult to overstate.

According to record evidence in this case, just before the 2020 presidential election the FBI conveyed to social-media companies false information that led to online censorship of a matter of great public importance (the Hunter Biden laptop story)—censorship that was utterly unjustified and may have affected the election's outcome. The 2024 election is now just months away, and the Government has announced resumption of the very same operations that led to this unjustifiable censorship in 2020. There can be no greater irreparable harm, under the First

8

Amendment, than unlawful interference in a presidential election, which is the single most important event in American democracy. Because such immeasurable irreparable harm is imminently threatened here—because such harm is in fact occurring right now—the sliding scale approach to preliminary injunctive relief directs this Court to give every benefit of the doubt to the movant.

V. **Plaintiff Sampognaro Has Standing.**

Ms. Sampognaro's right-to-listen standing is fully supported by the facts set forth in her Declaration and the arguments made in Plaintiffs' opening memorandum. Those facts and arguments will not be repeated here. But one error in Defendants' brief must be corrected.

Defendants argue that Ms. Sampognaro has failed to "point to a[] specific instance of content moderation that caused [her] identifiable harm," with a "causal link" to one of the Defendants. (ECF No. 53 at 19.) Defendants seem to be suggesting Ms. Sampognaro cannot establish right-to-listen standing under *Murthy* unless she can point to a particular post or item on social media that she was denied access to. But such a requirement would be absurd. If an item posted to a social media platform has been blocked and removed, then a plaintiff will never know it and cannot point to it. *Murthy* did not impose this impossible prerequisite on a right-to-listen plaintiff. Instead, the Court said clearly that a right-to-listen plaintiff must "identif[y] specific speakers or topics that they have been unable to hear or follow." *Murthy*, 144 S. Ct. at 1980-81. And that is exactly what Ms. Sampognaro has done.

She has named three speakers—CHD, Dr. Joseph Mercola, and the GreenMedInfo website—whom she has been unable to hear and follow and whose speech on health, supplements, immune-boosting alternative treatments, COVID and the COVID vaccines was especially valuable to her. And the speakers Ms. Sampognaro has identified fully satisfy any "causal link" requirement. Like CHD, Dr. Mercola and GreenMedInfo are also part of the so-called

9

Disinformation Dozen,[8] and like the other members of that group, they too have been severely censored online as a result of the same governmental pressure campaign summarized above. Indeed, Dr. Mercola was completely deplatformed by YouTube at about the same time as CHD.[9] By identifying the de-platformed CHD and Dr. Mercola as speakers she is unable to follow on a topic of life-or-death importance to her, Ms. Sampognaro has pointed to "specific instance[s] of content moderation that caused [her] identifiable harm."

Ms. Sampognaro has plainly satisfied redressability as well. If this Court's injunction leads, as it likely will, to *any* lessening of the continuing social-media censorship of *any* of the three speakers whom she has identified—indeed to any lessening of censorship of any of the so-called Disinformation Dozen—that will in turn lessen Ms. Sampognaro's right-to-listen injury. Under controlling Fifth Circuit precedent, that potential lessening of injury satisfies redressability. *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) ("When 'establishing redressability, [a plaintiff] need only show that a favorable ruling could potentially lessen its injury; [plaintiff] need not definitively demonstrate that a victory would completely remedy the harm.'").

## CONCLUSION

For the foregoing reasons, the Court should reaffirm the *Kennedy* Plaintiffs' standing.

---

[8] Digital Hate, *The Disinformation Dozen: Why Platforms Must Act on Twelve Leading Online Anti-Vaxxers*, Mar. 24, 2021, at 12, 28, https://counterhate.com/research/the-disinformation-dozen.

[9] *See* Washington Post, *YouTube is banning prominent anti-vaccine activists and blocking all anti-vaccine content*, Sept. 29, 2021, https://www.washingtonpost.com/technology/2021/09/29/youtube-ban-joseph-mercola.

DATED: August 12, 2024

Respectfully Submitted,


/s/ G. Shelly Maturin, II
G. SHELLY MATURIN, II
(La. Bar#26994)
Welborn & Hargett, LLC
1540 W. Pinhook Road
Lafayette, LA 70503
Telephone: 337-234-5533
E-mail: shelly@wandhlawfirm.com

JED RUBENFELD
(NY Bar # 2214104)
(*pro hac vice*)
1031 Forest Road
New Haven CT 06515
Telephone: 203-432-7631
E-mail: jed.rubenfeld@yale.edu

ROGER TEICH
(Cal. Bar #147076)
(pro hac vice forthcoming)
337 Liberty Street
San Francisco, CA  94114
Telephone: (415) 948-0045
E-mail: rteich@juno.com

Attorneys for Plaintiffs

11

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that on August 12, 2024, the above Brief in Opposition to Defendants' Motion for Stay was filed with this Court via the CM/ECF system, which will send notice of said filing to all counsel of record.

Dated: August 1, 2024

                                                           /s/ G. Shelly Maturin, II  
                                       G. SHELLY MATURIN, II (#26994)  
                                       WELBORN & HARGETT, LLC  
                                       1540 W. Pinhook Road  
                                       Lafayette, LA 70503  
                                       Telephone: (337) 234-5533  
                                       Facsimile: (337) 769-3173  
                                       shelly@wandhlawfirm.com