UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| **ROBERT F KENNEDY JR ET AL** | **CASE NO. 3:23-CV-00381** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **JOSEPH R BIDEN JR ET AL** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

MEMORANDUM RULING

The United States Court of Appeals for the Fifth Circuit [Doc. No. 50] remanded this case for the limited purpose of allowing the undersigned to consider the Kennedy Plaintiffs' standing. This Court ordered supplemental briefing on the limited remand issue, and this ruling shall address such.

**I.    BACKGROUND**

On February 14, 2024, this Court issued a Preliminary Injunction[1] in favor of Robert F. Kennedy, Jr., ("Kennedy"), Children's Health Defense ("CHD"), and Connie Sampognaro ("Sampognaro"), (collectively "Kennedy Plaintiffs") against the White House Defendants, Surgeon General Defendants, FBI Defendants, CDC Defendants, and the CISA Defendants (collectively "Government Defendants").[2] Government Defendants appealed the Preliminary

---

[1] [Doc. No. 38]
[2] Because both the records in *Kennedy v. Biden*, 3:23-0381 and *Missouri v. Biden*, 3:22-1213 are discussed and cited, citations in Footnotes in *Kennedy .v Biden* will be denoted by "Kennedy," while citations to the *Missouri v. Biden* case will be denoted by "Missouri."
**White House Defendants** consists of President Joseph R. Biden ("President Biden"), White House Press Secretary Karine Jean-Pierre ("Jean-Pierre"), Ashley Morse ("Morse"), Deputy Assistant to the President and Director of Digital Strategy Rob Flaherty ("Flaherty"), Dori Salcido ("Salcido"), Aisha Shah ("Shah"), Sarah Beran ("Beran"), Stuart F. Delery ("Delery"), Mina Hsiang ("Hsiang"), and Dr. Hugh Auchincloss (Dr. Auchincloss").
**Surgeon General Defendants** consists of Dr. Vivek H. Murthy ("Murthy") and Katharine Dealy ("Dealy").
**FBI Defendants** consists of Elvis Chan ("Chan"), the Federal Bureau of Investigation ("FBI"), Lauren Dehmlow ("Dehmlow"), and the U.S. Department of Justice ("DOJ").
**CDC Defendants** consists of the Centers for Disease Control & Prevention, Carol Crawford ("Crawford"), Jay Dempsey ("Dempsey"), Kate Galatas ("Galatas"), United States Census Bureau ("Census Bureau"), Jennifer Shopkorn ("Shopkorn"), the Department of Health and Human Services ("HHS"), Xavier Becerra ("Becerra"), Yolanda Byrd ("Byrd"), Christy Choi ("Choi"), Ashley Morse ("Morse"), and Joshua Peck ("Peck"). **CISA Defendants** consists of the Cybersecurity and Infrastructure Security Agency ("CISA"), Jen Easterly ("Easterly"),Kim

Injunction.[3] This matter was consolidated with the case of *Missouri v. Biden*[4] on July 24, 2023.[5] At the time of the consolidation, the *Missouri v. Biden* ("*Missouri*") case was pending before the Supreme Court of the United States after certiorari was granted on October 20, 2023.[6]

The parties in the instant case and the *Missouri* case overlap considerably. In fact, the Court's preliminary injunction in *Missouri* was against some of the same Defendants named in this case.[7] The injunction was narrowed by the United States Court of Appeals for the Fifth Circuit on October 3, 2023, which limited the injunction to the White House Surgeon General's Office, the ("OSG"), Federal Bureau of Investigations ("FBI"), Center for Disease Control and Prevention ("CDC"), and Cybersecurity and Infrastructure Security Agency ("CISA"). *Missouri*, 83 F.4th 350.

On June 26, 2024, the Supreme Court of the United States dismissed the Plaintiffs' case on the basis of Article III standing. *Murthy v. Missouri,* 144 S.Ct. 1972 (2024).

On July 25, 2024,[8] the Fifth Circuit remanded the case to this Court to consider the Kennedy Plaintiffs' standing in view of the Supreme Court's holding in *Murthy v. Missouri* ("*Murthy*"). This Court ordered supplemental briefing on the issue of standing.[9]

---

Wyman ("Wyman"), Lauren Protentis ("Protentis"), Geoffrey Hale ("Hale"), Allison Snell ("Snell"), Brian Scully ("Scully"), the Department of Homeland Security ("DHS"), Alejandro Mayorkas ("Mayorkas"), Robert Silvers ("Silvers"), and Samantha Vinograd ("Vinograd").
**CISA Defendants** consists of the Cybersecurity and Infrastructure Security Agency ("CISA"), Jen Easterly ("Easterly"), Kim Wyman ("Wyman"), Lauren Protentis ("Protentis"), Geoffrey Hale ("Hale"), Allison Snell ("Snell"), Brian Scully ("Scully"), the Department of Homeland Security ("DHS"), Alejandro Mayorkas ("Mayorkas"), Robert Silvers ("Silvers"), and Samantha Vinograd ("Vinograd").
[3] [Doc. No. 39] - Kennedy
[4] 3:22-cv-01213
[5] [Doc. No. 27] - Kennedy
[6] *Murthy et al v. Missouri et al*, 144 S.Ct. 1972 (2024) (*Missouri v. Biden* is synonymous with *Murthy v. Missouri* on the Supreme Court docket).
[7] 2023 WL 4335270 (W.D. La. July 4, 2023)
[8] [Doc. No. 50] Kennedy
[9] [Doc. No. 51] Kennedy

On August 1, 2024, the Kennedy Plaintiffs filed a Supplemental Brief on Standing.[10] Government Defendants filed their Supplemental Brief[11] on August 8, 2024, and the Kennedy Plaintiffs filed a Reply[12] on August 12, 2024. This Court is now prepared to rule.

## II. LAW AND ANALYSIS

### A. General Law on Standing

Article III of the United States Constitution limits federal courts' jurisdiction to "cases" and "controversies." *Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005) (*citing* U.S. Const. art. III, § 2). The "law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 435 (2017) (citation omitted). Thus, "the standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (citation and internal quotation marks omitted). The Article III standing requirements apply to claims for injunctive and declaratory relief. *See Seals v. McBee*, 898 F.3d 587, 591 (5th Cir. 2018), *as revised* (Aug. 9, 2018); *Lawson v. Callahan*, 111 F.3d 403, 405 (5th Cir. 1997).

Article III standing is comprised of three essential elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (citation omitted). "The plaintiff must have (1) suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (internal

---

[10] [Doc. No. 52] Kennedy
[11] [Doc. No. 53] Kennedy
[12] [Doc. No. 54] Kennedy

3

citations omitted). Furthermore, "[a] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y.*, 581 U.S. at 439 (citations omitted). The presence of one party with standing "is sufficient to satisfy Article III's case-or-controversy requirement." *Texas*, 809 F.3d 134 (citing *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)).

In the context of a preliminary injunction, it has been established that "the 'merits' required for the plaintiff to demonstrate a likelihood of success include not only substantive theories but also the establishment of jurisdiction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). To establish standing, the plaintiffs must demonstrate that they have encountered or suffered an injury attributable to the defendants' challenged conduct and that such injury is likely to be resolved through a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992). Further, during the preliminary injunction stage, the movant is only required to demonstrate a likelihood of proving standing. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020).

In *Murthy*, the Supreme Court emphasized that "it is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" 144, S.Ct. 1972, 1977 (*quoting Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42). It further emphasized that because plaintiffs, such as the ones here, seek forward-looking relief, "they must face 'a real and immediate threat of repeated injury.'" *Id.*, (*quoting O'Shea v. Littleton¸* 414 U.S. 488, 496). Therefore, "the plaintiffs must show a substantial risk that, in the near future, at least one [defendant] will restrict the [rights] of at least one plaintiff in response to the actions of at least one [ ] defendant." *Id*. Further, at the preliminary injunction stage, plaintiffs "must show that they are likely to succeed in carrying that burden." *Id.*

**B.**     *Murthy v. Missouri*

In *Murthy*, the plaintiffs were the States of Missouri and Louisiana, three doctors, Jayanta Bhattacharya ("Bhattacharya"), Martin Kulldorff ("Kulldorff"), Aaron Kheriaty ("Kheriaty"), a social media user and news website owner, Jim Hoft ("Hoft") (owner of the Gateway Pundit), and Jill Hines ("Hines"), a healthcare activist and codirector of Health Freedom Louisiana.

Because the purpose of this ruling is to determine whether Kennedy, CHD, and Sampognaro have standing, it is pertinent to examine why the Supreme Court found the seven plaintiffs in *Murthy* did not have standing.

In *Murthy*, the Supreme Court held "We begin-and end-with standing. At this stage, neither the individuals nor the state plaintiffs have established standing to seek an injunction against any defendant. We therefore lack jurisdiction to reach the merits of the dispute." *Id.*, at 1985.

The Supreme Court found that none of the seven plaintiffs had standing. It held that "the plaintiffs must demonstrate a substantial risk that, in the near future, they will suffer an injury that is traceable to a Government defendant, and redressable by the injunction they seek. Because no plaintiff has carried that burden, no one has standing to seek a preliminary injunction." *Id.*, at 1981. Further, "Putting these requirements together, the plaintiffs must show a substantial risk that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one Government defendant. On this record, that is a tall order." *Id.*, at 196.

In *Murthy*, the Supreme Court focused on the fact that all seven plaintiffs were making claims of "direct censorship injuries," but there were no specific causation findings made by the lower courts with respect to any direct instance of content moderation. *Id*., at 1987. Therefore, in this type of a case, a court must make specific findings that a particular defendant pressured a particular platform to censor a particular topic before the platform suppressed a particular

5

plaintiff's speech on that topic. *Id.* The Supreme Court further found that approaching standing "at a high level of generality" is not enough. *Id.*, at 1987.

Therefore, this Court will determine whether the Kennedy Plaintiffs have met the standing requirements consistent with the Supreme Court's ruling in *Murthy*.

### C. The Kennedy Plaintiffs

The Kennedy Plaintiffs are Kennedy, CHD and Sampognaro. Each will be evaluated separately to determine whether they have standing using the *Murthy* standard. At the outset, the Court must note that in a case like this, where the alleged Government coercion or involvement came from numerous people at numerous Federal agencies and/or the White House, it is almost impossible for most plaintiffs to prove standing without conducting discovery.[13] Much of the alleged pressure asserted by Plaintiffs came through meetings, private conversations, and emails. Therefore, the Court allowed the Kennedy Plaintiffs the benefit of preliminary-injunction related discovery, just as this type of discovery was allowed in *Missouri v. Biden*.[14]

Government Defendants argue that the Kennedy Plaintiffs have waived their right to claim direct censorship because they filed a class action lawsuit. However, in making the claim for a class action suit, the Kennedy Plaintiffs also alleged they were victims of direct censorship by Government Defendants.[15] In ruling on the preliminary injunction, this Court only ruled on the Kennedy Plaintiffs' individual claims, not the claims of the prospective class.[16] Because the Kennedy Plaintiffs alleged direct censorship, there is no waiver.

---

[13] Even though "expedited discovery is not the norm." *Wilson v. Samson Contour Energy E & P, LLC*, 2014 WL 2949457 at 3 (W.D. La. 2014).
[14] [Doc. No. 34] Missouri
[15] [Doc. No. 1, ¶¶ 406, 435] Kennedy
[16] [Doc. No. 38, p. 23] Kennedy

**(i)    Kennedy**

The Court finds that Kennedy is likely to succeed on his claim that suppression of content posted was caused by actions of Government Defendants, and there is a substantial risk that he will suffer similar injury in the near future.

Most of the evidence in *Missouri v. Biden* relates to actions by Government Defendants to suppress content related to the COVID-19 pandemic and the 2020 election cycle. Kennedy, along with his non-profit organization CHD, were in positions contrary to Government positions on COVID-19, including mask mandates, vaccine mandates, vaccine injuries, lockdowns, etc. Kennedy, who is currently running as a presidential candidate in the 2024 presidential election on the independent ticket, was identified as a member of the so-called "Disinformation Dozen," which was made up of twelve individuals that the Government specifically targeted for spreading alleged disinformation regarding COVID-19.[17] Kennedy formed CHD, a non-profit group that was also targeted for alleged COVID-19 misinformation relating to COVID-19 vaccines.[18] The "Disinformation Dozen" was initially identified by the non-profit Center for Countering Digital Hate in March 2021.[19] That report, entitled "The Disinformation Dozen" identified Kennedy as one of the dozen and identified CHD as an organization used by Kennedy to spread anti-vaccine messages.[20]

---

[17] On May 1, 2021, Facebook, in responding to demands that the White House had made at a recent meeting, noted that in response to the White House demands, it was scrutinizing twelve accounts that were responsible for 73% of the vaccine information (the "Disinformation Dozen"), and was censoring these accounts whenever it could, despite the fact that most of the content did not violate Facebook's policies. [Doc. No. 174-1, pp. 41-42]. The White House responded that it was their position that Facebook "slow down" vaccine hesitant posts. [Id.] Facebook called this new policy its "Dedicated Vaccine Discouraging Entities policy" and even suggested to the White House that too much censorship could reinforce the notion "that there's a cover-up." [Id., p. 42].
[18] [Id.]
[19] [Doc. No. 10-1, p.483] Missouri
[20] [Id., p. 181]

Three days after President Biden took office, on January 23, 2021, Clarke Humphrey ("Humphrey"), Digital Director at the White House for the COVID-19 Response Team, emailed Twitter, requesting the removal of an anti-COVID-19 tweet by Kennedy.[21] Humphrey's email stated, "Hey folks – Wanted to flag the below tweet and am wondering if we can get moving on the process of having it removed ASAP."[22] A copy of the email was also sent by Humphrey to Rob Flaherty ("Flaherty"), then Assistant to President Biden and Director of Digital Strategy. Twitter responded to Humphrey the same day, stating "Thanks. We recently escalated this."[23]

In February 2021, Flaherty began sending emails to Facebook to remove "dubious, but not provably false" claims about COVID-19.[24] Facebook responded that "vaccine-skeptical" content did not violate Facebook's policies,[25] but even though it did not violate Facebooks' policies, Facebook agreed to have the content's distribution reduced and to add strong warning labels.[26] Facebook further told Flaherty that despite content not violating Facebook's policies, Facebook would censor content in other ways, by preventing posts discouraging vaccines from going viral, by using informational labels, and by preventing recommendations for Groups, Pages, and Instagram accounts pushing content discouraging vaccines.[27]

On March 1, 2021, Flaherty and Humphrey participated in a meeting with Twitter about misinformation. After the meeting, Twitter representative Todd O'Boyle emailed three White House officials to assure the White House that Twitter would increase censorship of "misleading information."[28]

---

[21] [174-1, p.1] Missouri
[22] [Id.]
[23] [Id., p.2]
[24] [Id., p. 7]
[25] [Id., p. 5-6]
[26] [Id.]
[27] [Id.]
[28] [Doc. No. 214-10 at 2] Missouri

Also in March 2021, Flaherty accused Facebook of "hiding the ball" and made it clear the White House was seeking more aggressive action on "borderline content."[29] Flaherty accused Facebook of being the "top driver of vaccine hesitancy" and playing a "shell game" with the White House.[30]

The White House continued to pressure Facebook, and on March 21, 2021, after Facebook had an in-person meeting with White House officials, including Flaherty, Facebook provided a report to the White House that stated in addition to removing vaccine misinformation, it was now focused on reducing the virality of content discouraging vaccines that did not contain actionable misinformation.[31]

On April 13, 2021, after the temporary halt of the Johnson & Johnson vaccine, Flaherty asked Facebook to "amplify" various messages that the halt of the Johnson & Johnson vaccine may have on vaccine hesitancy.[32] Facebook admitted that although the CHD's posts did not violate its policies, it would suppress content that originated from CHD.[33]

On May 5, 2021, the White House Press Secretary Jen Psaki ("Psaki") told the media that with respect to the major platforms, President Biden favors "a robust anti-trust program.[34] Shortly thereafter on May 6, 2021, Flaherty criticized Facebook's efforts to censor the "Disinformation Dozen," stating, "Seems like your 'dedicated vaccine hesitancy policy isn't stopping the disinfo-dozen- they're being deemed as not dedicated – so it feels like that problem likely coming over to groups."[35]

---

[29] [Doc. No. 174-1, p. 11] Missouri
[30] [Id.]
[31] In other words, content that did not violate Facebook policies. [Id. at 15]
[32] [Id., pp. 30-32]
[33] [Id., pp. 25-27]
[34] [Doc. No. 10-1, p. 353] Missouri
[35] [Doc. No. 174-1, p. 41] Missouri

In July 2021, the White House put its pressure campaign to censor COVID-19 misinformation by the "Disinformation Dozen" into high gear. At a joint press-conference between White House Press Secretary Jen Psaki ("Psaki") and Surgeon General Vivek Murthy ("Murthy") to announce the Surgeon General's Health Advisory on Misinformation, Psaki announced that Murthy had published an advisory on health misinformation, that they were expecting more from our technology companies, and were asking them to consistently act against misinformation "super-spreaders" on the companies' platforms. Psaki further stated, "We're flagging problematic posts for Facebook that spread disinformation."[36] Psaki also stated the White House "asks" include four key steps by which social-media companies should: 1) measure and publicly share the impact of misinformation on their platforms; 2) create a robust enforcement strategy; 3) take faster action against harmful posts; and 4) promote quality information services in their feed algorithms.[37]

On July 20, 2021, at a White House Press Conference, White House Communications Director Kate Bedingfield ("Bedingfield") stated the White House would be announcing whether social-media platforms are legally liable for misinformation spread on their platforms, and examining how misinformation fits into the liability protection granted by Section 230 of the Communications Decency Act.[38] Bedingfield further stated the administration was reviewing policies that could include amending the Communications Decency Act. Bedingfield also stated the administration was reviewing policies that could include amending the Communications Decency Act, and that social-media platforms "should be held accountable."[39] On July 23, 2021,

---

[36] [Doc. No. 10-1 at 477-78] Missouri
[37] [Id., pp. 377-78]
[38] [Id., pp. 477-78]
[39] [Id.]

10

three days after Bedingfield's threat, a Facebook representative emailed Murthy, "I wanted to make sure you saw the steps we just took this past week to further address the 'disinfo dozen'."[40]

On August 18, 2021, Facebook announced that it took action against the "Disinformation Dozen," by removing over three dozen pages, groups and/or Facebook or Instagram accounts linked to the "Disinformation Dozen."[41] The report further indicated that Kennedy's Facebook-owned Instagram account was taken down, but his Facebook account was not.

The Virality Project published a report entitled "Memes, Magnets and Microchips"[42] on April 26, 2022. This report explained the work of the Virality Project during the COVID-19 pandemic. The CDC was working with the Virality Project to have social media platforms delete and/or reduce social-media posts by persons and organizations it believed were spreading misinformation. In its report, the Virality Project specifically listed Kennedy as a highly influential recurring actor related to the spread of COVID-19 misinformation.[43] The Virality Project created "tickets," which were used to report alleged COVID-19 misinformation to social-media platforms.[44] Both Kennedy and CHD were mentioned numerous times in the report as providing COVID-19 misinformation.[45]

The report identified Kennedy as "the actor associated with the highest number of incidents" reported on a ticket[46] and that Kennedy created the non-profit CHD to gain legitimacy.[47] The report also listed Kennedy and CHD in the Virality Project's list of actors associated with the

---

[40] [Doc. No. 210-19, p. 4] Missouri
[41] [Doc. No. 10-1, pp.483-85] Missouri
[42] [Doc. No. 209-3] Missouri
[43] [Id., pp. 16- 17]
[44] [Id., pp. 34-40]
[45] [Id., pp. 54-57, 63-64, 70, 72, 76-77, 82-84, 98-99, 111, 113, 124-25, 129, 142-43, and 145]
[46] [Id., p. 82]
[47] [Id., p. 83]

top number of incidents, at fifth and second place, respectively, and that Kennedy's anti-vaccine posts were also reportedly among the highest performing of the week by engagements.[48]

The Virality Project was discussed extensively in the Court's previous Memorandum Ruling,[49] but the Virality Project primarily targeted "domestic," not foreign, speakers and flagged Kennedy numerous times. Although not a government agency, the Virality Project coordinated with the State Department, Global Engagement Center, and CISA. The Virality Project is a "multistakeholder collaboration" including government entities among its key stakeholders.[50] The Virality Project also acknowledged that government stakeholders, such as federal health agencies, were among those that provided the Virality Project with COVID-19 misinformation and narratives.[51]

There is not much dispute that both Kennedy and CHD were specifically targeted by the White House, the Office of Surgeon General, and CISA, and the content of Kennedy and CHD were suppressed. Therefore, Kennedy must now show a substantial risk that in the near future, at least one platform will restrict the speech of Kennedy in response to the actions of one Government Defendant.

The Court finds that Kennedy has satisfied this burden and can show that there is a substantial risk that in the near future at least one platform will restrict his speech in response to the actions of at least one Government Defendant.

The FBI and CISA had regular meetings with Facebook, Twitter, Google/YouTube, Microsoft, Yahoo!, Wikimedia Foundation, and Reddit during all relevant times to this suit.[52] The

---

[48] [Id.]
[49] [Doc. 293, pp. 78-88] Missouri
[50] [Doc. No. 209-3, p. 17] Missouri
[51] [Id., p. 24] Missouri
[52] [Doc No. 204-1, pp. 18, 23-24, 171, Missouri (referred to as "Industry meetings")]

FBI would provide strategic, unclassified overviews of things it was seeing from Russian actors.[53] Elvis Chan ("Chan") was the FBI agent in charge of the Cyber Branch for the San Francisco Division and was the primary FBI agent communicating with social-media platforms about disinformation on behalf of the FBI.[54] Chan graduated from the Naval Postgraduate School in 2020, with an M.A. in Homeland Security Studies. Chan's thesis was entitled, "Fighting Bears and Trolls. An Analysis of Social Media Companies and U.S. Efforts to Combat Russian influence Campaigns During the 2020 Election."[55] Although Chan's thesis was about "foreign" disinformation in elections, when identifying alleged election disinformation to flag for social-media platforms, the FBI made no attempt to distinguish whether reports of election disinformation were American or foreign.[56] This resulted in "domestic disinformation" being flagged by the FBI for social-media platforms. Chan testified the FBI had about a 50% success rate in having alleged election disinformation taken down or censored by social-media platforms.[57] Chan also testified that the Industry meetings continued through the 2022 election, and Chan assumed the meetings will continue through the 2024 election.[58] Chan further testified that 3,613 Twitter accounts and 825 Facebook accounts were taken down due to FBI reporting and/or flagging in 2018 and 2019.[59]

---

[53] [Id., pp. 156-157] Missouri
[54] [Id., pp. 105-107]
[55] [Doc. No. 204-2, p. 1] Missouri
[56] [Doc. No, 204-1, pp. 163-64] Missouri
[57] [Id., pp. 163,167]
[58] [Id., pp. 285-286]
[59] [Doc. No. 204-1, pp. 133-34, 149-50] Missouri

On May 8, 2024, Senator Mark Warren, chair of the Senate Intelligence Committee, told reporters that federal agencies such as the FBI and CISA had restarted discussions with Big Tech Platforms.[60]

Approximately 100 days prior to the 2020 election, the Election Integrity Partnership ("EIP") was formed. CISA interns came up with the idea of working with the EIP to fill a gap that existed because of state and local official's lack of resources to monitor and report on election disinformation affecting their jurisdiction during national elections.[61] The EIP operated during the 2020 and 2022 election cycles.[62] The EIP engaged in "switchboarding."[63] "Switchboarding" is a reporting system provided by CISA that allowed state and local officials to identify content on social media that was deemed misinformation. The state and/or local officials would forward the information to CISA, who would then share that information with social-media companies.[64]

Through EIP and CISA efforts, numerous incidents of election misinformation were reported to social-media companies, resulting in alleged content suppression. A report entitled "The Long Fuse" was published by the EIP in 2021.[65] The report reflects that the combined efforts of CISA and the EIP resulted in primarily domestic, not foreign, alleged election misinformation being suppressed.[66] The Long Fuse report confirms this. Specifically, the report states "The primary report spreaders of false and misleading narratives were verified, blue-check accounts belonging to partisan media outlets, social media influencers, and political figures, including

---

[60] The Federalist FBI Confirms It's Restarting Online Censorship Efforts Ahead of 2024 Election Season, May 8, 2024, https://thefederalist.com/2024/05/08/fbi-confirms-it's-retarting-online-censorship-efforts-ahead-of-2024-elections.
[61] [Doc. No. 209-1, p. 49-57] Missouri
[62] [Id., pp. 51-54]
[63] [Id., pp.16-17]
[64] [Id.]
[65] [Doc. No. 209-2] Missouri
[66] [Doc. No. 209-1, pp. 122-23] Missouri

President Trump and his family."[67] The Long Fuse report mentioned President Trump, his two older sons, Charlie Kirk, James O'Keefe, Fox News, The Gateway Pundit, Breitbart News, Just the News, and other conservative persons and/or sites as report spreaders of election disinformation.[68]

The Long Fuse sought to censor both "misinformation" and "disinformation." The report defined "misinformation" as "false, misleading, or exaggerated information or claims".[69] The stated goal of the EIP was "to detect and mitigate the impact of attempts to prevent or deter people from voting or to delegitimize election results."[70] Like the Virality Project, the EIP used "tickets" to identify alleged election misinformation and report it to social-media platforms.[71] The EIP processed 639 in-scope tickets, 72% of which were related to delegitimizing the election results. Among these, 35% of the content reported to Facebook, Instagram, Twitter, TikTok, and YouTube were either labeled, removed, or soft blocked.[72] For example, content of American citizens that there was "fraud in the 2020 election" was suppressed as alleged election misinformation.

The Court acknowledges that the Long Fuse report did not mention Kennedy or CHD; however, it cites to this evidence because it is relevant to the issue here. It was clear that then presidential-hopeful Donald Trump was censored by the actions of one of the Government Defendants. It is not out of the realm of possibility, then, that Kennedy, who is running for president on the 2024 ticket, may suffer the same fate.

In his supplemental brief, Kennedy provided the Declaration of Brigid Rasmussen[73] ("Rasmussen"). Rasmussen has been the Chief of Kennedy's Presidential campaign since October

---

[67] [Doc. No. 209-2, p. 12] Missouri
[68] [Id., pp. 206-209]
[69] [Id., p. 19]
[70] [Id., p. 23]
[71] [Id., pp. 26-29]
[72] [Id., p. 45]
[73] [Doc. No. 52-2] Kennedy

2023. Rasmussen declared that content favorable to Kennedy's campaign on social media has been censored.[74] Rasmussen declared a film entitled "Who is Bobby Kennedy?," hashtags supporting Kennedy, a live stream of Kennedy answering the same questions asked to President Trump and President Biden in the June 27, 2024, Presidential debate, and numerous other supportive content have been censored by social-media platforms.[75] Rasmussen testified that the censorship of pro-Kennedy content "continues to this day."[76]

At the preliminary injunction stage, the degree of evidence to show standing is less than at later stages. "The movant must clearly show only that each element of standing is likely to obtain in the case at hand." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329-30 (5th Cir. 2020).

This Court finds that there is significant evidence showing Kennedy was directly censored in the past, and there is likely a substantial risk that Kennedy's content will be restricted in the future because of the actions of at least one of the Government Defendants. During the preliminary injunction stage, the movant is only required to demonstrate a likelihood of proving standing, which Kennedy has done here.

There is ample evidence in the record showing that Kennedy has been directly censored in the past. Not only was he a part of the alleged "Disinformation Dozen," which was repeatedly flagged and/or censored at the behest of numerous Defendants, but he was also censored for his anti-vaccine and anti-COVID-19 rhetoric. Therefore, Kennedy has more than satisfied the first element for Article III standing, that is, he suffered an injury-in-fact when he was censored. The injury is traceable to the Government Defendants, as there were numerous orders that social-media companies censor the "Disinformation Dozen." Finally, Kennedy has satisfied the third element

---

[74] [Doc. No. 51-2, p.8] Kennedy
[75] [Id., pp. 5-8]
[76] [Id.]

of standing as this injury is likely to be redressed by a favorable judicial decision (in this case, a preliminary injunction).

The analysis does not stop there, though. The Supreme Court made it clear that the movant here cannot satisfy the standing requirements if he only argues injury that resulted from the independent action of some third party that is not before the Court. Kennedy has provided evidence that in the near future, at least one of the defendants will restrict his rights in response to the actions of one of the Government Defendants. In the instant case, Kennedy has provided evidence showing that as a result of the actions of certain Government Defendants, he was restricted in the past. He has provided the Court with concrete links between his injuries and Defendants' conduct. The Court finds that there is further risk for future risk injury here because Kennedy is a 2024 presidential candidate. For example, if, hypothetically, the FBI saw a piece of information related to the 2024 presidential election posted by the Kennedy campaign on social media that it deemed to be "misinformation," then it reached out to CISA, who worked closely with the EIP, who then removed the posts, Kennedy would be censored by the action of one Government Defendant in response to another. Therefore, there is a risk of a real and immediate threat of repeated injury.

For these reasons, the Court finds that Kennedy has Article III standing to pursue his Preliminary Injunction.

    **(ii)**     **CHD**

It is undisputed that CHD has satisfied its burden of showing injury in fact for much of the same reasons that Kennedy has. Because the pandemic is over, Government Defendants argue CHD cannot prove there is a substantial risk CHD will suffer similar injury in the future. In turn, CHD argues that if this were true, then it would not continue to be deplatformed from Facebook and Instagram at present.

In addition to the evidence submitted by CHD and detailed above, CHD submitted the Declaration of Mary S. Holland,[77] the Chief Executive Officer of CHD. Holland declared that not only has CHD been subject to past censorship but is also undergoing present ongoing censorship. Holland declared that on August 17, 2021, Facebook permanently terminated CHD's Facebook account and removed CHD's Facebook page from being searchable or accessible online. Holland further declares CHD was also deplatformed from Instagram and that CHD continues to be deplatformed from both Facebook and Instagram through the present day. Holland further declared that in September 2021, YouTube blocked CHD's account and removed CHD's archived videos, and that CHD continues to be deplatformed from YouTube to the present day.

A "continuing injury" is sufficient to create standing for injunctive relief. *Gonzalez v Blue Cross Blue Shield Ass'n*., 62 F4th 891, 902 (5th Cir. 2023). It is clear from the record that CHD's injury is continuing, as it is still deplatformed from both Facebook and Instagram. As part of the "Disinformation Dozen," the Court finds that CHD has shown that through the actions of the Government Defendants, i.e., the demand on multiple occasions that certain information and/or members of the "Disinformation Dozen" be censored, then it suffered an injury, and that the injury is ongoing. Because the injury is ongoing, the Court need not determine whether a future injury is likely to occur. Further, the evidence supplied by CHD has established a concrete link between its injuries and the Defendants' conduct. For these reasons, the Court finds that CHD has overcome the Article III standing threshold that the *Missouri* Plaintiffs failed to cross, according to the Supreme Court's analysis. Therefore, CHD has Article III standing.

---

[77] [Doc. No. 52-1] Kennedy

### (iii) Sampognaro

Sampognaro is a healthcare professional who resides in Louisiana.[78] As part of her practice, Sampognaro declares that since early 2020, she is in need of accurate and reliable information about the proper treatment of COVID-19 and of Lyme disease. Sampognaro further declares that she follows several specific organizations online- CHD, Dr. Joseph Mercola, GreenMedInfo, and Parent Choice Louisiana. Sampognaro maintains that she is unable to access these organizations due to censorship by social-media platforms that is traceable to Government Defendants. Sampognaro does not allege direct censorship, but censorship of her "right to listen" to preferred organizations.

The Supreme Court addressed the "right to listen" in *Murthy*, 144 S.Ct. 1972, 1977 calling the theory "startingly broad." The Supreme Court further stated there is a First Amendment right to review information and ideas only when the listener has a concrete, specific connection to the speakers. *Id*. Further, the Supreme Court stated that for this action to be recognized, the Plaintiff must point to specific instances of content moderation that caused the listener identifiable harm. *Id*.

Although Sampognaro has identified specific speakers she was deprived of hearing, she has not shown specific instances of content moderation that caused her identifiable harm. Therefore, this Court finds Sampognaro does not have standing.

However, only one Plaintiff is required to have standing for this suit to proceed. *Department of Commerce v. New York*, 588 U.S. 752, 766 (2019).

---

[78] [Doc. No. 52-3, Declaration of Connie Sampognaro] Kennedy

### (iv) Standing Against Specific Government Defendants

Standing is not dispensed in gross. Plaintiffs must demonstrate standing for each claim that they press against each Defendant, and for each form of relief that they seek. *TransUnion LLC v Ramirez*, 594 U.S. 413, 431 (2021). The Preliminary Injunction was previously granted in favor of the Kennedy Plaintiffs against the White House Defendants, Surgeon General Defendants, FBI Defendants, CDC Defendants, and the CISA Defendants. Kennedy has standing for his First Amendment direct censorship claims against the White House Defendants, Surgeon General Defendants, FBI Defendants, CDC Defendants, and CISA Defendants.

## III. CONCLUSION

In conclusion, and for the reasons set forth herein, and in accordance with the limited remand of the United States Court of Appeals for the Fifth Circuit, this Court finds that Plaintiffs Robert F. Kennedy, Jr. and Childrens Health Defense have Article III Standing.

This Court further finds that Plaintiff Connie Sampognaro does not have standing.

MONROE, LOUISIANA this 20th day of August 2024.

_____
**TERRY A. DOUGHTY, JUDGE
UNITED STATES DISTRICT COURT**